**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **loanDepot.com, LLC**<br><br>                    Plaintiff,<br><br>vs.<br><br>**CROSSCOUNTRY MORTGAGE, LLC,<br>KEISHA ANTOINE, SCOTT BONORA,<br>STUART KOLINSKY, BARRY KOVEN,<br>ENRICO MARTINO, SCOTT NADLER,<br>EMELINE RAMOS, ROBERT RAUSH,<br>MICHAEL SECOR, ERIKA VIGNOLA,<br>and YAN ZHENG**<br><br>                    Defendants. | Case No. _____<br><br><br>**ECF Case** |

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS,
AND FOR DAMAGES AGAINST CROSSCOUNTRY**

Plaintiff loanDepot.com, LLC ("loanDepot"), by and through its counsel, Kirkland & Ellis LLP, by way of this Verified Complaint against Defendants Keisha Antoine, Scott Bonora, Stuart Kolinsky, Barry Koven, Enrico ("Rick") Martino, Scott Nadler, Emeline Ramos, Robert Raush, Michael Secor, Erika Vignola, and Yan ("Jenny") Zheng, (collectively, the "Departed NY Employees"), and their new employer, CrossCountry Mortgage, LLC ("CrossCountry") alleges as follows:

**INTRODUCTION**

1.      In federal courts and arbitral tribunals across the United States, mortgage lenders have been forced to seek relief from ongoing and organized raiding attacks on their most important employees, profitable branches, and valuable proprietary data.  The common denominator in nearly all of these actions is CrossCountry Mortgage, an institution which, at the urging of its CEO

Ronald Leonhardt, has adopted tortious interference, aiding and abetting, and theft of trade secrets as core corporate principles.

2.      Plaintiff loanDepot, one of the country's largest and most successful mortgage lenders and a chief competitor to CrossCountry, has been the most frequently targeted CrossCountry victim.  Indeed, loanDepot has already been compelled to seek relief from CrossCountry attacks in New Jersey, California, and Illinois.  This time, loanDepot's New York operations are in the crosshairs.  Since February 23, 2022, CrossCountry has improperly poached no fewer than **32** loanDepot employees from loanDepot branches in Manhattan, Brooklyn, and Fishkill, New York by interfering with loanDepot's contractual and other legal rights.  More troubling still, loanDepot's initial review has shown that many of these employees took valuable loanDepot trade secrets and proprietary customer information with them when they left for CrossCountry and that CrossCountry is actively using this information to capture loanDepot business and customer relationships.  loanDepot brings this action for injunctive relief and damages to address CrossCountry's and the Departed NY Employees' misappropriation of loanDepot's trade secrets, breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference with loanDepot's contracts and prospective economic advantage, and unfair competition.

3.      CrossCountry's focus on loanDepot's New York operations is hardly surprising. loanDepot's New York branches are highly profitable and have produced $846 million billion of loans per year on average.  As has been its *modus operandi* in other regions of the country, CrossCountry seeks to capture this upside by targeting the top producers at loanDepot in the New York region.  And to ensure that it is going after the best of the best, CrossCountry has trained its sights on those loanDepot employees, and their respective team members, who have achieved the

prestigious "Chairman's Elite" status, a recognition reserved for loanDepot's top 250 producers. As it has done in other regions, CrossCountry poached these elite performers in New York and then conspired with these individuals—many of the Departed NY Employees—to orchestrate a widespread New York solicitation effort that resulted in a tidal wave of departures from loanDepot to CrossCountry as well as broad misappropriation of loanDepot's proprietary information and trade secrets.

4.      The exodus of the NY Departed Employees from loanDepot to CrossCountry in this matter occurred in rapid and coordinated succession.  First, Defendant Secor, a loan consultant, and Defendant Ramos, Secor's production assistant, abruptly resigned on February 23, 2022 and February 24, 2022, respectively.  Nine loan consultants and three managers then not coincidentally followed them out the door over the next two weeks, including Defendant Bonora, an area sales manager, and the majority of Bonora's team.   Since those departures, CrossCountry has successfully recruited 18 additional loanDepot employees, comprised of loan consultants, managers, and production assistants.  These solicitations alone have inflicted heavy damage and disruption on loanDepot.  Indeed, the Departed NY Employees are among loanDepot's highest performers—accounting for approximately 81% of the loan volume achieved by loanDepot's New York operations in the past year—and, in some cases, worked for loanDepot for over ten years before being poached.  On information and belief, other loanDepot employees plan to leave loanDepot imminently in order to join CrossCountry.

5.      More damaging still, many of the Departed NY Employees took loanDepot's confidential, proprietary, and trade-secret information on their way out the door.  As just one example, an initial forensic review of Defendant Bonora's loanDepot-issued computer reveals a pattern of egregious and carefully planned misappropriation.  Bonora began laying the groundwork

for his departure to CrossCountry *months* in advance by copying thousands of loanDepot documents—comprising client pre-approvals, client-specific property appraisals, and mortgage applications—to a USB drive. Acutely aware of the myriad lawsuits that have been brought against CrossCountry and the likelihood that his own conduct would be heavily scrutinized, Bonora also attempted elaborate steps to cover his tracks. These transparent efforts were ultimately fruitless but they cement the conclusion that Bonora and the other Departed NY Employees have acted in bad faith.

6.     The information misappropriated by CrossCountry and the Departed NY Employees includes valuable and highly sensitive customer information, pipeline reports, realtor lists, title reports, appraisals, disclosures, pre-approvals, tax documents, financial statements, and paystubs of loanDepot customers. Defendants Ramos and Martino alone ***copied over 10,000 of such documents between them to a USB external storage device before leaving***. All of this information and material is subject to and protected by confidentiality provisions applicable to loanDepot employees, as well as a sweeping body of federal and state privacy laws and regulations that protect the non-public information that consumers provide to their lenders. By interfering with loanDepot's contractual protections and inducing the Departed NY Employees to breach their confidentiality obligations, CrossCountry has improperly obtained information and data that allows CrossCountry to capture a substantial amount of potential mortgage business that rightfully belongs to loanDepot.

7.     This is not mere speculation. Publicly available data has established that ***CrossCountry is actively using this illicitly-obtained information to convert loanDepot customers and capture business properly belonging to loanDepot***. While there generally is a multi-month time-lag in the public recording of mortgages, public data already shows that

CrossCountry has begun to record loans with customers identified in loanDepot's misappropriated information. Indeed, numerous loanDepot customers who worked directly with Departed NY Employees at loanDepot have subsequently closed loans with CrossCountry.

8.       Notably, these wrongfully converted customers are likely just the first of many to be targeted by the Departed NY Employees and CrossCountry, and converted to CrossCountry, using loanDepot confidential and trade secret information. Because of the lag in the recording of mortgages, discovery will need to reveal the extent to which CrossCountry is exploiting the customer data misappropriated from loanDepot.

9.       Besides valuable customer information, the Departed NY Employees and CrossCountry also misappropriated loanDepot's internal personnel and financial information, internal service and operational manuals, the manner and methods of conducting business, and training and educational materials. Among other things, certain of the Departed NY Employees fed compensation and sales data about loanDepot employees to CrossCountry, so that CrossCountry can strategically target specific loanDepot employees. For example, the day before leaving loanDepot, Defendant Secor forwarded to his personal email address a communication identifying loanDepot's "2021 Region 12 LO Rankings," which identified the company's top producers in New York, New Jersey, Connecticut, Massachusetts, and New Hampshire.

10.      CrossCountry is indisputably aware that both the data at issue and the Departed NY Employees implicated in its raid on loanDepot's New York operations are subject to restrictive covenants, including confidentiality restrictions and prohibitions on non-solicitation of other loanDepot employees. In fact, just a few years ago, CrossCountry perpetrated virtually the *same* attack on loanDepot in New York, resulting in litigation in federal court in New Jersey, followed

by a settlement agreement that compensated loanDepot for a raid on loanDepot's New York City branch.

11.      Similarly, just a few months ago, a federal court in Chicago issued a temporary restraining order enjoining CrossCountry from engaging in virtually identical conduct with respect to loanDepot employees in Illinois.  *See loanDepot.com, LLC v. CrossCountry Mortgage, LLC, et al.*, Case No. 22-cv-1874 (N.D. Ill. April 15, 2022) ("Chicago Action"), at Dkt. 21 (enjoining departed loanDepot employees and CrossCountry from directly or indirectly (a) contacting or soliciting any customer or prospective customer listed on the stolen documents; (b) soliciting or inducing any loanDepot employee to terminate their employment or apply to CrossCountry; (c) directly or indirectly accessing, using, relying on, disclosing, or storing any of loanDepot's confidential information or trade secrets).[1]  Tellingly, rather than address the merits of the Chicago Action, CrossCountry has instead cast an array of baseless and unrelated aspersions against loanDepot centered on news articles and mere conjecture.  *See generally* Chicago Action, Dkt. 60. If CrossCountry were to utilize such transparent and unsupported tactics this Action, it would raise

---

[1]      Over the past several years, CrossCountry has systematically poached teams of employees from loanDepot and other large mortgage lenders across the country, knowing full well and in fact expecting that its competitors' employees would, in the course of joining CrossCountry, be violating contractual and legal obligations owed to their employers by soliciting other employees, misappropriating confidential information and trade secrets, and pirating loans in process with competing mortgage lenders.  This has produced widespread litigation against CrossCountry from loanDepot and other mortgage lenders.  *See, e.g., Homeside Fin.*, 8:18-cv-02639, Dkt. 27 (D. Md. 2018) (enjoining CrossCountry from: (a) directly or indirectly using, disclosing, or storing any of plaintiff's confidential information or trade secrets, including employee compensation information, training materials, and customer information; and (b) employing any of plaintiff's employees); *Caliber Home Loans, Inc. v. CrossCountry Mortgage, LLC*, 2:22-cv-00616 (W.D. Wash. 2022); *loanDepot.com, LLC v. Schneider et al.*, 1:22-cv-01874 (N.D. Ill. 2021); *Homeside Financial v. CrossCountry Mortgage, LLC, et al.*, 21-cv-006488 (S.D. Ohio 2021); *American Neighborhood Mortgage Acceptance Company, LLC dba AnnieMac Home Mortgage v. CrossCountry Mortgage, Inc.*, 2:20-cv-00874 (D.N.J. 2020); *loanDepot.com, LLC v. CrossCountry Mortgage, Inc.*, 2:18-cv-12091 (D.N.J. 2018); *Homeside Financial, LLC v. CrossCountry Mortgage, Inc.*, 8:18-cv-02639 (D. Md. 2018); *Freedom Mortgage Corp. v. CrossCountry Mortgage, Inc.*, 2:18-cv-000270 (D. Nev. 2018); *Freedom Mortgage Corp. v. CrossCountry Mortgage, Inc.*, 2:18-cv-5783 (E.D.N.Y. 2018); *Guaranteed Rate, Inc. v. Conn, et al.*, 1:17-cv-03289 (N.D. Ill. 2017); *loanDepot.com, LLC v. CrossCountry Mortgage, LLC, et al.*, Case No. 37-2021-00022044 (Ca. Sup. Ct., San Diego Cty. May 18, 2021) (the "San Diego Action").

abuse of process concerns and even potential claims under New York's recently expanded anti-SLAPP statute.

12.     At this point, it is clear that CrossCountry is willing to absorb such litigation and injunctive relief as a cost of doing (illegal) business.  CrossCountry has simply and willfully continued to pillage loanDepot's employees and business even in the face of restraining orders and expedited litigation in multiple venues.  Indeed, CrossCountry's CEO Leonhardt even offered to pay a $50,000 bounty to anyone who is able to coopt an entire loanDepot branch:  "50k for ever [sic] depot branch they get!" And to help fund this strategy of employee raiding and misappropriation, CrossCountry recently raised a $400 million war chest from outside investors.  Leonhardt is quoted as admitting that this fresh investor capital was intended to grow CrossCountry's geographical footprint and expand its platform.    Then, within one month of the outside funding being announced, CrossCountry executed on its scheme, first raiding loanDepot's Chicago branches, then its New York branches.  Likewise, upon information and belief, CrossCountry has agreed to indemnify poached New York employees in the event of litigation.

13.     If anything, CrossCountry seems intent on taking its misconduct to the next level in this matter.  On April 20, 2022, following the initial wave of defections by the Departed NY Employees to CrossCountry—and just a week after the court in Chicago issued its TRO—loanDepot sent a letter to CrossCountry, copied to certain of the Departed NY Employees, demanding that CrossCountry stop interfering with loanDepot's contractual rights and business relations and ensure that no loanDepot data, customer information, or other confidential information be used or disclosed.  In an apparent effort to lull loanDepot and buy time, CrossCountry initially responded by stating that it would agree to "abide by" the terms of the Chicago Action TRO.  Eager to avoid unnecessary motion practice, loanDepot agreed and drafted

a written agreement that closely tracked the terms of the Chicago Action TRO in order to document CrossCountry's offer.  But CrossCountry's offer was apparently a ruse.  CrossCountry and the Departed NY Employees repeatedly refused to execute the agreement that they themselves had proposed, while using the delay to put the finishing touches on their illicit raid.  During this protracted delay, no fewer than eight *additional* loanDepot employees were improperly solicited and resigned to join CrossCountry.  To date, CrossCountry and the Departed NY Employees have still refused to execute the agreement to abide by the terms of the Chicago Action TRO (despite their offer to do so) or to otherwise provide any reasonable assurance that they are not continuing to improperly solicit loanDepot's employees, interfere with loanDepot's rights, and misuse loanDepot's proprietary data and customer information.

14.    Absent appropriate judicial intervention, CrossCountry will continue building its business by unlawful means—raiding loanDepot for its employees, trade secrets, and other confidential information that loanDepot spent many years and significant resources developing. Unless checked, CrossCountry's and the Departed NY Employees' ongoing attack on loanDepot's NY branches and business will continue to cause irreparable harm to loanDepot by, among other things: (a) impairing loanDepot's goodwill and reputation with its customers and referral sources; (b) destroying loanDepot's customer, referral, and employee relationships; (c) disrupting the continuity of loanDepot's workforce; and (d) threatening the continued disclosure, misuse, and misappropriation of loanDepot's confidential and trade secret information, including legally protected consumer information.

15.    Accordingly, loanDepot brings this action to obtain not just compensatory and punitive damages but preliminary and permanent injunctive relief enjoining Defendants from continuing to inflict irreparable harm on loanDepot by (a) their wrongful, threatened, and

inevitable disclosure, taking, and using of loanDepot confidential, trade secret, and proprietary information; (b) wrongful solicitation of loanDepot employees; and (c) wrongful solicitation of loanDepot clients and customers.[2]

## THE PARTIES

16.     Plaintiff loanDepot.com, LLC is a Delaware limited liability company with its principal place of business in Orange County, California.  loanDepot is registered to do business in New York and operates multiple branches in New York, including in Manhattan, Queens, and Brooklyn.

17.     Defendant CrossCountry is a Delaware limited liability company, with its principal place of business in Brecksville, Ohio.  CrossCountry is registered to do business in New York and has offices in New York.

18.     Defendant Keisha Antoine is a natural person who, upon information and belief, resides in Bay Shore, New York.  Antoine was a Production Assistant at loanDepot until April 15, 2022, when she voluntarily resigned to work for CrossCountry.

19.     Defendant Scott Bonora is a natural person who, upon information and belief, resides in Westfield, New Jersey.  Bonora was an area manager at loanDepot until March 22, 2022, when he voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

20.     Defendant Stuart Kolinsky is a natural person who, upon information and belief, resides in New York, New York.  Kolinsky was a loan consultant at loanDepot until April 29, 2022, when he voluntarily resigned to work for CrossCountry's branch in Purchase, New York.

---

[2]     Pursuant to the Departed NY Employees' arbitration agreements with loanDepot, loanDepot will in parallel file a Demand for Arbitration and a Verified Statement of Claim against each of the Departed NY Employees.  To be clear, loanDepot does not seek to prevent the Departed NY Employees from working for CrossCountry, either through this action or in those arbitrations.  Rather, in this action, loanDepot seeks to enforce the Departed NY Employees' limited and tailored confidentiality and non-solicitation covenants.

21.     Defendant Barry Koven is a natural person who, upon information and belief, resides in Brooklyn, New York.  Koven was a branch manager at loanDepot until March 22, 2022, when he voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

22.     Defendant Rick Martino is a natural person who, upon information and belief, resides in Brooklyn, New York.  Martino was a loan consultant at loanDepot until April 11, 2022, when he voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

23.     Defendant Scott Nadler is a natural person who, upon information and belief, resides in New York, New York.  Nadler was a loan consultant at loanDepot until March 21, 2022, when he voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

24.     Defendant Emeline Ramos is a natural person who, upon information and belief, resides in Pensacola, Florida.  Ramos was a production assistant at loanDepot at the Fishkill, New York loanDepot branch until February 24, 2022, when she voluntarily resigned to work for CrossCountry.

25.     Defendant Robert Raush is a natural person who, upon information and belief, resides in Wyckoff, New Jersey.  Raush was a loan consultant at loanDepot until March 18, 2022, when he voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

26.     Defendant Michael Secor is a natural person who, upon information and belief, resides in Poughkeepsie, New York.  Secor was a loan consultant at loanDepot until February 23, 2022, when he voluntarily resigned to work for CrossCountry's branch in Danbury, Connecticut.

27.     Defendant Erika Vignola is a natural person who, upon information and belief, resides in New York, New York.  Vignola was a loan processor at loanDepot until April 11, 2022, when she voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

28.     Defendant Jenny Zheng is a natural person who, upon information and belief, resides in Glen Head, New York.  Zheng was a loan consultant at loanDepot until April 27, 2022, when she voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

## JURISDICTION AND VENUE

29.     This Court has federal subject matter jurisdiction over Count I, a claim under the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. ("DTSA").  28 U.S.C. § 1331.  This Court further has supplemental jurisdiction over the other counts in this Complaint because they form part of the same case or controversy as Count I.  28 U.S.C. § 1367.

30.     Under 28 U.S.C. § 1391(b)(2), venue is proper in the Southern District of New York because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this judicial district.  *See also* 28 U.S.C. § 1391(b)(3).

31.     CrossCountry is subject to personal jurisdiction in New York given its maintenance of multiple office locations in New York, misappropriation of trade secrets in New York, tortious interference in New York, and other suit-related conduct in New York.

32.     The Departed NY Employees are subject to personal jurisdiction in New York given that they reside and/or work in New York, maintain continuous contacts in New York, misappropriated trade secrets and confidential information in New York, improperly solicited employees in New York, and otherwise purposefully avail themselves of New York.

## FACTUAL ALLEGATIONS

**I.     loanDepot's Business and Employment of the Departed NY Employees**

33.     loanDepot opened in 2010 with approximately 50 employees.  The following year, loanDepot achieved $3 billion in annual loan volume, and thereafter quickly grew to become one of the country's largest and most successful mortgage lenders.  Today, loanDepot has over 5,000 employees and is the second largest non-bank consumer lender in the U.S.

34.     The Departed NY Employees were integral to loanDepot's rapid growth and success.

### a)     Defendant Antoine

35.     Antoine started with loanDepot in 2020.  At the time of her resignation, she was a production assistant for Defendant Bonora.  As a production assistant, Antoine supported Bonora in administrative marketing and servicing clients and business partners.  She helped manage Bonora's active pipeline and was responsible for, among other things, reviewing customer loan files for completeness.  Antoine was expected to go the "extra mile" for customers to build trust, loyalty, and satisfaction through the loan process.  Antoine was a highly trusted employee who owed a fiduciary duty to loanDepot.

36.     In 2021, Antoine's total gross pay was just under six figures.

### b)     Defendant Bonora

37.     Bonora started with loanDepot in 2012 as a producing branch manager in Manhattan.  Over the last decade, and with substantial support and investment from loanDepot, Bonora helped grow loanDepot's New York operations, expanding the business to three branches and developing it into one of loanDepot's top-three producing branches in the country.

38.     At the time of his resignation, Bonora was an area sales manager for New York City.  As an area sales manager, Bonora was responsible for supervising and managing the day-to-day affairs of 55 loan consultants, branch and sales managers, and production assistants.  Bonora was also responsible for selling mortgage loan products and services to residential mortgage customers as well as developing and maintaining a network of relationships with existing and prospective clients.  Bonora was a highly trusted employee who owed a fiduciary duty to loanDepot.

39.     As one of loanDepot's highest performing employees, Bonora achieved loanDepot's Chairman's Elite status, an accolade awarded to the company's top 250 loan consultants.  In 2021, Bonora generated over $100 million in loan applications (the third highest among all of loanDepot's branches in the northeastern states) and in funded loans (the fifth highest in the region).

40.     Bonora is a licensed mortgage loan originator ("MLO") in eight states, including New York.  Each of his MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

41.     In 2021, Bonora's total gross pay was well into the seven figures.

      c)      **Defendant Kolinsky**

42.     Kolinsky started with loanDepot in 2012.  As a loan consultant, he was responsible for cultivating loan referrals, including through referral partners, clients, and agents.  He collaborated with borrowers to determine the best loan programs to meet their individual needs and preferences, based on their income, assets, credit, and property.  Kolinksy collected documentation from borrowers, including pay statements, bank account statements, and other highly personal, confidential, and protected financial information.  He would negotiate and confirm rates, fees, and lock in terms with clients.  Kolinsky would then lock in a loan in loanDepot's system on the agreed upon terms, and manage the locked pipeline through the funding of the loan.  He was expected to communicate regularly with clients to meet their expectations and to further develop the customer relationship.  Kolinsky was a highly trusted employee who owed a fiduciary duty to loanDepot.

43.     Kolinsky is a licensed MLO in four states, including New York.

44.     In 2021, Kolinsky's total gross pay was over six figures.

d) **Defendant Koven**

45.     Koven joined loanDepot in 2018 as a loan officer reporting to Bonora.  At the time of his resignation, he was a branch manager at the Brooklyn branch.  As a branch manager, Koven was responsible for supervising and managing the day-to-day affairs of 15 loan consultants and production assistants.  Koven was also responsible for selling mortgage loan products and services to residential mortgage customers as well as developing and maintaining a network of relationships with existing and prospective clients.  Koven was a highly trusted employee who owed a fiduciary duty to loanDepot.

46.     Koven is a licensed MLO in five states, including New York.

47.     In 2021, Koven's total gross pay was well into the six figures.

e) **Defendant Martino**

48.     Martino joined loanDepot in 2017.  As a loan consultant, Martino had the same duties and responsibilities as Kolinsky, described above.   As with the other Departed NY Employees, Martino was a highly trusted employee who owed a fiduciary duty to loanDepot.

49.     Martino is a licensed MLO in New York.

50.     In 2021, Martino's total gross pay was over six figures.

f) **Defendant Nadler**

51.     Nadler joined loanDepot in 2015.  As a loan consultant, Nadler had the same duties and responsibilities as Kolinsky and Martino, described above.  As with the other Departed NY Employees, Nadler was a highly trusted employee who owed a fiduciary duty to loanDepot.

52.     Nadler is a licensed MLO in six states, including New York.

53.     In 2021, Nadler's total gross pay was well into the six figures.

g)     **Defendant Raush**

54.     Raush came to loanDepot in 2015 through loanDepot's purchase of another mortgage lender, Mortgage Master.  As a loan consultant, Raush had the same duties and responsibilities as Kolinksy and Martino, described above.  As with the other Departed NY Employees, Raush was a highly trusted employee who owed a fiduciary duty to loanDepot.

55.     Raush is a licensed MLO in five states, including New York.

56.     Like Bonora, Raush belonged to loanDepot's Chairman's Elite, reflecting his status as one of loanDepot's highest-performing loan consultants.

57.     In 2021, Raush's total gross pay was well into the six figures.

h)     **Defendant Secor**

58.     Secor started with loanDepot as a loan consultant in 2019.  Secor had the same duties and responsibilities as Kolinksy, Martino, and Raush, described above.  As with the other Departed NY Employees, Secor was a highly trusted employee who owed a fiduciary duty to loanDepot.

59.     Secor is a licensed MLO in two states, including New York.

60.     Like Bonora and Raush, Secor belonged to loanDepot's Chairman's Elite.

61.     In 2021, Secor's total gross pay was nearly half a million dollars.

i)     **Defendant Ramos**

62.     Ramos started at loanDepot in 2019.  At the time of her resignation, she was a production assistant for Secor.  As a production assistant, Ramos supported Secor and had the same duties and responsibilities as Antoine, described above.  Ramos was expected to go the "extra mile" for customers to build trust, loyalty, and satisfaction through the loan process.  Ramos was a highly trusted employee who owed a fiduciary duty to loanDepot.

63.     In 2021, Ramos's total gross pay was over six figures.

### j)   **Defendant Vignola**

64.     Vignola started at loanDepot in 2013.  At the time of her resignation, she was a loan processor.  As a loan processor, Vignola assisted with the closing of loans by collecting and organizing application paperwork for the underwriting process.  Vignola was a highly trusted employee who owed a fiduciary duty to loanDepot.

65.     In 2021, Vignola's total gross pay was over six figures.

### k)   **Defendant Zheng**

66.     Zheng joined loanDepot in 2018.  At the time of Zheng's resignation, Zheng was a loan consultant.  As a loan consultant, Zheng had the same duties and responsibilities as Kolinsky, described above.  As with the other Departed NY Employees, Zheng was a highly trusted employee who owed a fiduciary duty to loanDepot.

67.     Zheng is a licensed MLO in six states, including New York.

68.     In 2021, Zheng's total gross pay was over six figures.

## II.   **The Departed NY Employees' Restrictive Covenants**

69.     To safeguard its confidential, proprietary, and trade secret information from being used for any unauthorized purpose—*i.e.*, for any purpose other than conducting loanDepot's business—and to protect its substantial investment in its employees, loanDepot requires its employees to agree to confidentiality, non-disclosure, and non-solicitation restrictions.

70.     The Departed NY Employees agreed to be bound by such obligations as a condition of their employment at loanDepot and receipt of loanDepot's confidential, proprietary, and trade secret information.  All Departed NY Employees are bound by identical restrictive covenants by virtue of the respective Retail Master Incentive Plan agreements ("Incentive Agreement") or Offer

Letter (collectively, the Incentive Agreement and Offer Letter are the "Agreements") or both.[3] The Departed NY Employees' Agreements and are identical in all material respects related to confidentiality, non-disclosure, and non-solicitation.  In each Agreement, the Departed NY Employee is referred to as the "Participant."

71.    Pursuant to the restrictive covenants in the Agreements, the Departed NY Employees agreed to, among other things, keep confidential loanDepot's proprietary and trade secret information.  The Departed NY Employees also agreed, while employed and for a period of one year following cessation of employment, to not solicit or induce an employee or independent contractor of loanDepot to, among other things, apply for employment with another business.

72.    As alleged herein, the Departed NY Employees have willfully breached these obligations, and CrossCountry has tortiously interfered with same.

        a)    **Confidentiality and Non-Disclosure Obligations**

73.    With respect to loanDepot's confidential, proprietary, and trade secret information, the Departed NY Employees agreed in the Agreement, that:

> while employed by the Company [and] at any time thereafter, Participant will keep strictly confidential and will not, directly or indirectly, disclose to any person or entity or use for the benefit of Participant or any other person or entity any "Confidential Information," as defined below, that Participant learned, obtained or had access to in the course of or as the result of Participant's employment with Company or using Company's systems, access, means or computing or mobile devices.  Participant agrees, at all times, to take appropriate and reasonable steps to safeguard Confidential Information and to protect it against disclosure, misuse, unauthorized access, espionage and theft.

**Exs. A-M**, Section VI(A)(1) (emphasis added).

74.    The Agreement defines "Confidential Information" to include the following:

> information and materials in any medium learned, obtained or accessed by Participant because of or through his or her employment with Company, or using

---

[3]    The executed agreements for the Departed NY Employees are attached as Exhibits A-M.

Company's systems, access means or computing or mobile devices, <u>about Company's</u> business, prospects, plans and operations, products, processes, methods of doing business, systems, <u>databases</u> and technology, inventions and other intellectual property, loan origination and <u>marketing practices</u>, training, services, <u>and Customers</u> (as defined herein) and that is not known or readily available through proper and lawful means to the general public as well as Customer data. "Customers" mean[s] . . . <u>visitors or registrants to Company websites, leads, callers to Company call centers, loan or prequalification or pre-approval applicants (whether or not a loan is approved or closed or denied), and loan customers, in each case, past, present and future</u>.

*Id.*, Section VI(A)(2) (emphasis added).

75.     The Departed NY Employees further agreed to return all Confidential Information and property to loanDepot upon termination of their employment or upon loanDepot's request. *See id.*, Section VI(A)(4), (5).  The Departed NY Employees also agreed that they would "<u>not share, copy, transmit, or use such Confidential Information or property</u> except only to the extent required solely for and in the course of Participant's employment by Company."

*Id.*, Section VI(A)(4) (emphasis added).

**b)      Non-Solicitation Obligations**

76.     The Agreement also protects loanDepot's investment in its employees through a non-solicitation provision prohibiting the Departed NY Employees, during their employment with loanDepot and for one year thereafter, from "<u>solicit[ing] or induc[ing], directly or indirectly,</u> whether on his or her own behalf, working with or through others, on or behalf of or through any other person, business or entity, <u>an employee or independent contractor of Company to terminate or breach his or her employment or contractor relationship with Company or apply for employment or a contractor relationship with any person, business or entity</u>."

*See id.*, Section VI(B) (emphasis added).

77.     The Departed NY Employees expressly agreed that loanDepot would be entitled to injunctive relief for breaches of any of the foregoing provisions:

Remedies.  Participant acknowledges that monetary damages alone will not be a sufficient remedy for Participant's breach of any provision of this Section VI of this Plan and that, in addition to other remedies available to Company, <u>Company shall be entitled to specific performance, injunctive relief, or such other equitable relief a court of competent jurisdiction deems appropriate</u>.  The prevailing party in any legal action arising from or relating to Section VI of this Plan shall be entitled to recover its reasonable attorneys' fees and costs including those incurred in any related appeal.

*See id.*, Section VI(C) (emphasis added).

### c)    The Covenants Are Reasonable

78.    The Agreements are reasonable and tailored to protect loanDepot's legitimate interests including, but not limited to, its trade secrets, confidential customer information, customer goodwill, and employees.

79.    loanDepot expended substantial time, energy, money, and ingenuity in collecting and compiling its customer lists and documents, referral sources, and training materials.  Because the mortgage loan industry is a competitive and regulated industry, information pertaining to loanDepot's business plans, products, services, training materials, strategies, employees, and customers is confidential and proprietary information, deserving trade-secret protection. loanDepot developed and marketed an extremely successful mortgage loan operation that is highly dependent upon maintaining the secrecy of this information.

80.    In addition, loanDepot also devotes substantial resources to the recruitment, training, mentoring, and compensation of its employees so that they can perform the necessary services for customers as well as develop and nurture the close relationships necessary to keep customers satisfied.  The restrictive covenants that prohibit the direct or indirect solicitation of loanDepot employees are reasonable and narrowly tailored to protect loanDepot's legitimate interests in its investment in its employees and maintaining the stability of its workforce.

81.     In fact, CrossCountry's own employment agreements restrict its employees from using or disclosing the same confidential materials and define such information as "a trade secret." *CrossCountry Mortgage, LLC v. American Neighborhood Mortgage Acceptance Co., LLC, d/b/a AnnieMac Home Mortgage*, No. 2:22-cv-01119 (D.N.J. Mar. 1, 2022), Dkt. 1, ¶¶ 22-23.  These same agreements prohibit the direct or indirect solicitation or hiring of CrossCountry employees for two years following the end of their employment.  *CrossCountry Mortgage, Inc. v. Messina et al,* No. 1:19-cv-01021 (N.D. Ohio May 7, 2019), Dkt. 1, ¶ 17.

82.     CrossCountry has emphasized that soliciting its customers, prospective customers, and referral sources "constitutes improper interference with [CrossCountry's] legitimate, actual and prospective business expectations and contractual relations with its customers, prospects and referral sources; constitutes misappropriation of [CrossCountry's] goodwill, and unfairly and unjustifiably harms [CrossCountry]."  *Id*. ¶ 20.

### III.    LoanDepot's Policies Protecting Its Confidential Information

83.     loanDepot takes seriously the protection of its confidential and trade secret information, including the security of confidential, non-public consumer information.  Customers trust loanDepot with their most sensitive financial information, and expect loanDepot to take every reasonable measure to protect that information from improper use and disclosure.

84.     Customer privacy, and the non-disclosure of confidential customer information, are vitally important to loanDepot, and loanDepot would be seriously harmed by the breach of customer privacy or unauthorized disclosure of its customers' confidential information.

85.     As licensed loan originators, Bonora, Kolinsky, Koven, Martino, Nadler, Raush, Secor, and Zheng were required to comply with the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801-6809 ("GLBA"), which governs the treatment of confidential nonpublic information of consumers

by financial institutions, along with comparable state laws and regulations governing consumer privacy.

86.     In addition to requiring that employees agree to confidentiality and non-disclosure provisions, loanDepot has implemented significant controls to safeguard and secure its information and that of its valued consumers.

87.     For example, loanDepot's proprietary databases that house confidential consumer information are password-protected and require dual authentication.  Once an employee accesses these databases with unique credentials, the employee has access only to the information that the employee needs to perform his or her duties on behalf of loanDepot.

88.     To further safeguard its data, information systems, and consumer and employee information, loanDepot developed an Information Security Program ("ISP"), which is governed by a written Information Security Policy ("ISP Policy").  Employees are required to read and acknowledge the ISP and ISP Policy.  *See* **Ex. N**.

89.     Pursuant to the ISP, the following activities are strictly prohibited: (a) accessing data, a server, or an account for any purpose other than conducting company business, even if the employee otherwise has authorized access; (b) sharing company information with non-approved parties outside the company; and (c) storage of company information in non-company managed locations such as personal drives, personal cloud storage, and devices.

90.     loanDepot's Employee Handbook also addresses safeguarding confidential information, including by (i) referencing a "Confidential and Consumer Information" policy, which states, "the Company has placed special emphasis on the appropriate collection, storage and use of customer information.  Your role in privacy protection is critical"; and (ii) incorporating the

ISP Policy referenced above.  The Departed NY Employees acknowledged that they received, read, and agreed to comply with the policies in the Employee Handbook.

91.     These measures—confidentiality agreements, the ISP policy, loanDepot's detailed handbook, and password and database protection—are significant and thorough steps loanDepot takes to protect its trade secret and confidential information.

### IV.     The Coordinated Departure of the Departed NY Employees

92.     At the end of July 2021, having already raided loanDepot branches in Manhattan and San Diego, Leonhardt texted loanDepot's National Director of Business Development that he was offering CrossCountry's recruiters a $50,000 bounty for every loanDepot branch they could coopt.

93.     Since then, CrossCountry has received $400 million from outside investors, providing CrossCountry with fresh capital to fund its illegal aspirations.  At the time, Leonhardt crowed that the "financing positions CrossCountry Mortgage for accelerated growth as we continue to expand our platform, geographical footprint and residential mortgage offering."  One of CrossCountry's funders is likewise quoted as stating that "CrossCountry Mortgage continues to execute its organic and inorganic growth strategy."

94.     CrossCountry then began targeting loanDepot's operations in Chicago and New York.

95.     Although the departures of loanDepot employees for CrossCountry in the New York region did not begin until late February 2022, in the months beforehand Defendant Bonora researched the details of CrossCountry's 2018 raid of loanDepot's New York branches.  From this, Bonora would have been keenly aware of the pitfalls by CrossCountry and that cohort of departed employees that led to loanDepot's 2018 lawsuit.

96.    Thus, in this case, the first wave of departures included seven of Bonora's deputies, but not himself.  In the immediate aftermath, Bonora feigned to show his loanDepot superiors that he was attempting to stem the tide of additional departures.  In reality, Bonora had already engaged in wide-scale copying of loanDepot's confidential information and spent a weekend day alone in loanDepot's New York City office under false pretenses, described further below.  Two weeks later, it was Bonora's turn and he abruptly resigned.  A surge of additional departures followed thereafter.

97.    According to NMLS Consumer Access and the CrossCountry website, at least 17 of the departed employees, including Bonora and 11 of his deputies, joined the same CrossCountry branch at 37 N. 15 Street, Suite 108, Brooklyn, New York 11222 (the "Brooklyn Branch").

98.    The nature and circumstances of these closely-timed coordinated departures, along with CrossCountry's well documented history of facilitating similar raids across the country, leads to only one explanation:  the departures were the result of rampant improper solicitation of loanDepot employees by the Departed NY Employees, with the knowledge and support of CrossCountry.

99.    Specifically, the departures began on February 23, 2022 when Defendant Secor resigned.  The next day, February 24, Secor's production assistant, Defendant Ramos, resigned.  According to NMLS Consumer Access, Secor commenced employment with CrossCountry effective February 24, 2022 at a branch location in Danbury, Connecticut.  According to his LinkedIn profile, Secor is now a "Loan Officer" for CrossCountry.  Upon information and belief, this position is virtually identical to the position Secor held at loanDepot.  Upon information and belief, Ramos joined CrossCountry in a position virtually identical to her position at loanDepot on February 24, 2022.

100.     The Ramos and Secor resignations were a harbinger of things to come.  Just two weeks later, on March 11, 2022, loanDepot employee Stanislav "Stan" Aleshin resigned from loanDepot's Manhattan branch.  Aleshin had worked at loanDepot as a loan consultant since 2020 and reported to Defendant Bonora.  According to NMLS Consumer Access, Aleshin commenced employment with CrossCountry, effective March 11, 2022, at the Brooklyn Branch.  According to his LinkedIn profile, Aleshin is now a "Senior Mortgage Loan Officer" for CrossCountry.  Upon information and belief, this position is virtually identical to the position Aleshin held at loanDepot.

101.     Then the dam broke.  On March 18, five additional loan consultants, all of whom reported to Defendant Bonora, resigned:  Yusheng "Ron" Liu, Daniel Meidan, Giovanni Narvaez, Defendant Raush, and Llewellyn Tejada.  According to NMLS Consumer Access, Liu and Tejada commenced employment with CrossCountry effective, March 18, 2022, at the Brooklyn Branch.  Defendant Raush commenced employment with CrossCountry at the Brooklyn Branch effective March 21, 2022.  Meidan commenced employment with CrossCountry effective March 21, 2022, in Cranford, New Jersey.  Narvaez commenced employment with CrossCountry effective March 30, 2022, in Boca Raton, Florida.  According to their LinkedIn profiles, Meidan, Narvaez, Defendant Raush, and Tejada are Senior Loan Officers at CrossCountry.  Upon information and belief, these positions are virtually identical to the positions they held at loanDepot.

102.     Since these coordinated resignations on March 18, loanDepot lost 24 more loan consultants, managers, loan processors, and production assistants from its New York branches to CrossCountry.

103.     On March 21, 2022, Defendant Nadler, who also reported to Bonora, abruptly resigned.  He joined Aleshin, Liu, Defendant Raush, and Tejada at the Brooklyn Branch, effective March 23.

104.    On March 22, 2022, five more loanDepot employees left, including three managers, for the Brooklyn Branch.  That day, Defendant Bonora resigned, joining the Brooklyn Branch effective March 29.  In tandem, Rafael Reyes and Defendant Koven, both of whom reported to Bonora, resigned.  Reyes and Defendant Koven joined the Brooklyn Branch effective March 24. Dan and Jaroslaw ("Jarek") Kwiatkowski, loan consultants at loanDepot who reported to Defendant Koven, also resigned on March 22.  Jarek Kwiatkowski joined the Brooklyn Branch, effective March 25, and Dan Kwiatkowski joined the Brooklyn Branch, effective March 30.

105.    On March 28, Robert London, a loan consultant who reported to Bonora, resigned and joined the Brooklyn Branch, effective the next day.

106.    On March 30, Anthony ("Tony") Ayala, a sales manager who reported to Bonora, resigned and joined the Brooklyn Branch, effective the next day.

107.    On April 5, Henry Greenberg, a loan specialist who reported to Bonora, resigned and joined the CrossCountry branch located in Cranford, New Jersey, effective April 12.

108.    Over the next month, Defendant Vignola, a loan processor, and production assistants Defendant Antoine, Emilio Sosa, Alexandra Gong, Alesia Khan, and Patricia Zielenski resigned from loanDepot and joined CrossCountry.  Antoine, Sosa, and Khan previously supported Bonora at loanDepot.  Gong supported Liu at loanDepot.

109.    On April 11, Defendant Martino, a loan consultant who reported to Bonora, resigned and joined the Brooklyn Branch, effective April 15.

110.    On April 22, Robert LePanto, a loan processor, resigned from loanDepot and joined the Brooklyn Branch, effective May 2, 2022.

111.    On April 27, Defendant Zheng, a loan consultant who reported to Bonora, resigned and joined the Brooklyn Branch, effective May 2, 2022.

112.    On April 28, David Ostrowsky, a loan consultant who reported to Koven and previously reported to Bonora, resigned and joined the Brooklyn Branch, effective May 2, 2022.

113.    On April 29, Defendant Kolinsky, a loan consultant who reported to Bonora, resigned from loanDepot and joined the CrossCountry branch located in Purchase, NY, effective May 2, 2022.

114.    On May 3, Faheem Hossain, a loan consultant who reported to Bonora, resigned from loanDepot and joined the Brooklyn Branch, effective that same day.

115.    On May 4, Ilya Vaysberg, a loan consultant who reported to Koven, and Natalya Trejos, Vaysberg's production assistant, resigned from loanDepot.  Vaysberg joined the Brooklyn Branch effective May 9, 2022.

116.    On May 16, Katara Bush, a loan processor, resigned from loanDepot to joing CrossCountry.

117.    The coordinated nature of these departures, combined with their rapid succession, erases any doubt that rampant solicitation was involved.  *See Speedmark Transp., Inc. v. Mui*, 778 F. Supp. 2d 439, 443 (S.D.N.Y. 2011) (suspicious timing of defendants' resignations "support[s] a plausible claim that [defendants] violated the terms of their employment contracts" by soliciting employees with whom they worked to leave).

**V.    The Departed NY Employees Breach Their Contractual Obligations to loanDepot, with the Knowledge, Encouragement, and Assistance of CrossCountry**

118.    During their employment at loanDepot, and continuing after they left loanDepot to join CrossCountry, the Departed NY Employees schemed with CrossCountry to solicit additional loanDepot employees and to misappropriate loanDepot's confidential information, trade secrets, employees, and customers.

119.    Upon information and belief, CrossCountry induced at least some Departed NY Employees with both a signing bonus and an *additional* bonus if later-solicited employees achieved a certain dollar amount of loan origination.  This incentivized the Departed NY Employees to not only leave loanDepot but also to then solicit other existing loanDepot employees to leave loanDepot and join CrossCountry.  It further incentivized the Departed NY Employees to abscond with vast quantities of protected and confidential information that would enable them to transfer existing and prospective business to CrossCountry and hit the ground running with a ready-made book of business developed at loanDepot.

120.    Upon information and belief, the Departed NY Employees also agreed to misappropriate loanDepot confidential and trade secret information, including accessing, copying, and transferring to CrossCountry detailed customer lists with confidential information about thousands of loanDepot customers and referral sources.

121.    Upon information and belief, as part of their scheme with CrossCountry, the Departed NY Employees also deliberately stalled borrowers and potential borrowers from doing business with loanDepot so that they could convert this business to CrossCountry.

122.    CrossCountry knew the identity of the loanDepot employees who were the highest producing loan consultants and could wield influence over other employees.[4]  CrossCountry communicated with loanDepot employees through the loanDepot employee's personal email accounts to deliberately conceal Defendants' knowingly wrongful misconduct.

---

[4]    An independent forensic investigation of the devices of defendants in the Chicago Action revealed that before leaving for CrossCountry certain loanDepot loan consultants emailed to their personal email addresses screenshots of a loanDepot Retail "leaderboard," which included information regarding the performance of loanDepot's top originators by purchase volume and units and loan amount volume and units.  Not coincidentally, this leaderboard identified multiple individuals who resigned from loanDepot's New York branches to join CrossCountry, and was likely used by CrossCountry to target and solicit loanDepot's top originators.

123.    CrossCountry was also aware of, or reasonably should have been aware of, the Departed NY Employees' restrictive covenants and legal obligations owed to loanDepot. loanDepot has filed suit against CrossCountry in three jurisdictions, including a lawsuit relating to the same offices at issue here (the Manhattan branch raid in 2018).  Indeed, agreements containing identical restrictive covenants were part of the record in the San Diego Action as recently as June 2021, putting CrossCountry on notice of the form agreements applicable to all loanDepot employees at least as of that date.  Moreover, CrossCountry requires its own employees to execute employment agreements with similar restrictive covenants.  *See, e.g.*, *CrossCountry Mortgage, Inc. v. Messina et al.*, 1:19-cv-01021 (N.D. Ohio) (alleging that two former CrossCountry employees violated the restrictive covenants of their employment agreements, including confidentiality, non-disclosure, and non-solicitation provisions, when they set up shop for a competing mortgage lender).  It is not plausible that CrossCountry was unaware of the Departed NY Employees' restrictive covenants.

124.    Defendants' ongoing and improper misappropriation of loanDepot's confidential and trade secret information and solicitation of loanDepot employees has caused, is continuing to cause, and threatens to cause, irreparable harm to loanDepot by, among other things, (a) impairing loanDepot's goodwill and reputation with its customers and referral sources; (b) destroying loanDepot's customer, referral, and employee relationships; (c) disrupting the continuity of loanDepot's workforce; and (e) threatening the continued disclosure, misuse, and misappropriation of loanDepot's confidential and trade secret information, including legally protected consumer information and proprietary operational, training, and educational materials.

125.    Prior litigation filed by loanDepot against CrossCountry in multiple jurisdictions has reinforced to CrossCountry and would-be-departing loanDepot employees that loanDepot will

vigorously pursue its rights and the protection of its confidential information and trade secrets. This knowledge certainly resulted in efforts by Defendants to mask their wrongdoing to cover up the coordinated exodus from loanDepot.  Nevertheless, based upon an initial independent forensic examination of the Departed NY Employees' loanDepot devices and available emails, loanDepot was still able, in a short amount of time, to identify significant evidence of misconduct.  A few examples of the Departed NY Employees' misconduct are described below.   loanDepot's investigation is ongoing.

a)   <u>**Defendant Bonora**</u>

126.    In September 2021, Bonora used his loanDepot-issued computer to review an opinion from the District Court of New Jersey denying CrossCountry's motion to dismiss as to all but one claim in the New Jersey Action.  This opinion detailed CrossCountry's and the New Jersey defendants' specific wrongdoing, including how certain former loanDepot employees emailed private customer information, loan-related documents, and pipeline reports to personal email addresses.  This opinion would have allowed Bonora to gain an in-depth understanding of how to attempt to avoid tipping off loanDepot to his and CrossCountry's scheme.

127.    In November and December 2021, Bonora began to read extensively about CrossCountry online, including about the "Carbon Team," which includes the former loanDepot employees who were the subject of the 2018 CrossCountry raid and legal action.  Bonora also researched CrossCountry's capital raising efforts, including the $400 million referenced above.

128.    On January 23, 2022, Defendant Bonora transferred his "Clients" folder from his desktop to a USB drive.  This folder contained over 200 folders named after clients, and those folders in turn contained hundreds of files.  These files contained details about loanDepot's former, existing, and potential customers, and included extensive non-public customer information, such as pre-approvals, client-specific property appraisals, and mortgage applications.

29

129.    Less than two weeks later, on February 8, Bonora suspiciously researched several CrossCountry employees, including Sam Hansen.  Hansen had operated a mortgage team at a loanDepot branch in San Diego and subsequently took his entire team to CrossCountry in November 2021.  Bonora had no legitimate business reason to do so, other than to prepare for his own impending departure to CrossCountry.

130.    On March 9, Bonora looked up several more CrossCountry employees, including Steven Lo Bue, a Regional Vice President based in Hackensack, New Jersey.

131.    On Sunday, March 6, roughly two weeks before his abrupt departure from loanDepot, Bonora made an unusual and out of the ordinary request:  he asked a loanDepot employee to provide him weekend access to loanDepot's Manhattan office so that Bonora could supposedly retrieve a "cornhole game" for his vacation house.  This was particularly out of character because Bonora did not typically come to the Manhattan office, let alone on a weekend.  Nevertheless, Bonora spent several hours in the office alone that Sunday.  Despite having claimed that he needed access to the office to retrieve the cornhole game, Bonora conspicuously left the game in his office that day.

132.    On March 18, after five of Bonora's team members left for CrossCountry, Bonora wrote to his loanDepot supervisor:  "Need to talk.  I need a little time to digest but we have multiple resignations today.  Please give me a few [sic] I am going to take a walk and get my emotions and stress in check."  Upon information and belief, Bonora deliberately intended to deceive his supervisor by claiming "stress" so that he could continue collecting loanDepot's confidential information undetected and prepare for his own impending departure.

133.    Thereafter, on March 21, the day before he left loanDepot for Cross Country, Bonora asked a loan processing manager to supply him with the pipeline reports for Liu, Raush,

Tejada, and Narvaez, which he received shortly thereafter.  Each of these loan consultants reported to Bonora prior to leaving for CrossCountry on March 18.  The pipeline reports identified, among other things, the loan number, borrower's name, <u>credit score</u>, property address, status of the loan, loan type, product type, and <u>rate and rate-lock information</u>.  Also on March 21, Bonora received an email forwarded from Nadler, who resigned that same day and joined CrossCountry.  Nadler's email included his notes on the status of each of his clients.

134.    Then, on March 22, Bonora suddenly resigned from loanDepot.  Before returning his laptop to loanDepot on the day of his departure, Bonora purged the "Clients" folder from his computer and cleared his email from Outlook, clearly in an effort to try and hide his prior transfer of the "Clients" folder to the USB drive.[5]

135.    Not coincidentally, loanDepot has since discovered that, on May 24, 2022, a CrossCountry loan where Bonora is identified as the loan officer was recorded for borrower J. C.,[6] a client that Bonora worked with in 2019 at loanDepot.

        **b)**      <u>**Defendant Secor**</u>

136.    On February 22, the day before he left loanDepot, Defendant Secor forwarded numerous emails from his loanDepot email account to his personal email.  These emails included loanDepot's "2021 Region 12 LO Rankings," which identified the company's top producers in New York, New Jersey, Connecticut, Massachusetts, and New Hampshire, as well as a loanDepot

---

[5]    The day before he left loanDepot, Bonora enclosed a USB drive in an envelope with a contrived letter addressed to his supervisor purporting to claim that Bonora copied data onto the USB drive when his company computer was not working properly, and he was compelled to preserve information before it became irretrievable.  He further claimed that he deleted his personal data from the USB drive and was returning the customer data, having not made any copies of the USB drive.  Bonora's claim that he needed to copy extensive amounts of loanDepot's confidential information to a USB drive is transparently a pretext for his misappropriation.

[6]    For privacy reasons, loanDepot customers referenced in this Complaint will be referred to only by the initials of their first and last names.

"guide to extended rate locks."  That same day, Secor copied over 1,000 documents to a USB drive, including pre-approvals with income statements, pay stubs, tax returns, and other information typically supplied by borrowers in support of their mortgage applications, which documents contained non-public information regarding scores of customers.  Secor also copied folders named: (a) "purchase leads," which folders contained, among other documents, income documentation, financial statements, pay stubs, tax forms, copies of identifications, loan estimates, and rate information for loan applicants; (b) "Refi leads," which contained, among other documents, loan applications, pay stubs, tax forms, and loan estimates; (c) "work folder," which contained, among other documents, loanDepot's pricing and rankings; and (d) "2019 Closed LD," "2020 closed LD," "2021 closed LD," and "2022 Closed Files."

137.    On February 24, the day after he left, Defendant Secor copied two more folders of files to a USB drive: "new info 2022," which contained subfolders with loan applicants' names including G.R., B.M. and L., emails, asset lists, credit reports, and other documents relating to their applications; and "updates Feb," which contained pricing data, appraisals, final lists of Secor's closings from prior years, and a calculator spreadsheet.

138.    In addition to this blatant conversion of loanDepot information, Defendant Secor also repeatedly advised customers to call or text his cell phone regarding pre-approvals in the lead-up to his departure.  Upon information and belief, Secor was intentionally stalling these customers and providing them with his personal contact information so that he could bring these opportunities to CrossCountry.

139.    On April 12, 2022, after Secor began his employment with CrossCountry, Secor was recorded as the loan officer for a loan to D. B., a loanDepot client to whom Secor had issued a loanDepot preapproval dated February 9, 2022.

140.    The "new info 2022" folder Secor copied on February 24 contained a folder named after D. B., and the folder contained at least a file named "docs [B.].pdf."

141.    Similarly, on April 20, 2022, a CrossCountry loan where Secor is identified as the loan officer, was recorded for loanDepot customer G. R.   When an attorney involved with the purchase received an email from CrossCountry prior to closing, she forwarded the email to Secor's loanDepot email account and wrote "Do you know anything about this?   I thought they were working with Loan Depot [. . .].   Who are these people?"

142.    The "new info 2022" folder Secor copied on February 24 contained a folder named after G. R., which contained subfolders named "Assets" and "Misc."  The "Misc" folder contained at least a file named "credit [G.] Dec 24 21.pdf."

143.    Also on April 20, 2022, a CrossCountry loan with Secor as the loan officer was recorded to B. M., a loanDepot customer. Secor worked with B. M. in early February of 2022 while at loanDepot.

144.    The "new info 2022" folder Secor copied on February 24 contained a folder named after B. M.  The folder contained subfolders named "Emails," "Property," "Income," and "Misc." These folders contained at least an email named "Fwd Sale Memo - [Seller] to [M. and presumably M.'s spouse] - [Address].msg," "Agent Full_[Address].pdf," and "2020 W2 [B.].pdf."

145.    On April 26, 2022, a CrossCountry loan with Secor as the loan officer was recorded to J. T., a loanDepot client to whom Secor had issued a loanDepot preapproval dated December 13, 2021.

146.    On April 27, 2022, a CrossCountry loan with Secor as the loan officer was recorded to D. L., a lead loanDepot assigned to Secor on November 13, 2021 and for whom Secor issued

loanDepot preapprovals on January 22 and February 12, 2022.  D. L. was a loanDepot client who appeared on Secor's pipeline spreadsheets.

### c)   **Defendant Ramos**

147.   Between approximately February 16 and February 23, Secor's production assistant, Defendant Ramos, copied over 1,000 documents to a USB drive, including realtor lists, title reports, appraisals, disclosures, pre-approvals, tax documents, paystubs, and other non-public information typically supplied by borrowers in support of their mortgage loan applications.  The folders Defendant Ramos copied to the USB drive also included those titled, "NEW LEADS" for 2019, 2020, 2021, and 2022 as well as "CLOSED LOANS" and "CLOSED LOANS 2022." Defendant Ramos subsequently deleted over 3,500 folders and subfolders from her OneDrive and 1,430 files from her email account.  Among the files and folders that Defendant Ramos deleted were the "NEW LEADS 2021" and 1,352 subfolders that she had copied to the USB drive just nineteen minutes earlier, as well as email folders titled "Michaels loans," "Mello Leads," "Zillow leads," "Referrals," and "ESTIMATED CLOSINGS."  Also during this period, Defendant Ramos forwarded to her personal email address a February 19 inquiry from a borrower regarding the effect of a temporary pay increase on her loan application and approval amount.

### d)   **Defendant Raush**

148.   In the weeks prior to his departure, Defendant Raush searched for and downloaded contact lists, including exporting to a .csv file pipeline documents and contacts from his loanDepot Outlook account.  Raush also deleted documents related to customers' personally identifiable information and lists of potential leads and contacts.

149.   Over the days leading up to his departure, Defendant Raush told several potential borrowers to call his cell phone to discuss their loan applications, including one potential borrower who expressed that he wanted to wait until he returned from vacation to have further discussions.

On March 18, Defendant Raush instructed a loanDepot customer, M. T., to "hold off" sending a tax return to him because he was "literally resigning from loanDepot."

150.    Not coincidentally, loanDepot recently discovered that, on May 4, 2022, Raush was identified as the loan officer on a CrossCountry loan recorded to M. T., the same loanDepot customer that Raush told to "hold off" due to his resignation on March 18, 2022 and for whom Raush issued loanDepot preapprovals on February 4 and March 1, 2022.

151.    In addition, on May 10, 2022, a CrossCountry loan with Raush as the loan officer was recorded to J. M., a lead loanDepot assigned to Raush on December 6, 2021 and for whom Raush issued a loanDepot preapproval on December 6, 2021.

### e)    **Defendant Kolinsky**

152.    On December 23, 2021, Defendant Kolinsky copied his computer's Documents, Desktop, and Downloads folders to a USB drive.

153.    Also on December 23, 2021, Kolinsky created personal storage table (PST) files, a file format used by Microsoft programs such as Outlook to store items like calendar events, contacts, and email messages.

154.    In addition, Kolinsky impermissibly installed Dropbox on his work computer, allowing him to access loanDepot information from personal devices.  The Dropbox directory on Kolinsky's computer contained, among other things, subfolders named "Rental Income," "pre-qual," "Income Calculator LD," "marketing," and a file named "1039.xlsx."

155.    On March 22, 2022, a week before resigning, Kolinsky generated a contact list from loanDepot's proprietary database that included names, email addresses, mailing and property addresses, cell phone, home, and office numbers, and birth dates for over 1,850 contacts.  Kolinsky emailed the report from his work email address to his personal email address.

f)   **Defendant Martino**

156.   In the weeks before his departure, Defendant Martino copied over 9,500 documents to USB drives and an external hard drive.  These documents included non-public client information such as financial statements, credit reports, pay stubs, tax returns, pre-approvals, and loan consultant pipelines.

157.   On April 5, 2022, the week before he left, Martino also copied to a USB drive a list of contacts and leads.

g)   **Defendant Vignola**

158.   On March 23, 2022, less than a month before her resignation, Vignola copied a folder of loanDepot documents to a USB drive.  This folder included hundreds of documents such as profit and loss statements, gift letters, employment verification forms, tax returns and forms, contracts, customers' social security numbers.

h)   **Defendant Zheng**

159.   Between March 4, 2022 and her departure on April 27, 2022, Zheng sent multiple emails from her work email, jzheng@loandepot.com, to jzheng@yzrcapital.com. These emails contained confidential, non-public financial documents loanDepot clients had sent to Zheng, including tax returns, bank statements, pay stubs, employment contracts, and driver's licenses.

160.   On March 29, 2022, Zheng accessed Mello and SharePoint web pages within ten minutes prior to accessing a personal Gmail account.

i)   **Defendant Antoine**

161.   On February 4, 2022, Antoine copied a file named "Lender Contacts" to a USB.

162.   Three days later, on February 7, 2022, Antoine copied the files "Rental Agreements" and "Traderkeish 2022" to a USB.

163.    On April 16, 2022, one day after she resigned, Antoine deleted 677 files from the recycle bin on her loanDepot computer, the names of which are not recoverable.

### j)   **Defendant Koven**

164.    loanDepot assigned a customer lead for A. P. to Koven on March 17, 2022, just days before his March 22 departure.

165.    On May 26, 2022, a CrossCountry loan with Koven as the loan officer was recorded to A. P.

### k)   **Defendant Nadler**

166.    loanDepot assigned a customer lead for J. G. to Nadler on October 25, 2021.

167.    Nadler issued loanDepot preapprovals to J. G. on October 25, 2021, October 27, 2021, February 12, 2022, and February 15, 2022.

168.    On April 28, 2022, a CrossCountry loan with Nadler as the loan officer was recorded to J. G.

169.    Upon information and belief, each of the Departed NY Employees improperly accessed, used, and disclosed loanDepot trade secrets and confidential information as well as solicited loanDepot employees and customers in violation of their Employment Agreements.

## VI.   **The Information Taken by the Departed NY Employees Constitutes Trade Secrets**

170.    The information and documents described above are trade secrets.  In the Chicago Action, the United States District Court for the Northern District of Illinois entered a TRO on the basis that equivalent types of loanDepot information constituted protected trade secret information. *See* Chicago Action, Dkt. 21 at 3.

171.    That the types of information at issue are protectable trade secrets is also established by CrossCountry itself.  In fact, CrossCountry has recently alleged the same with respect to its own comparable information in a different federal lawsuit.  *CrossCountry Mortgage, Inc. v.*

*Messina et al.*, No. 1:19-cv-01021, Dkt. 1 at ¶¶ 55, 66 (N.D. Ohio, May 7, 2019) (CrossCountry arguing that "customer data, including names and other information regarding CrossCountry's loan customers and potential customers, including credit information, constitute trade secrets" under DTSA).  It doubled down on that contention earlier this year, asserting that its non-public borrower and pricing information "constitute[s] trade secrets under federal law."  *CrossCountry Mortgage, LLC v. American Neighborhood Mortgage Acceptance Co., LLC, d/b/a AnnieMac Home Mortgage*, No. 2:22-cv-01119 (D.N.J. Mar. 1, 2022), Dkt. 1, ¶¶ 22, 23, 74.

### COUNT I

### FEDERAL DEFEND TRADE SECRETS ACT
### (FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND MONETARY DAMAGES AGAINST CROSSCOUNTRY)

172.    loanDepot incorporates the preceding allegations as if fully set forth herein.

173.    The Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate foreign commerce."  18 U.S.C. § 1836.

174.    Under the DTSA, "trade secret" means

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically . . . or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

175.    Under the DTSA, "misappropriation" means

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or

use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5).

176.     Under the DTSA, "improper means" . . . "(A) includes theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6).

177.     By engaging in the above conduct, CrossCountry and the Departed NY Employees have misappropriated, threaten to misappropriate, or inevitably will misappropriate loanDepot's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce in violation of the DTSA.

178.     In particular, the Departed NY Employees downloaded to external drives, emailed to their personal email addresses, and/or otherwise absconded with the identities of customers that use loanDepot services, and the non-public personal information provided by customers or potential customers to loanDepot, compilations of customer information, as well as loanDepot employee sales information, the identities and volume of business of loanDepot "leaders," and loanDepot customized job aids and training materials.

179.     This information is used in connection with loanDepot's services, which are offered in New York and throughout the country.

180.    loanDepot expended substantial resources and ingenuity collecting, compiling, and protecting this confidential and proprietary information.  This information also derives actual and potential independent economic value from not being generally known to, and not being readily ascertainable by proper means by, others.  This is especially true in the non-bank consumer loan industry where successfully acquiring business from customers depends largely upon pricing.

181.    Accordingly, loanDepot has taken reasonable steps as part of its ongoing standard operating procedures to maintain the confidential nature of this information including through confidentiality and non-disclosure provisions, an Information Security Program, housing confidential information and trade secrets in password-protected proprietary databases, and restricting employee access to those who have a reasonable need to know.

182.    The Departed NY Employees were subject to the provisions designed to protect loanDepot's proprietary and confidential information through their Agreements, which required that they maintain the confidentiality of loanDepot's information and prohibited them from using such information other than as necessary in the course of performing their duties for loanDepot. The Departed NY Employees were further subject to provisions in the loanDepot Employee Handbook and Information Security Policy, which prohibit, among other things, (a) accessing data, a server, or an account for any purpose other than conducting company business, even if the employee has authorized access; (b) sharing company information with non-approved parties outside the company; and (c) storage of company information in non-company-managed locations such as personal drives, personal cloud storage, and devices.

183.    The Departed NY Employees had no right to retain or use any of loanDepot's trade secrets or other confidential and proprietary information after resigning from employment with loanDepot.  At no point did loanDepot give the Departed NY Employees permission to download

or take loanDepot's confidential information and trade secrets, transfer them to external storage devices, or email the information to personal email addresses. The Departed NY Employees knew or should have known that the information they retained upon their departure contained trade secrets belonging to loanDepot.

184.     CrossCountry directed, participated, and/or benefited from the misappropriation of loanDepot's confidential information. Upon information and belief, loanDepot's confidential information is now in CrossCountry's possession and on CrossCountry's systems and Defendants are retaining the misappropriated information to compete with and otherwise harm loanDepot. Upon information and belief, CrossCountry has permitted if not encouraged departed loanDepot employees from other branches to transfer to CrossCountry the customer relationship databases belonging to other raided loanDepot branches. Upon information and belief, CrossCountry further permits and encourages branches that depart for CrossCountry to operate as sub-entities of CrossCountry that control their own customer relationship management software through Salesforce or Jungo.

185.     Defendants can obtain economic value for the disclosure and use of loanDepot's trade secrets, for example, by avoiding the years, and millions of dollars in investment, that it took loanDepot to develop the trade secrets, and to convert loanDepot customers and employees to CrossCountry for their own financial gain.

186.     As a consequence of the foregoing, loanDepot has suffered and will continue to suffer irreparable harm, injury, and loss that cannot be remedied through monetary damages. Unless enjoined, Defendants will continue to use loanDepot's trade secret information to unfairly compete and loanDepot will continue to suffer irreparable harm.

187.    Pursuant to the DTSA, actual or threatened misappropriation of trade secrets may be enjoined.

188.    Additionally, the Departed NY Employees agreed in their respective Agreements that monetary damages alone would not be a sufficient remedy for the Departed NY Employees' breaches of any provision of the Agreement, and that in addition to other remedies available to loanDepot, loanDepot would be entitled to injunctive relief as well as its costs and expenses, including attorneys' fees incurred in bringing this action.

189.    As a direct and proximate result of Defendants' willful and malicious conduct, loanDepot has suffered direct and consequential damages, and is entitled to recovery compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

### COUNT II

### BREACH OF CONTRACT
### (FOR INJUNCTIVE RELIEF AGAINST DEPARTED NY EMPLOYEES)

190.    loanDepot incorporates the preceding allegations as if fully set forth herein.

191.    The Agreements are valid contracts between loanDepot and the Departed NY Employees.  *See* **Exs. A-M**.

192.    In their respective Agreements, the Departed NY Employees agreed to "keep strictly confidential and [to] not, directly or indirectly, disclose to any person or entity or use for the benefit of [the Departed NY Employee] or any other person or entity any 'Confidential Information' . . . ." **Exs. A-M**, Section VI(A)(1).  The Agreements define Confidential Information to include, among other things, information "about Company's business, prospects, plans, operations, products, processes, methods of doing business, systems, databases . . . as well as Customer data." *Id.*, Section VI(A)(2).  The Agreements require the Departed NY Employees to return all Confidential Information to loanDepot upon termination of their employment and

prohibit the Departed NY Employees from sharing the Confidential Information. *See id.*, Section VI(A)(4), (5).

193.    The Departed NY Employees also agreed in their Agreements to refrain from "solicit[ing] or induc[ing], directly or indirectly, whether on his or her own behalf, working with or though others, on or behalf of or through any other person, business or entity, an employee or independent contractor of Company to terminate or breach his or her employment or contractor relationship with Company or apply for employment or a contractor relationship with any person, business or entity." *Id.*, Section VI(B).

194.    loanDepot performed all of its duties and obligations under the Agreements.

195.    As set forth above, the Departed NY Employees breached (and threaten to breach) their respective Agreements by, among other things, (1) using and disclosing loanDepot's Confidential Information; (2) removing Confidential Information from loanDepot; (3) soliciting and inducing loanDepot employees to terminate their employment with loanDepot.

196.    As a direct and proximate result of the above-referenced breaches, among others known and to be discovered, loanDepot suffers and continues to suffer damages, including, but not limited to, lost business, lost profits, costs of hiring and retaining former and new employees, costs of retaining customers, and damage to goodwill.

197.    The Departed NY Employees agreed in their respective Agreements that monetary damages alone would not be a sufficient remedy for the Departed NY Employees' breaches of any provision of the Agreement, and that in addition to other remedies available to loanDepot, loanDepot would be entitled to injunctive relief as well as its costs and expenses, including attorneys' fees incurred in bringing this action.

## COUNT III

## TORTIOUS INTERFERENCE WITH CONTRACT
## (AGAINST CROSSCOUNTRY)

198.    loanDepot incorporates the preceding allegations as if fully set forth herein.

199.    The Agreements are valid contracts between loanDepot and the Departed NY Employees.

200.    Upon information and belief, CrossCountry, which was not a party to the Agreements, was aware of the Agreements from times preceding the breaches thereof. CrossCountry's knowledge of the Agreements is derived at least in connection with repeated litigation between loanDepot and CrossCountry, including an action filed in New Jersey District Court involving loanDepot employment agreements containing similar restrictive covenants, confidentiality provisions, and non-solicitation provisions.

201.    Despite having this knowledge of the Agreements, CrossCountry intentionally induced, condoned, supported, and permitted the Departed NY Employees' violations of their respective Agreements without justification. CrossCountry offered a substantial monetary reward for poaching an entire loanDepot branch, and upon information and belief, CrossCountry offered indemnification for any litigation resulting from departed employees' violations of agreements with loanDepot.

202.    As a result of CrossCountry's conduct, loanDepot suffered and will continue to suffer irreparable harm.  If not enjoined, CrossCountry will induce further breaches of the Agreements and other loanDepot employee agreements, which will result in additional damages and irreparable harm to loanDepot.  Injunctive relief is necessary as loanDepot is without an adequate remedy of law to prevent this harm to loanDepot.

203.     As a direct and proximate result of this conduct, loanDepot has suffered direct and consequential damages, and is entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

## COUNT IV

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND MONETARY DAMAGES AGAINST CROSSCOUNTRY)

204.     loanDepot incorporates the preceding allegations as if fully set forth herein.

205.     loanDepot has and had protectable business relationships with all of the loanDepot employees that left loanDepot for CrossCountry, including the Departed NY Employees as well as the customers that Defendants have solicited or induced or attempted to solicit or induce to leave loanDepot.

206.     loanDepot had a reasonable expectation that (1) its employees would continue their employment with loanDepot; and (2) its customers would continue using loanDepot for its services.

207.     At all relevant times, Defendants knew of these prospective business relationships.

208.     Defendants intentionally induced, permitted, and encouraged the Departed NY Employees' breaches of their respective Agreements; and Defendants intentionally induced, permitted, and encouraged loanDepot's customers and employees to leave loanDepot.

209.     Defendants' conduct resulted in the severance of loanDepot's prospective business relationships with loanDepot employees and loanDepot customers.

210.     Defendants' conduct was done purposefully and with malicious, wrongful, and unjustifiable intent, through improper means, and for an improper purpose.

211.     As a direct and proximate result of this conduct, loanDepot has suffered and will continue to incur actual damages, including, but not limited to, lost business, lost profits, damage

to goodwill, and the costs of hiring and retaining former and new employees, among other things, in an amount to be proven at trial.

212.    Punitive damages, lost profits, and attorneys' fees are warranted due to the malicious nature of the above conduct in an amount to be determined at trial.

## COUNT V

## BREACH OF FIDUCIARY DUTY
## (FOR INJUNCTIVE RELIEF AGAINST THE DEPARTED NY EMPLOYEES)

213.    loanDepot incorporates the preceding allegations as if fully set forth herein.

214.    As employees of loanDepot, the Departed NY Employees owed certain fiduciary duties of care, loyalty, and good faith; to exercise good business judgment; to act prudently in the operation of loanDepot's business; to discharge their actions in good faith; and to act in the interests of loanDepot.

215.    The Departed NY Employees breached their fiduciary duties of loyalty to loanDepot by knowingly and intentionally acting adversely to loanDepot's interests during their employment with loanDepot by (a) soliciting loanDepot employees to leave loanDepot and join CrossCountry; (b) using loanDepot information for the benefit of CrossCountry; (c) planning a group departure designed to harm loanDepot; and/or (d) diverting business opportunities to CrossCountry.

216.    Because of the Departed NY Employees' actions, loanDepot has suffered, and will continue to suffer, irreparable harm, as well as damages and loss that will be determined in arbitration.

217.    The Departed NY Employees' actions were intentional, willful, outrageous, and malicious, and justify the imposition of punitive damages.

## COUNT VI

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND MONETARY DAMAGES AGAINST CROSSCOUNTRY)

218.    loanDepot incorporates the preceding allegations as if fully set forth herein.

219.    The Departed NY Employees breached their fiduciary duties to loanDepot.

220.    The Defendants knew that their conduct breached the Departed NY Employees' and other loanDepot employees' duty of loyalty to loanDepot.

221.    The Defendants gave each other substantial assistance or encouragement to breach the Departed NY Employees' and other loanDepot employees' respective fiduciary duties.

222.    Defendants rendered this substantial assistance despite their knowledge that the Departed NY Employees were acting adversely to loanDepot's interests during their employment with loanDepot by (a) soliciting loanDepot employees to leave loanDepot and join CrossCountry; (b) using loanDepot information for the benefit of CrossCountry; (c) planning a group departure designed to harm loanDepot; and/or (d) diverting business opportunities to CrossCountry.

223.    Because of the Departed NY Employees' and CrossCountry's conduct, loanDepot has suffered irreparable harm, as well as damages and loss, in an amount to be determined at trial.

## COUNT VII

### UNFAIR COMPETITION
### (AGAINST CROSSCOUNTRY)

224.    loanDepot incorporates the preceding allegations as if fully set forth herein.

225.    loanDepot's confidential information, employee relationships, and customer goodwill and relationships are the result of loanDepot's skill, expenditures, and labor.

226.     CrossCountry misappropriated loanDepot's confidential information, employee relationships, and customer goodwill and relationships when it induced, permitted, and encouraged the Departed NY Employees' breaches of their respective Agreements.

227.     CrossCountry misappropriated loanDepot's confidential information, employee relationships, and customer goodwill and relationships to gain a commercial advantage over loanDepot.

228.     CrossCountry intentionally, maliciously, and in bad faith induced, permitted, and encouraged loanDepot's customers and employees to leave loanDepot using loanDepot's misappropriated confidential information, employee relationships, and customer goodwill.

229.     CrossCountry directed, participated, and/or benefited from the misappropriation of loanDepot's confidential information.  Upon information and belief, loanDepot's confidential information is now in CrossCountry's possession and on CrossCountry's systems and CrossCountry is retaining the misappropriated information to compete with and otherwise harm loanDepot.  Upon information and belief, CrossCountry has permitted if not encouraged departed loanDepot employees from other branches to transfer to CrossCountry the customer relationship databases belonging to other raided loanDepot branches.   Upon information and belief, CrossCountry further permits and encourages branches that depart for CrossCountry to operate as sub-entities of CrossCountry that control their own customer relationship management software through Salesforce or Jungo.

230.     As a result of CrossCountry's conduct, loanDepot suffered and will continue to suffer irreparable harm.  If not enjoined, CrossCountry will continue misappropriate loanDepot's confidential information, relationships, and goodwill, and will induce further breaches of the Agreements and other loanDepot employee agreements, which will result in additional damages

and irreparable harm to loanDepot.  Injunctive relief is necessary as loanDepot is without an adequate remedy of law to prevent this harm to loanDepot.

231.    As a direct and proximate result of this conduct, loanDepot has suffered direct and consequential damages, and is entitled to recovery compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, loanDepot demands judgment against Defendants as follows:

1.    A preliminary injunction, enjoining and restraining (a) the Departed NY Employees, and anyone acting in concert with them, including CrossCountry, from violating, or participating in the violation of, any of the terms of their respective Agreements; (b) CrossCountry, and anyone acting in concert with it, from interfering with any of the Departed NY Employees' Agreements with loanDepot; (c) CrossCountry, and anyone acting in concert with it, including but not limited to the Departed NY Employees, from (i) contacting, soliciting, or servicing any customer, prospective customer, or referral source about whom the Departed NY Employees possessed or learned confidential information about while employed at loanDepot, including but not limited to any person listed on any document misappropriated by the Departed NY Employees from loanDepot and (ii) from soliciting or employing any employee of loanDepot; (d) Defendants, and anyone acting in concert with Defendants, from using, divulging, disclosing, or misusing any loanDepot Confidential Information (as defined by the Departed NY Employees' Agreements with loanDepot) and trade secrets;

2.    An Order requiring the following, at the Departed NY Employees' expense: (a) a forensic inspection of all of the Departed NY Employees' personal devices, email accounts, and cloud storage accounts ("devices/accounts"), and any devices/accounts used by the Departed NY Employees at CrossCountry, in order to identify loanDepot Confidential Information (as defined

by the Departed NY Employees' Agreements with loanDepot) and trade secrets; (b) CrossCountry to search its corporate systems (including email systems, networks, shared drives, cloud storage, etc.) to identify loanDepot property, Confidential Information (as defined by the Departed NY Employees' Agreement with loanDepot), and trade secrets; (c) CrossCountry to take remedial action to purge all such loanDepot property, Confidential Information, and trade secrets from the above-referenced systems, networks, devices, and cloud storage; and (d) Defendants to return all such loanDepot property, Confidential Information, and trade secrets to loanDepot;

3.      An Order requiring Defendants to preserve all documents, electronically stored information, and other information relevant to the factual allegations and claims contained within this Verified Complaint, including any communications, text messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts, by and between the Departed NY Employees (or any of the other loanDepot employees that joined CrossCountry); between CrossCountry and the Departed NY Employees (or any of the other loanDepot employees that joined CrossCountry); between Defendants and any loanDepot employee; and between Defendants and any loanDepot customer, prospective customer, or referral source;

4.      An Order granting preliminary and (with respect to CrossCountry) permanent injunctive relief in accord with Paragraphs 1 and 2 above, and as separately may be requested at a preliminary injunction hearing and any trial;

5.      An Order (with respect to CrossCountry) awarding loanDepot its actual and exemplary damages, in an amount to be determined at trial;

6.      An Order (with respect to CrossCountry) awarding loanDepot its pre- and post-judgment interest as allowed by law as well as its attorneys' fees and costs of this action; and

7.      An Order (with respect to CrossCountry) awarding any and all other available damages, including punitive damages and such other and further relief as the Court deems just and proper.

Dated: New York, New York
     July 12, 2022

Respectfully Submitted,

**KIRKLAND & ELLIS LLP**

/s/ *Josh Greenblatt*
Josh Greenblatt, P.C.
John P. Del Monaco
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
josh.greenblatt@kirkland.com
john_delmonaco@kirkland.com

*Counsel for Plaintiff loanDepot.com*

## VERIFICATION

Under penalty of perjury, pursuant to 28 U.S.C. § 1746, the undersigned, Mark McGowen, hereby verifies that he is a Vice President, Regional Production at loanDepot.com, LLC, and as such is authorized to make this Verification on behalf of Plaintiff; that he has read the foregoing Verified Complaint and knows the contents thereof; and that the statements set forth in the Verified Complaint are true and correct, except as to matters therein stated to be on information and belief, which are true to the best of his knowledge and belief.

Mark McGowen

Date: **July 12, 2022**

## <u>CERTIFICATE OF SERVICE</u>

John P. Del Monaco, an attorney, hereby certifies that, on July 13, 2022, he caused the foregoing *Verified Complaint* to be filed electronically with the Clerk of the Court, using the court's CM/ECF system, and sent notice to the following by email:

| Counsel for the Departed NY Employees: | Counsel for CrossCountry: |
|---|---|
| Jeffrey L. Widman<br>Fox Rothschild LLP<br>321 N. Clark Street, Suite 1600<br>Chicago, IL 60654<br>jwidman@foxrothschild.com | Michael A. Platt<br>Jones Day<br>901 Lakeside Ave.<br>Cleveland, Ohio, 44114<br>maplatt@jonesday.com<br><br>Alex Ragon<br>Chief Legal Counsel<br>CrossCountry Mortgage, LLC<br>Alex.ragon@myccmortgage.com<br><br>Ashley Wakefield<br>Associate Corporate Counsel<br>CrossCountry Mortgage, LLC<br>Ashley.wakefield@myccmortgage.com |

*/s/ John P. Del Monaco*
John P. Del Monaco