# **EXHIBIT J**

**loanDepot**

loanDepot.com, LLC
26642 Towne Centre Drive
Foothill Ranch, CA 92610
d.b.a. loanDepot.com,
loanDepot

March 19, 2019

Re:     Offer of Employment

Dear Michael Secor:

We are pleased to offer you employment with loanDepot.com, LLC ("loanDepot") on the following terms and conditions:

1. Position. loanDepot offers you the position of **Loan Consultant** reporting to **Christian Babcock**.

2. Start Date. Your anticipated start date is scheduled for **Tuesday, March 19, 2019** and will be confirmed by loanDepot Recruiting upon your acceptance of this offer and satisfactory completion of new hire paperwork and background check.

3. Classification. The outside Loan Consultant is an Exempt, Commission only position. This position is required to spend the majority of the time (50% or greater) working hours outside the office to conduct sales calls to create, develop and maintain referral relationships with real estate professionals, builders, and consumers.

4. Special Terms - Guarantee. For the months of **March, April, May, & June**, you will be eligible for the greater of a monthly guarantee ("Guarantee") OR your earned commissions based on the Loan Consultant Compensation Plan. For example, if your guarantee is $2,000.00 for the month of March, and you earn $1,000.00 in commissions under the Loan Consultant Compensation Plan for the month of March, you will be paid your $2,000.00 guarantee because it is greater than the commissions you earned. In contrast, if you earn $5,000.00 in commissions, you will be paid the $5,000.00 commissions earned instead of the Guarantee because the commissions earned are greater than the Guarantee.

Guarantees are paid semi-monthly in two equal payments on the 15th & 28th of each month. Based on your current start date of Tuesday, March 19, 2019, your Guarantee payment schedule is as follows:

> **March: $35,000.00. The $35,000.00 is split in half of two equal payments.**
> The first half will be on March 28, 2019 & the second half will be paid on April 15, 2019.
> **April: $30,000.00. The $30,000.00 is split in half of two equal payments.**
> The first half will be paid on April 28, 2019 & the second half will be paid on May 15, 2019.
> **May: $20,000.00. The $20,000.00 is split in half of two equal payments.**
> The first half will be paid on May 28, 2019 & the second half will be paid on June 15, 2019.
> **June: $15,000.00. The $15,000.00 is split in half of two equal payments.**
> The first half will be paid on June 28, 2019 & the second half will be paid on July 15, 2019.

The Guarantee is considered an advance on wages and not actual wages itself and is subject to charge-back by loanDepot. If at any time during the Guarantee Period you are not meeting the minimum production requirements outlined in this document, loanDepot reserves the right in its sole discretion to modify or eliminate your eligibility to receive a Guarantee. loanDepot will notify you of any such modification or elimination in writing. If loanDepot eliminates the Guarantee, you will be paid solely the commissions earned. You agree that, if your employment ends for any reason, whether voluntarily or involuntarily for cause, prior to the one-year anniversary of your start date, loanDepot can charge back the difference between the commissions you earned (if any) during the Guarantee Period and the Guarantee paid from your final paycheck, future bonus or commissions, or other compensation. If there are insufficient funds to cover the outstanding amount due, you agree that you must pay any outstanding difference between the commissions earned and guarantee paid within 30 calendar days from the date you are notified by loanDepot that a charge back has occurred. For example, if you earn $1,000.00 in commissions in the month of February, and are paid a $2,000.00 guarantee, the Company may charge back $1,000.00, which is the difference between the commissions earned and the Guarantee paid, from your final pay check and/or to be paid directly by you upon notification.

**loanDepot**

5. <u>Special Compensation:</u> As an added incentive, you will be eligible to earn an increased amount of commissions in the amount of **115 BPS** through **September 30, 2019**. Once this eligibility period expires, you will then earn commissions in accordance with the Loan Consultant Compensation Plan.

6. <u>Production Requirements (Monthly Origination & Funded Volume/Units).</u>

    **April - 5 Applications
    May - 5 Applications
    June - 6 Applications / 4 Fundings
    July – 6 Applications / 5 Fundings

    Includes Loans referred to Internal Loan Consultants and/or Branch Manager**

    At the end of the Period, you will become entitled to loanDepot's standard incentive compensation for employees of your same rank and tenure, which is included with this offer letter. If at any time you are not meeting the minimum production requirements outlined in this document, loanDepot reserves the right in its sole discretion to modify or eliminate the above 'Special Terms' compensation.

7. <u>Pay Date</u>. All compensation, including commissions and guarantees are paid on 15th & 28th of each month. Only licensed Loan Consultants are eligible to earn/receive commissions.

8. <u>Employment Benefits and 401K Program</u>.  You will be eligible to begin participation in loanDepot's benefits program on the **first day of the month following your first full calendar month**.  Full details regarding the program options can be found on www.loandepotlivewell.com.  Participation costs will be provided to you under separate cover.

9. <u>Policies</u>. You must abide by loanDepot's policies and procedures, including all policies contained in loanDepot's Employee Handbook, which you will receive as part of your Workday onboarding tasks. All policies must be signed prior to your first day of employment.

10. <u>Background Investigation</u>. This offer is contingent upon your satisfactory completion of a background investigation, which may include criminal history, credit history, employment verification and references and social security number verification.

11. <u>Eligibility</u>.  This offer of employment is contingent upon you completing on the first day you report to work (i.e. your start date) the "Employment Eligibility Verification" Form (I-9), and providing the appropriate identification documents as listed on the enclosed "Lists of Acceptable Documents".  If you are unable to provide acceptable identification documents within three (3) business days of your start date, loanDepot will be required by law to terminate your employment immediately.

12. <u>No Reliance</u>.  You acknowledge that you are not relocating your residence or resigning employment in reliance on any promise or representation by loanDepot regarding the kind, character, or existence of such work, or the length of time such work will last, or the compensation therefore.

13. <u>At Will</u>.  Your employment with loanDepot is at will, and either you or loanDepot may terminate the employment relationship at any time with or without notice for any reason. No loanDepot representative has the authority to modify the at-will nature of your employment except for the President of loanDepot, and any such modification must be in writing signed by both you and the President of loanDepot.

14. <u>Workers' Compensation.</u>   All claims should reported to the Human Resources Department and be filed with The Hartford Group, PO Box 14187, Lexington KY 40512 under loanDepot's Insurance Policy #WC 72 WE ZQ 1983.  Please contact The Hartford's main office by calling (800) 327-3636.

15. <u>Modification</u>.  loanDepot reserves the right to modify your position, duties, compensation, benefits, and/or other terms and conditions of employment at any time in its sole discretion, as allowed by law, except for the at will employment policy.

16. <u>Prior Verbal Agreements</u>.  This letter supersedes any prior verbal agreements or representations regarding your employment with loanDepot.

17. <u>Offer</u>.  This offer of employment is valid, executable, and must be received by Human Resources within **seven** (7) calendar days from date identified in offer. After **seven** (7) calendar days from date identified in the offer, this offer becomes null and void.

We are excited to have you join our team. If you have any questions, please feel free to contact me directly.

Regards,
loanDepot Talent Acquisition Team

Acknowledged, Accepted and Agreed by:

*Michael Secor*

**Signature - Michael Secor**

Mar 20, 2019 | 11:19 AM PDT
**Date**

**RETAIL MASTER INCENTIVE PLAN**

All incentive plans at loanDepot.com, LLC ("the Company"), including sales incentives and other incentive plans, are covered by this Retail Master Incentive Plan (the "MIP") effective from and after January 1, 2019. The Company's incentive programs are intended to

reward eligible participants for their contributions in meeting the Company objectives. The MIP describes the overarching purpose, structure, eligibility, administration and payout mechanics as well as the general terms and conditions of all incentive plans.

I. <u>PLAN STRUCTURE</u>

    A. <u>The Plan</u>. The "Plan" collectively refers to this MIP and the Role-Specific Incentive Terms ("RITs") offered for a particular role.

    B. <u>Plan Governance</u>. The Plan has been approved and is governed by a Plan Governance Committee (the "Committee") comprised of Company executives.

    C. <u>Eligible Employees</u>. Employees of the Company who have been designated by the Committee as eligible to participate in an incentive compensation plan and who sign and return to the Company a copy of the Plan may participate ("Participant") in this Plan.

    D. <u>New Hires</u>. Eligible employees hired will be eligible for participation in the Plan as of such employee's official start date of employment in an eligible role.

    E. <u>RITs</u>. Each Participant's opportunity to earn incentive compensation will be based on the RITs offered for his or her role. Those terms are attached to this MIP as Attachment A. The RITs for each position may vary, and Participant should look to both this MIP and their RITs to understand the full terms of their incentive compensation.

II. <u>KEY BEHAVIORS AND COMPETENCIES REQUIRED FOR PARTICIPATION IN PLAN</u>

    A. <u>Plan Participation</u>. Participants may be disqualified from participation in the Plan or have their incentives adjusted if they are found to have violated Company policy, engaged in misconduct, or failed to demonstrate expected performance behaviors or key competencies such as initiative, teamwork, leadership, job ownership & accountability, which the Company considers vital for ensuring individual team member success. Incentive payments that may be impacted by failures in these areas will be made at the discretion of the Committee.

III. <u>INCENTIVE PAYMENT TERMS</u>

    A. <u>Incentive Compensation Eligibility</u>. Incentive compensation is not earned until: (1) all conditions precedent for eligibility for incentives under the terms of the Plan have been met; (2) all conditions precedent set out in the RITs have been met; (3) all information necessary to calculate and verify eligibility for an incentive has been received by Company and the calculations have been performed; and (4) the Measurement Period has concluded. The applicable "Measurement Period" is the period of time (i.e., quarterly, monthly, etc.) used to calculate the incentive and/or on which incentives are awarded. Measurement Periods are described in the RITs, based on the incentives available to a role. In some instances, the Company may pay anticipated incentives prior to all conditions being met; in any such case, the payment is a draw or advance on anticipated earnings and is subject to reconciliation (i.e., a true-up) based on actual results.

    B. <u>Loan Quality/Compliance</u>: Loans that are obtained, procured, originated, sourced or funded through fraud or misconduct or in a manner that is inconsistent with the Company's policies specific to loan origination quality and compliance will not be eligible or considered for purposes of calculating any potential incentive compensation under the Plan. This term is not intended to limit any further action to address such issues by the Company, including disqualification of a Participant from participation in this Plan, and possible disciplinary action, up to and including termination of employment.

    C. <u>Adjustments for Uncollected Appraisal Fees</u>: Pursuant to Company policy, Participants are required to collect all applicable appraisal pass-through fees on a loan ("Appraisal Fees"). Failure to collect Appraisal Fees is a willful violation of Company policy. A Participant's incentive compensation shall be adjusted at Company's discretion to account for any and all uncollected Appraisal Fees on canceled and denied loans as permitted by applicable law.

    D. <u>Payment of Incentives</u>: Unless otherwise specified in the RIT, under typical circumstances, incentives calculable between the 1st and the 15th day of a month will be advanced on the 28th day of the same month. Incentives earned between the 16th through the last day of a month, will be advanced on the 15th day of the following month. Incentive payments are a draw, advanced on anticipated final earnings, and are subject to reconciliation (i.e., a true-up) based on actual results.

E.   Treatment and Reconciliation of Advances:  The Company is under no obligation to advance incentive pay and reserves the right to charge back an advance in the event that actual results fall short of expected earnings.  In such cases, the Company ordinarily will reconcile advances in excess of earnings against future advances.  Once the need for reconciliation is apparent to the Company, reconciliation against actual results ordinarily will be made at the next pay cycle.  If a Participant's employment ends prior to full reconciliation of an advance, then the amount outstanding becomes due and payable in full at the time of termination.  If permissible under state and local law, Participant acknowledges and agrees that Company can deduct advances that exceeded actual earnings from his or her final paycheck (including accrued vacation if payable at the time of termination), future incentives, and or other compensation.

F.   Withholding and Deductions:  All compensation payable to a Participant pursuant to this this Plan shall be subject to such withholding and deductions by the Company as required by law.

G.   Review and Correction of Incentives:  All incentive payments made under the Plan are subject to review and approval by the Company.  Any correction, and the manner in which it is addressed, shall be at the sole discretion of management.

IV.   CHANGES IN EMPLOYEE STATUS AND EFFECT ON INCENTIVES AND PARTICIPATION IN PLAN

A.   Death.  An incentive payment, considering the Company and individual performance, may be approved for payment according to normal Plan payout timing to the estate of any Participant who dies.

B.   Disability: An incentive payment, considering the Company and individual performance, may be approved for payment according to normal Plan payout timing to any Participant who becomes permanently disabled.

C.   Reassignment/Transfer/Promotion/Termination:  The RITs set forth the terms of any incentive payment for Plan participants who terminate employment with the Company or if Participant is reassigned, transferred, or promoted to a position that is not eligible to participate in this Plan.

V.   ADDITIONAL TERMS AND CONDITIONS

The Company and the Committee have developed the Plan with the intent of honoring and executing all payments described by the MIP or the RITs according to the parameters defined herein.  In compliance with expectations of the Committee, the Company maintains standard terms and conditions for all participants in the Plan.  These standard terms and conditions are as follows:

A.   The Plan may be changed, modified, amended or terminated at any time at the sole discretion of the Committee.  The Plan does not guarantee any financial obligation and the representations and definitions in the Plan should not be construed as a proposed contract or promise of payment between the Company and any of its employees, whether or not they are Participants in the Plan.

B.   No person shall have any right, vested or contingent, or any claim whatsoever, to be granted any award or receive any payment under the Plan.

C.   Neither the action of the Company in establishing this Plan, nor any provisions hereof, nor any action taken by the Company, shall be construed as giving any employee the right to be retained in the employ of the Company for any period of time, or to be employed in any particular position, or any particular rate of remuneration.  All employees of the Company are employed at-will.

D.   Payment pursuant to this Plan shall not affect, or have application to, the Company life insurance, medical or other employee benefit plans, whether contributory on the part of the employees, except as may be specifically provided by the terms of the specific plan.

E.   No right or benefit under this Plan shall be subject to anticipation, alienation, sale assignment, pledge, encumbrance or change by, or to the debts, contracts liabilities or torts of a participant or any other person.  Any attempt to subject any such right or benefit shall be void, and upon any such attempt, or upon the bankruptcy of any Participant, such right or benefit (or, in the event of such bankruptcy, such rights and benefits as the Company may specify), shall, at the discretion of the Company, cease and terminate.

DocuSign Envelope ID: 6002B705-9C09-4F17-A853-9D8F9F4534DF
Case 1:22-cv-05971-LGS   Document 1-10   Filed 07/13/22   Page 7 of 18

loanDepot

F.	Any dispute about the terms of the Plan or a Participant's entitlement to any type of compensation under the Plan: (a) is subject to the Company's Mutual Arbitration Agreement.  This Plan does not and shall not be construed to in any way alter the Mutual Arbitration Agreement, which remains in full force and affect; (b) , shall be governed by the law of the state in which the Participant primarily worked for the Company, and, without regard to conflicts of law principles, shall exclusively govern any disputes between them, including but not limited to, the validity, interpretation, and effect of this Plan, as well as any other disputes arising out of this Plan; except, however, this Plan shall in all respects be interpreted, enforced and governed under federal law to the extent federal law preempts state law.

VI.	<u>EMPLOYEE CONFIDENTIALITY, COMPANY PROPERTY, AND NON-SOLICITATION OBLIGATIONS</u> (Referred to herein as "Section VI of this Plan")

In consideration of the opportunity to earn incentive compensation under the Plan, and allowing the Participant access to Confidential Information, and as an express condition of such opportunity to earn incentive compensation, and the Participant employment, or continuing employment, or opportunity for increased compensation, or promotion, or training opportunity by the Company, the sufficiency of which consideration Participant expressly acknowledges, Participant and the Company agree as follows:

A.	Confidential Information & Tangible/Intangible Property.

1.	Participant agrees that, while employed by the Company at any time thereafter, Participant will keep strictly confidential and will not, directly or indirectly, disclose to any person or entity or use for the benefit of Participant or any other person or entity any "Confidential Information," as defined below, that Participant learned, obtained or had access to in the course of or as the result of Participant's employment with Company or using Company's systems, access means or computing or mobile devices.  Participant agrees, at all times, to take appropriate and reasonable steps to safeguard Confidential Information and to protect it against disclosure, misuse, unauthorized access, espionage and theft.

2.	"Confidential Information" means information and materials in any medium learned, obtained or accessed by Participant because of or through his or her employment with Company, or using Company's systems, access means or computing or mobile devices, about Company's business, prospects, plans and operations, products, processes, methods of doing business, systems, databases and technology, inventions and other intellectual property, loan origination and marketing practices, training, services, and Customers (as defined herein) and that is not known or readily available through proper and lawful means to the general public as well as Customer data.  "Customers" mean, for purposes of this Section VI of this Plan, visitors or registrants to Company websites, leads, callers to Company call centers, loan or prequalification or preapproval applicants (whether or not a loan is approved or closed or denied), and loan customers, in each case, past, present and future.

3.	Participant acknowledges and agrees that Company has taken reasonable measures to keep such Confidential Information confidential or secret, and that the Confidential Information derives independent economic value from not being generally known to and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

4.	Participant agrees that he or she will return any such Confidential Information and property to Company upon the termination of Participant's employment or at any other time promptly upon the request of Company and that Participant will not share, copy, transmit, or use such Confidential Information or property except only to the extent required solely for and in the course of Participant's employment by Company.  To the extent the property is in an electronic format, Participant will confirm in writing upon request that he or she has returned or destroyed any such electronically-stored information or property that was in his or her possession, custody, and/or control.

5.	Upon termination of Participant's employment for any reason, or upon receipt of written request from Company, Participant shall immediately deliver to Company all tangible and intangible property (including computers, computing devices, cell phones, memory devices, files, data downloads and any other tangible item), drawings, notes, memoranda, specifications, devices, notebooks, formulas and  documents, together with all copies of any of the foregoing, and any other material containing, summarizing, referencing, or incorporating in any way or otherwise disclosing any work product or Company materials.

B.	Non-Solicitation.  To the fullest extent permitted by applicable law, Participant agrees that he or she will not, while in the employment of Company and for a period of one (1) year after the termination of that employment regardless of reason, solicit or induce, directly or indirectly, whether on his or her own behalf, working with or through others, on or behalf of or

through any other person, business or entity, an employee or independent contractor of Company to terminate or breach his or her employment or contractor relationship with Company or apply for employment or a contractor relationship with any person, business or entity.

C.   Remedies.  Participant acknowledges that monetary damages alone will not be a sufficient remedy for Participant's breach of any provision of this Section VI of this Plan and that, in addition to other remedies available to Company, Company shall be entitled to specific performance, injunctive relief, or such other equitable relief a court of competent jurisdiction deems appropriate.  The prevailing party in any legal action arising from or relating to Section VI of this Plan shall be entitled to recover its reasonable attorneys' fees and costs including those incurred in any related appeal.

D.   Continuing Obligations.  The obligations of the Participant under Section VI of this Plan and all ownership rights, assignments and licenses provided for in this Section VI of this Plan will survive and continue after the termination of the Participant's employment for any reason or any termination of the Plan.

RECEIPT & ACKNOWLEDGEMENT

By acknowledging this document through Docusign/Workday, I understand that I am acknowledging that I have received, reviewed, and accept the terms of the Plan, including the MIP and any applicable RITs.  I also understand and agree that the Company may change, modify, amend or terminate the Plan at any time at its sole discretion.  I understand that this Plan does not constitute a guarantee or contract of employment, and nothing in it should be construed to limit or change the at-will employment relationship between the Company and myself which may be terminated at any time, with or without cause or notice, by me or the Company.

EMPLOYEE'S ACKNOWLEDGMENT THROUGH DOCUSIGN/WORKDAY CONSTITUTES AN ELECTRONIC SIGNATURE AND CONFIRMS THAT HE OR SHE HAS READ THE PLAN, INCLUDING ANY RITS, IN ITS ENTIRETY AND UNDERSTANDS ITS TERMS AND ACKNOWLEDGES THAT HE OR SHE HAS HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL OF HIS OR HER CHOICE AND/OR OTHER PERSONS TO THE FULL EXTENT DESIRED BEFORE SIGNING THIS AGREEMENT. EMPLOYEE'S ACKNOWLEDGEMENT REPRESENTS THAT HE OR SHE HAS BEEN GIVEN A REASONABLE TIME TO REVIEW AND CONSIDER THIS AGREEMENT AND ENTERS THIS AGREEMENT OF HIS OR HER OWN FREE CHOICE. IF EMPLOYEE HAS ANY QUESTIONS REGARDING THESE TERMS, PLEASE CONTACT generalcounsel@loandepot.com.

Acknowledged, Accepted and Agreed by:

*Michael Secor*
**Signature - Michael Secor**

Mar 20, 2019 | 11:19 AM PDT
**Date**

**loanDepot**

ATTACHMENT A: Role Specific Incentive Terms

This Attachment A - Role Specific Incentive Terms ("RIT") is incorporated by reference into and subject to the Retail Master Incentive Plan ("MIP"). From and after the Effective Date, this RIT replaces all prior RITs and incentive plans. Capitalized terms not otherwise defined herein shall have the meaning set forth in the MIP.

**Effective Date**
This RIT is effective January 1, 2019 ("Effective Date") and shall continue until changed, modified, amended or terminated, at the sole discretion of the Company.
1. Funded Loans that are locked prior to the Effective Date will be eligible for incentive payment pursuant to the RIT in effect of as of the Funding Date. Notwithstanding the foregoing, Funded Loans that have a Funding Date in January will be compensated at the higher of the RIT in effect as of the Funding Date or compensation plan in effect prior to the Effective Date.
2. Funded Loans that are locked on or after the Effective Date; and (a) locked and priced through the PP&E, will be eligible for incentive payment pursuant to the RIT in effect as of the most recent Lock Date; or and (b) not locked and priced through the PP&E, will be eligible for incentive payment pursuant to the RIT in effect as of the Funding Date.

**Compensation Components**
**Salary Compensation** - the Retail Loan Consultant ("LC") is an incentive only position and is exempt from overtime pay. All LCs are expected by the Company and required to spend a majority of his or her work time (50% or greater) working outside the office to generate sales through conducting sales calls and creating, developing and maintaining referral relationships with real estate professionals, builders, and consumers.

**Incentive Compensation** - refer to terms of the incentive compensation section below. The incentive compensation below defines the level of Basis Points ("BPS") that are utilized to calculate sales incentives on Funded Loan volume <u>prior</u> to any adjustments elected by the Retail Loan Consultant in the Sales Election Calculator ("SEC"). The SEC allows a LC to propose various elective selections for sales and marketing support that will result in an adjustment to the incentive compensation. Any elective selections and adjustment to incentive compensation proposed by the LC and will be documented on the SEC election forms.

**Incentive Compensation**

A. **Qualified Loan Pool**

An LC's Qualified Loan Pool consists of all Self-Sourced Funded Loans originated by the LC during the calendar month that are not part of the LC's Payment Schedule Loan Pool (set forth in Section B below). The Qualified Loan Pool incentives are based on the base BPS Incentive Rate set forth below, subject to any modification made in the SEC. Subject to adjustment or change pursuant to the other terms of this Plan, incentives ordinarily will be calculated by multiplying the BPS Incentive Rate by the amount of an eligible Funded Loan.

1. BPS Incentive Rate for Qualified Loan Pool – **90 BPS**
2. Maximum incentive that can be earned on any individual Funded Loan in the Qualified Loan Pool **- $7,000.00.**
3. For calculation of incentive pay on subordinate-lien mortgages, the loan amount of the subordinate-lien mortgage shall be added to the loan amount of the first-lien mortgage. First-lien mortgages with "piggyback" subordinate-lien loan products qualify as a single unit and are subject to the maximum incentive cap.

B. **Payment Schedule Loan Pool**

The Payment Schedule Loan Pool includes the following Funded Loan types, and incentives may be earned at the base rates set forth below, subject to any proposed modification made in the SEC approved by the Company. Subject to adjustment or change pursuant to the terms of this Plan, incentives ordinarily will be calculated by multiplying the base rate by the amount of an eligible Funded Loan.

1. Broker Loans
2. Corporate Sourced Loans
3. Silent Seconds/Bond Second Loans
4. Permitted Loan Transfers
5. Retail Transferred Loans
6. Refinance Transfer to Direct
7. Retail Loan Recapture Program
8. Early Pay-Off ("EPO") Loans
9. Employee Loans

Unless otherwise provided below, the maximum incentive that can be earned on any individual Funded Loan in the Payment Schedule Loan Pool **- $7,000.00.** *(same cap as Qualified Loan Pool)*

1. <u>Broker Loans:</u>  Loans brokered to third-party lenders other than the Company will be paid a sales incentive of 50 BPS. Notwithstanding the foregoing, HELOC's brokered to a third-party lender other than the Company will be paid a sales incentive of $300 per funded HELOC. The LC may only broker loans in situations in which the Company does not offer an identical or comparable product to that offered by the third-party lender or the loan has been denied under the Company guidelines. Brokered loans that do not meet this standard will not be eligible for any sales incentives.

2. <u>Corporate Sourced Loans:</u> Corporate Sourced Loans are defined as loans from any source in which the Company has a relationship that has led to a Funded Loan with the exception of loans that are self-sourced by the LC. Corporate Sourced Loans include, but are not limited to, loans sourced through Company marketing, affinity agreements, Builder Select Community loans, employer loans from the Company or its affiliates, portfolio refinance programs and DPLP.
   a. <u>Special Company Sourced Loan Types</u>:
      i. Terminated LO transfer:  20 BPS up to a cap of $500
   b. All other Company Sourced Loan Types: 50 BPS

3. <u>Silent Second/ Bond Second Loans:</u>   Silent second-lien loans or other bond program subordinate-lien mortgages for which Company does not receive compensation are not eligible for any sales incentives.

4. <u>Permitted Loan Transfers</u>: LC is permitted to transfer loans to another LC for the reasons stated below. To the extent permitted under applicable law, the LC is eligible for a sales incentive rate of 30 BPS for any Permitted Loan Transfer that results in a Funded Loan. Any loan transfer outside those defined below is not permissible and not eligible for any sales incentive. "Permitted Loan Transfers" shall include:
    a. <u>Licensed State Transfer</u> - LC with a MLO license, but not licensed in the state where the property that is the subject of the loan is located. May transfer the loan to another originator in the same branch, another branch or different channel that holds the appropriate state license.
    b. <u>Extended Time Away from Office Transfer</u> – If LC is out of the office for a permissible purpose for an extended period of time and needs another originator to assist the customer during the extended absence, the LC may transfer the loan to another originator.
    c. <u>Product Certification Transfer</u> - If LC is not certified or qualified to originate the product that best meets the customer's needs, the LC must transfer the loan to a designated originator.
    d. <u>Customer Requested Transfer</u> - If a LC transfers loan to another originator at the Company as a result of a written request of a customer.
    e. <u>Protected Builder Account</u> – If a LC receives a loan from a customer within a Protected Builder Account territory, the LC must transfer the loan to the designated Builder Account LC.

5. <u>Retail Transferred Loans</u>: Loans the LC receives from another retail channel loan originator as a result of a Permitted Loan Transfer that has resulted in a Funded Loan. The LC will be eligible to receive sales incentive for originating the Retail Transferred Loan equal to (A) the LC's BPS Incentive Rate for Qualified Loan Pool set forth above minus (B) 30 BPS.

6. <u>Refinance Transfer to Direct</u>: If LC requests a Direct Lending Loan Officer to assist a customer with refinance loan, the LC can transfer the loan to a Direct loan consultant. The LC will be eligible for sales incentive of 50 BPS up to a $1,500 cap on the refinance loan originated by the Direct Lending Loan Officer.

7. <u>Retail Loan Recapture Program</u>: LCs who opt in to Retail Loan Recapture Program on the LC's previously funded loan portfolio serviced by the Company will be eligible for sales incentive of 50 BPS up to a $1,500 cap on the refinance loan originated by a Direct Lending Loan Officer.

8. <u>Early Pay-Off ("EPO") Loans:</u> EPO Loans are defined as loans previously originated by Company that are refinanced within 180 days of the original Funding Date. EPO loans that are paid off within 120 days of the original Funding Date as a result of the LC refinancing the prior loan will not be eligible for sales incentive pay. EPO loans paid off between 121 to 180 days of the original Funding Date as a result of the LC refinancing the prior loan will be eligible for a sales incentive of 50 BPS.

9. <u>Employee Loans:</u> Employee Loans are defined as loans made to a Company employee. Employee Loans are not eligible for sales incentives. All Employee loans are originated in accordance with the Company's Employee Loan Policy. Such loans must be processed, underwritten and funded by a designated team.

C. **RIT Specific Incentive Payment Terms**

1. <u>Measurement Period</u>**:** The applicable measurement period for incentive compensation shall be the period of time beginning on the first day of the calendar month and ending on the last day of the calendar month.

2. <u>Reassignment/Transfer/Promotion/Separation Impact on Incentives</u>**:** If LC's employment with the Company terminates for any reason whatsoever, or he or she is reassigned, transferred, or promoted to a position that is not eligible to participate in this Plan, and another employee of the Company will have to perform significant work to ensure that any loans for which the application was taken by LC are funded, that necessary procedures are followed, and that other conditions regarding the loan are satisfied, the Company reserves the right to modify, reduce, adjust, or eliminate the LC's sales incentive pay; all such modifications, reductions, adjustments, or eliminations shall be made at the sole discretion of the Company. However, ordinarily the Company will allow LC to be eligible to earn sales incentives for loans for which LC provided services in accordance with the terms hereafter stated for 30 days after the termination of LC's employment, provided that: (1) all of the conditions precedent under the terms of the Plan for earning the incentives are satisfied during that 30-day period, including the condition that the loan funds within that 30-day period, (2) there are no early payment defaults within 90 days of the Funding Date of any such loan; (3) all loans are sellable, insurable and do not require extensive rework by the Company; (4) Final 1003s are signed by an employed, licensed Internal Loan Consultant or Loan Consultant of the Company; and (5) all other terms and conditions of the Plan are satisfied.

**loanDepot**

D. **Definitions**

1. DPLP: Means Digital Purchase Lead Program, a loanDepot strategic initiative that incorporates the Company's marketing spend and state of the art contact center to provide warm lead transfers to Retail LC's.

2. Funding Date: The date when the appropriate funds are drawn from the Company's warehouse lines and transmitted to the escrow agent to fund the loan.

3. Funded Loan: is defined as a funded residential mortgage loan that is originated by LC in accordance with all applicable state and federal law and regulations as well as the Company's policies and procedures. A loan is deemed funded on the Funding Date.

4. HELOC: A home equity line of credit is a loan in which the lender agrees to lend a maximum amount within an agreed period (called a term), where the collateral is the borrower's equity in his/her house.

5. Lock Date: Is the date the loan rate and pricing is confirmed as locked by the Company lock desk.

6. PP&E: Is loanDepot proprietary product, pricing and eligibility engine.

7. Self-Sourced Loans: Self-sourced loans are loans that the LC obtains through his or her own relationships, business sources, or marketing. Loans that are not Self-Sourced are not included in the Qualified Loan Pool.

RECEIPT & ACKNOWLEDGEMENT

I have received, reviewed, and accept the terms of this RIT. I also understand and agree that the Company may change, modify, amend or terminate this RIT at any time at its sole discretion. I understand that this RIT does not constitute a guarantee or contract of employment, and nothing in it should be construed to limit or change the at-will employment relationship between the Company and myself which may be terminated at any time, with or without cause or notice, by me or the Company.

RETAIL LOAN CONSULTANT ACKNOWLEDGES THAT HE OR SHE HAS READ THIS RIT AND THE MIP IN THEIR ENTIRETY AND UNDERSTANDS THEIR TERMS AND ACKNOWLEDGES THAT HE OR SHE HAS HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL OF HIS OR HER CHOICE AND/OR OTHER PERSONS TO THE FULL EXTENT DESIRED BEFORE SIGNING THIS RIT AND/OR THE RETAIL LOAN CONSULTANT AGREEMENT. RETAIL LOAN CONSULTANT'S ACKNOWLEDGEMENT REPRESENTS THAT HE OR SHE HAS BEEN GIVEN A REASONABLE TIME TO REVIEW AND CONSIDER THE RIT AND THE MIP, AND HAS AGREED TO EACH OF THEM OF HIS OR HER OWN FREE CHOICE. IF RETAIL LOAN CONSULTANT HAS ANY QUESTIONS REGARDING THESE TERMS, PLEASE CONTACT generalcounsel@loandepot.com.

*[signature: Dan A. Hanson]*

Dan Hanson
Chief Retail Production Officer
DHanson@loanDepot.com

Acknowledged, Accepted and Agreed by:

*[signature: Michael Secor]*

Case 1:22-cv-05971-LGS   Document 1-10   Filed 07/13/22   Page 13 of 18

**loanDepot**

**Signature - Michael Secor**

Mar 20, 2019 | 11:19 AM PDT
**Date**

DATE:           September 27, 2018
SUBJECT:        <u>Mutual Arbitration Agreement</u>

Attached is a copy of our Mutual Arbitration Agreement (the "Agreement").

In the rare case when disputes arise between LD Holdings Group, LLC, (and its parents, subsidiaries (which includes loanDepot.com, LLC), joint ventures, affiliates, officers, directors, agents, representatives, shareholders, successors and assigns, collectively "the Company"), and their employees, this Agreement provides both parties with an expedient alternative to costly and time-consuming litigation. In arbitration, claims are heard by a neutral third-party called an arbitrator. The parties are entitled to have their own attorneys represent them at the arbitration. Some of the benefits of arbitration are that it is generally a faster way of resolving disputes and less expensive for both sides. Arbitrations often provide a much greater level of privacy for both parties. The Company will pay all costs that are unique to arbitration including arbitration administrative fees, arbitration hearing fees and arbitrator compensation fees.

It is important to note that by signing this Agreement, you are not giving up all of your rights as an employee, but only agreeing that both you and the Company will waive your right to have disputes heard by a judge or jury in the court system. You also waive your right to file or participate in a class or collective action, and to the extent allowed by law, a representative action. However, you can still file claims against the Company individually in arbitration or with an administrative agency such as the Equal Employment Opportunity Commission.

Under this Agreement, the arbitrator would follow the JAMS Employment Arbitration Rules & Procedures, and be entitled to award relief that is similar to the relief available in court. A copy of the JAMS rules can be accessed online at http://www.jamsadr.com/rules-employment-arbitration and/or upon written request to me by email at [legal-arbitration@loandepot.com](mailto:legal-arbitration@loandepot.com).

Of course, there will be no retaliation against any employee who asks to review the JAMS Rules and/or who asks questions about this process.

Below is a list of Questions & Answers about the Agreement. If you have any other questions, please contact me directly by email.

DocuSign Envelope ID: 6002B705-9C09-4F17-A853-9D8F9E4534DF

Finally, please sign this memorandum below and return a copy to the Company, which will confirm that you received your own copy of this memorandum, the list of Questions & Answers, and the Agreement itself, on the date set forth below.

Acknowledgment

I received a copy of this memo, the list of Questions & Answers, and the Agreement on .

Mar 20, 2019 | 11:19 AM PDT

---

Michael Secor
EMPLOYEE PRINT NAME

*Michael Secor*
EMPLOYEE SIGNATURE

## Questions & Answers

**What is this document?** It is a Mutual Arbitration Agreement (the "Agreement").

**What is arbitration?** It is a legal process where the parties agree that any disputes between the parties that cannot be resolved informally must be resolved by a neutral third party called an arbitrator, instead of before a judge or jury in court. The parties are entitled to be represented by their own legal counsel at the arbitration. After reviewing the evidence and considering the arguments of the parties, the arbitrator makes a written decision to resolve the dispute. There will be no trial by a judge or jury, and no appeal of the arbitrator's decision, except as provided by law.

**Why is the Company using Arbitration Agreements?** The Company believes that resolving disputes through mutual arbitration instead of civil litigation in court benefits both parties. Arbitration is typically faster and less expensive than civil litigation in court for both parties.

**Who will run the arbitration?** A company called JAMS, whose website is at http://www.jamsadr.com/rules-employment-arbitration. You can obtain the JAMS Rules from that website, or upon written request to Peter Macdonald by email at legal-arbitration@loandepot.com. There will be no retaliation against you if request a copy of the JAMS Rules.

**Who pays the cost of arbitration?** The Company will pay the arbitrator's fees and any other administrative fees unique to arbitration.

**Can I still receive a similar award in arbitration that I would receive in court action?** An arbitrator is entitled to award relief that is similar to the relief available to you in court.

**What claims are not covered by the Agreement?** The Agreement only covers claims that can be arbitrated under the law. For example, workers compensation claims are not subject to arbitration, so they are not covered by this Agreement.

**Who has been asked to sign the Agreement?** Both new and current employees.

**Do I give up all of my rights to file claims against under the arbitration process in the Agreement?** No. You are not giving up all of your rights, but only agreeing that both you and the Company will give up the right to have disputes heard by a judge and/or jury in court. You also give up your right to file or participate in a class or collective action, and to the extent allowed by law, a

representative action, including any pending actions. However, you can still file any individual claims against the Company in arbitration or with an administrative agency.

**What if I have any additional questions?** You may contact Peter Macdonald by email at legal-arbitration@loandepot.com.

## ARBITRATION AGREEMENT

This Mutual Arbitration Agreement (the "Agreement") is entered into by Michael Secor and LD Holdings Group, LLC, (and its parents, subsidiaries, joint ventures, affiliates, officers, directors, agents, representatives, shareholders, successors and assigns, collectively "the Company"), as of `Mar 20, 2019 | 11:19 AM PDT`. In consideration for signing this Agreement, and the performance of the terms herein, you and the Company (collectively the "Parties") hereby agree:

1.      Arbitration. This Agreement requires the Parties to arbitrate all Claims, as defined in Section 3 of this Agreement, the Parties may have against each other. In arbitration, each side in the dispute presents its case to a neutral third party called an arbitrator, rather than to a judge or jury. You and the Company are entitled to be represented by your own legal counsel in the arbitration. After reviewing the evidence and considering the arguments of the Parties, the arbitrator will issue a written decision. There will be no trial by a judge or jury, and no appeal of the arbitrator's decision, except as provided by law.

2.      Arbitrator. By signing this Agreement, the Parties agree any arbitration shall be conducted before one neutral arbitrator selected by the Parties under the JAMS Employment Arbitration Rules & Procedures (the "JAMS Rules") then in effect. You may obtain a copy of the JAMS Rules by accessing the JAMS website at http://www.jamsadr.com/rules-employment-arbitration and/or by requesting a copy of the JAMS Rules from Peter Macdonald by email at legal-arbitration@loandepot.com.

3.      Claims. The claims covered by this Agreement, and subject to arbitration, include but are not limited to all past, present, future claims, including any currently pending litigation and/or class/collective/representative actions against the Company, for claims of: wrongful termination; discrimination; harassment; retaliation; breach of contract/covenant; trade secrets; emotional distress; fraud; misrepresentation; defamation; tort claims; wage and hour claims including but not limited to claims of: minimum wage, off the clock work, overtime, bonuses, meal/rest periods, wage statements, reimbursement, penalties, benefits; violation of any federal, state or other government constitution, statute, ordinance or regulation, including but not limited to Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the Americans With Disabilities Act, the Fair Labor Standards Act, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the Family and Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, the California Labor Code, the California Civil Code, the California Business and Professions Code, the California Wage Orders, and/or the California Private Attorneys General Act (to the extent allowed by law) (collectively the "Claims"); however, the term "Claims" does not include any claim or claims that cannot be arbitrated under the law. With the exception of claims brought before the California Division of Labor Standards Enforcement, nothing herein, however, shall prevent me from filing and pursuing administrative proceedings before administrative agencies such as the California Department of Fair Employment and Housing, or the United States Equal Employment Opportunity Commission (although if I choose to pursue a claim following the exhaustion of such administrative remedies, that claim would be subject to the provisions of this Agreement).

**loanDepot**

4.  Initiating Arbitration. Either Party may initiate arbitration by making a written request to arbitrate to the other Party listing the Claim(s) to be arbitrated. Requests to the Company shall be delivered to Peter Macdonald by email at legal-arbitration@loandepot.com. Requests to you shall be delivered to the last known mailing address you provided in writing to the Company. The arbitration shall take place in the county where you were last employed by the Company. The Company will pay the arbitrator's fees and any other administrative fees unique to arbitration.

5.  Arbitrator's Authority. The arbitrator shall apply applicable law to determine issues of liability and damages regarding all Claims to be arbitrated. The arbitrator is authorized to award any remedy or relief that would have been available to the Parties had the matter been heard in court. The arbitrator shall have the authority to provide for the award of attorneys' fees and costs to the prevailing party, if such award is authorized by applicable law. The decision of the arbitrator shall be in writing and shall provide the reasons for the arbitrator's award. The arbitrator's authority to resolve disputes and make awards under this Agreement is limited to disputes between (1) you as an individual and the Company; and (2) you as an individual and any current or former officer, director, representative, and/or agent for conduct within the scope of his or her employment with the Company. No arbitration award or decision will have any preclusive effect as to issues or Claims in any dispute with anyone who is not a named party to the arbitration. This Agreement shall not be construed to deprive a party of any substantive right preserved by law.

6.  No Class, Collective or Representative Actions. The Parties agree that each may file claims against the other only in their individual capacities, and may not file claims as a plaintiff and/or participate as a class member in any pending or future class and/or collective action against the other, including any currently pending actions at the time this Agreement is executed by you. The Parties agree that a court, not an arbitrator, shall determine whether class or collective actions are authorized in arbitration by this Agreement. The Parties agree that any class or collective claims that are found not subject to arbitration under this Agreement shall be resolved in court, and are stayed pending the outcome of the arbitration.

7.  No Representative Actions. The Parties agree that each may file claims against the other only in their individual capacities, and may not file claims as a plaintiff and/or participate as a representative in any pending or future representative action against the other, except to the extent this provision is unenforceable under the law, including any currently pending actions at the time this Agreement is executed by you. The Parties agree that a court, not an arbitrator, shall determine whether any representative claims are authorized in arbitration by this Agreement. The Parties agree that any representative claims that are found not subject to arbitration under the law shall be resolved in court, and are stayed pending the outcome of the arbitration.

8.  Protections. If a court determines that this Agreement is lacking any employee protections required by law, The Company may offer the employee protections the court and/or law deems necessary to preserve the enforceability of this Agreement. Notwithstanding the unavailability of class, collective or representative arbitration under this Agreement, nothing herein is intended to limit your rights under Section 7 of the National Labor Relations Act, including the right to engage in concerted activity, and you will not be retaliated against for exercising such rights.

9.  Severability. If any provision of this Agreement is determined to be illegal or unenforceable, such determination shall not affect the balance of this Agreement, which shall remain in full force and effect, and such invalid provision shall be deemed severable.

10. Miscellaneous. The Parties agree that the Company is engaged in transactions involving interstate commerce, and this Agreement shall be enforceable under the substantive and procedural provisions of the Federal Arbitration Act, 9 U.S.C. §§ 1, et seq. This Agreement supersedes any prior written and/or verbal agreements concerning arbitration between the Parties. The Parties confirm that they have read the Memorandum and list of Question & Answers dated September 27, 2018, explaining the arbitration process.

BY SIGNING THIS AGREEMENT, THE PARTIES AGREE THAT THEY HAVE READ THIS AGREEMENT, UNDERSTAND ITS TERMS, HAVE ENTERED INTO IT VOLUNTARILY, AND AGREE TO ARBITRATION.

Michael Secor
EMPLOYEE'S NAME

Name: Peter Macdonald Title:
EVP, General Counsel for LD
Holdings Group, LLC

**loanDepot**



## ACKNOWLEDGMENT

Initial each of the blanks below to indicate your agreement with the corresponding statements:

_MS_ I understand that I have signed a Mutual Arbitration Agreement (the "Agreement").

_MS_ I had an opportunity to read the Agreement before I signed it.

_MS_ I agreed to arbitrate any claims that I might have against the Company as designated on the agreement, except for claims that cannot be arbitrated under the law, such as workers compensation claims.

_MS_ I voluntarily waived my right to act as a plaintiff, class member or representative in any class, representative, or collective actions, including any pending actions, to the extent allowed by law.


_Michael Secor_
EMPLOYEE PRINT NAME

_Michael Secor_ (signature)
EMPLOYEE SIGNATURE