## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**loanDepot.com, LLC**

          Plaintiff,

vs.

**CROSSCOUNTRY MORTGAGE, LLC, STANISLAV ALESHIN, KEISHA ANTOINE, ANTHONY AYALA, SCOTT BONORA, FAHEEM HOSSAIN, STUART KOLINSKY, BARRY KOVEN, DANIEL KWIATKOWSKI, JAROSLAW KWIATKOWSKI, YUSHENG LIU, ROBERT LONDON, ENRICO MARTINO, DANIEL MEIDAN, SCOTT NADLER, GIOVANNI NARVAEZ, DAVID OSTROWSKY, EMELINE RAMOS, ROBERT RAUSH, RAFAEL REYES, MICHAEL SECOR, LLEWELLYN TEJADA, ILYA VAYSBERG, ERIKA VIGNOLA, and YAN ZHENG**

          Defendants.

Case No. 1:22-cv-05971-LGS

**ECF Case**

## ANSWER TO VERIFIED AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND FOR DAMAGES AGAINST CROSSCOUNTRY & DEFENDANTS KOLINSKY, RAUSH, AND VIGNOLA

Defendant Faheem Hossain ("Defendant" or "Hossain"), by his attorneys, states the following as his Answer to Plaintiff loanDepot.com, LLC's ("Plaintiff" or "loanDepot") Verified Amended Complaint for Injunctive Relief (the "Amended Complaint") and Affirmative Defenses:

### INTRODUCTION

1.     In federal courts and arbitral tribunals across the United States, mortgage lenders have been forced to seek relief from ongoing and organized raiding attacks on their most important employees, profitable branches, and valuable proprietary data. The common denominator in nearly

all of these actions is CrossCountry Mortgage, an institution which, at the urging of its CEO Ronald Leonhardt, has adopted tortious interference, aiding and abetting, and theft of trade secrets as core corporate principles.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of these allegations in this paragraph and therefore denies the same.

2.     Plaintiff loanDepot, one of the country's largest and most successful mortgage lenders and a chief competitor to CrossCountry, has been the most frequently targeted CrossCountry victim. Indeed, loanDepot has already been compelled to seek relief from CrossCountry attacks in New Jersey, California, and Illinois. This time, loanDepot's New York operations are in the crosshairs. Since February 23, 2022, CrossCountry has improperly poached no fewer than 32 loanDepot employees from loanDepot branches in Manhattan, Brooklyn, and Fishkill, New York by interfering with loanDepot's contractual and other legal rights. More troubling still, loanDepot's initial review has shown that many of these employees took valuable loanDepot trade secrets and proprietary customer information with them when they left for CrossCountry and that CrossCountry is actively using this information to capture loanDepot business and customer relationships. loanDepot brings this action for injunctive relief and damages to address CrossCountry's and the Departed NY Employees' misappropriation of loanDepot's trade secrets, breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference with loanDepot's contracts and prospective economic advantage, and unfair competition.

**ANSWER:**  To the extent this paragraph contains allegations against Hossain specifically, Hossain denies the allegations. Hossain lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

139734134.1

3.      CrossCountry's focus on loanDepot's New York operations is hardly surprising. loanDepot's New York branches are highly profitable and have produced $846 million of loans per year on average. As has been its modus operandi in other regions of the country, CrossCountry seeks to capture this upside by targeting the top producers at loanDepot in the New York region. And to ensure that it is going after the best of the best, CrossCountry has trained its sights on those loanDepot employees, and their respective team members, who have achieved the prestigious "Chairman's Elite" status, a recognition reserved for loanDepot's top 250 producers. As it has done in other regions, CrossCountry poached these elite performers in New York and then conspired with these individuals—many of the Departed NY Employees—to orchestrate a widespread New York solicitation effort that resulted in a tidal wave of departures from loanDepot to CrossCountry as well as broad misappropriation of loanDepot's proprietary information and trade secrets.

**ANSWER:** To the extent this paragraph contains allegations against Hossain specifically, Hossain denies the allegations. Hossain lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

4.      The exodus of the Departed NY Employees from loanDepot to CrossCountry in this matter occurred in rapid and coordinated succession. First, Defendant Secor, a loan consultant, and Defendant Ramos, Secor's production assistant, abruptly resigned on February 23, 2022 and February 24, 2022, respectively. Nine loan consultants and three managers then not coincidentally followed them out the door over the next two weeks, including Defendant Bonora, an area sales manager, and the majority of Bonora's team. Since those departures, CrossCountry has successfully recruited 18 additional loanDepot employees, comprised of loan consultants, managers, and production assistants. These solicitations alone have inflicted heavy damage and

disruption on loanDepot. Indeed, the Departed NY Employees are among loanDepot's highest performers—accounting for approximately 81% of the loan volume achieved by loanDepot's New York operations in the past year—and, in some cases, worked for loanDepot for over ten years before being poached.

**ANSWER**:  Hossain admits only that he resigned from loanDepot on or about May 3, 2022. Hossain was not familiar with Secor or Ramos prior to this litigation. Hossain lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

5.     More damaging still, many of the Departed NY Employees took loanDepot's confidential, proprietary, and trade-secret information on their way out the door. As just one example, an initial forensic review of Defendant Bonora's loanDepot-issued computer reveals a pattern of egregious and carefully planned misappropriation. Bonora began laying the groundwork for his departure to CrossCountry months in advance by copying thousands of loanDepot documents—comprising client pre-approvals, client-specific property appraisals, and mortgage applications—to a USB drive. Acutely aware of the myriad lawsuits that have been brought against CrossCountry and the likelihood that his own conduct would be heavily scrutinized, Bonora also attempted elaborate steps to cover his tracks. These transparent efforts were ultimately fruitless but they cement the conclusion that Bonora and the other Departed NY Employees have acted in bad faith.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of these allegations in this paragraph and therefore denies the same.

6.     The information misappropriated by CrossCountry and the Departed NY Employees includes valuable and highly sensitive customer information, pipeline reports, realtor

lists, title reports, appraisals, disclosures, pre-approvals, tax documents, financial statements, and paystubs of loanDepot customers. Defendants Ramos and Martino alone copied over 10,000 of such documents between them to USB external storage devices before leaving. All of this information and material is subject to and protected by confidentiality provisions applicable to loanDepot employees, as well as a sweeping body of federal and state privacy laws and regulations that protect the non-public information that consumers provide to their lenders. By interfering with loanDepot's contractual protections and inducing the Departed NY Employees to breach their confidentiality obligations, CrossCountry has improperly obtained information and data that allows CrossCountry to capture a substantial amount of potential mortgage business that rightfully belongs to loanDepot.

**ANSWER:**  To the extent this paragraph contains allegations against Hossain specifically, Hossain denies the allegations. Hossain lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

7.     This is not mere speculation. Publicly available data has established that CrossCountry is actively using this illicitly obtained information to convert loanDepot customers and capture business properly belonging to loanDepot. While there generally is a multi-month time-lag in the public recording of mortgages, public data already shows that CrossCountry has begun to record loans with customers identified in loanDepot's misappropriated information. Indeed, numerous loanDepot customers who worked directly with Departed NY Employees at loanDepot have subsequently closed loans with CrossCountry. As detailed below, loanDepot is already aware of at least 60 loans closed by CrossCountry despite being in the pipeline at loanDepot while the Departed NY Employees were employed by loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of these

allegations in this paragraph and therefore denies the same.

8.      Notably, these wrongfully converted customers are likely just the first of many to be targeted by the Departed NY Employees and CrossCountry, and converted to CrossCountry, using loanDepot confidential and trade secret information. Because of the lag in the recording of mortgages, discovery will need to reveal the extent to which CrossCountry is exploiting the customer data misappropriated from loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of these allegations in this paragraph and therefore denies the same.

9.      Besides valuable customer information, the Departed NY Employees and CrossCountry also misappropriated loanDepot's internal personnel and financial information, internal service and operational manuals, the manner and methods of conducting business, and training and educational materials. Among other things, certain of the Departed NY Employees fed compensation and sales data about loanDepot employees to CrossCountry, so that CrossCountry can strategically target specific loanDepot employees. For example, the day before leaving loanDepot, Defendant Secor forwarded to his personal email address a communication identifying loanDepot's "2021 Region 12 LO Rankings," which identified the company's top producers in New York, New Jersey, Connecticut, Massachusetts, and New Hampshire.

**ANSWER:**  To the extent this paragraph contains allegations against Hossain specifically, Hossain denies the allegations. Hossain lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

10.     A number of the Departed NY Employees have already admitted that they took documents from loanDepot on their way out the door. For example, Defendant Ramos admitted that she "copied documents to a USB drive and deleted files from her OneDrive and email account

described" in the Complaint. ECF No. 109, ¶ 147. Similarly, Defendant Martino admitted that he copied "a list of contacts and leads to a USB drive," (ECF No. 105, ¶ 157) and Defendant Secor admitted that he "forwarded emails from his loanDepot email to his personal email, copied documents to a USB drive, and copied folders." ECF No. 106, ¶ 136.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of these allegations in this paragraph and therefore denies the same.

11.     CrossCountry is indisputably aware that both the data at issue and the Departed NY Employees implicated in its raid on loanDepot's New York operations are subject to restrictive covenants, including confidentiality restrictions and prohibitions on non-solicitation of loanDepot employees and customers. In fact, just a few years ago, CrossCountry perpetrated virtually the same attack on loanDepot in New York, resulting in litigation in federal court in New Jersey, followed by a settlement agreement that compensated loanDepot for a raid on loanDepot's New York City branch.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of these allegations in this paragraph and therefore denies the same.

12.     Similarly, earlier this year, a federal court in Chicago issued a temporary restraining order enjoining CrossCountry from engaging in virtually identical conduct with respect to loanDepot employees in Illinois. See loanDepot.com, LLC v. CrossCountry Mortgage, LLC, et al., Case No. 22-cv-1874 (N.D. Ill. April 15, 2022) ("Chicago Action"), at Dkt. 21 (enjoining departed loanDepot employees and CrossCountry from directly or indirectly (a) contacting or soliciting any customer or prospective customer listed on the stolen documents; (b) soliciting or inducing any loanDepot employee to terminate their employment or apply to CrossCountry; (c)

directly or indirectly accessing, using, relying on, disclosing, or storing any of loanDepot's confidential information or trade secrets).[1]

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of these allegations in this paragraph and therefore denies the same.

13.    At this point, it is clear that CrossCountry is willing to absorb such litigation and injunctive relief as a cost of doing (illegal) business. CrossCountry has simply and willfully continued to pillage loanDepot's employees and business even in the face of restraining orders and expedited litigation in multiple venues. Indeed, since initiating this lawsuit, CrossCountry has continued to raid other loanDepot branches across the country. Most recently, it took an entire Georgia branch, where twelve out of thirteen employees resigned within an 8-minute span, and began working at CrossCountry shortly thereafter; in addition, CrossCountry recently offered $500,000 incentives to two Minnesota-based loanDepot Area Managers to solicit loanDepot loan officers and their supporting teams. CrossCountry's CEO Leonhardt even offered to pay a $50,000 bounty to anyone who is able to coopt an entire loanDepot branch: "50k for ever [sic] depot branch they get!" And to help fund this strategy of employee raiding and misappropriation, CrossCountry

---

[1] Over the past several years, CrossCountry has systematically poached teams of employees from loanDepot and other large mortgage lenders across the country, knowing full well and in fact expecting that its competitors' employees would, in the course of joining CrossCountry, be violating contractual and legal obligations owed to their employers by soliciting other employees, misappropriating confidential information and trade secrets, and pirating loans in process with competing mortgage lenders. This has produced widespread litigation against CrossCountry from loanDepot and other mortgage lenders. *See, e.g., Homeside Fin.*, 8:18-cv-02639, Dkt. 27 (D. Md. 2018) (enjoining CrossCountry from: (a) directly or indirectly using, disclosing, or storing any of plaintiff's confidential information or trade secrets, including employee compensation information, training materials, and customer information; and (b) employing any of plaintiff's employees); *Caliber Home Loans, Inc. v. CrossCountry Mortgage, LLC*, 2:22-cv-00616 (W.D. Wash. 2022); *loanDepot.com, LLC v. Schneider et al.*, 1:22- cv-01874 (N.D. Ill. 2021); *Homeside Financial, LLC v. CrossCountry Mortgage, Inc.*, 8:18-cv-02639 (S.D. Ohio 2021); *American Neighborhood Mortgage Acceptance Company, LLC dba AnnieMac Home Mortgage v. CrossCountry Mortgage, Inc.*, 2:20-cv-00874 (D.N.J. 2020); *loanDepot.com, LLC v. CrossCountry Mortgage, Inc.*, 2:18-cv-12091 (D.N.J. 2018); *Homeside Financial, LLC v. CrossCountry Mortgage, Inc.*, 8:18-cv-02639 (D. Md. 2018); *Freedom Mortgage Corp. v. CrossCountry Mortgage, Inc.*, 2:18-cv-000270 (D. Nev. 2018); *Freedom Mortgage Corp. v. CrossCountry Mortgage, Inc.*, 2:18-cv-5783 (E.D.N.Y. 2018); *Guaranteed Rate, Inc. v. Conn, et al.*, 1:17-cv-03289 (N.D. Ill. 2017); *loanDepot.com, LLC v. CrossCountry Mortgage, LLC, et al.*, Case No. 37-2021-00022044 (Ca. Sup. Ct., San Diego Cty. May 18, 2021) (the "San Diego Action").

139734134.1

recently raised a $400 million war chest from outside investors. Leonhardt is quoted as admitting that this fresh investor capital was intended to grow CrossCountry's geographical footprint and expand its platform. Then, within one month of the outside funding being announced, CrossCountry executed on its scheme, first raiding loanDepot's Chicago branches, then its New York branches. Likewise, upon information and belief, CrossCountry has agreed to indemnify poached New York employees in the event of litigation.

      **ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of these allegations in this paragraph and therefore denies the same.

      14.     If anything, CrossCountry seems intent on taking its misconduct to the next level in this matter. On April 20, 2022, following the initial wave of defections by the Departed NY Employees to CrossCountry—and just a week after the court in Chicago issued its TRO— loanDepot sent a letter to CrossCountry, copied to certain of the Departed NY Employees, demanding that CrossCountry stop interfering with loanDepot's contractual rights and business relations and ensure that no loanDepot data, customer information, or other confidential information be used or disclosed. In an apparent effort to lull loanDepot and buy time, CrossCountry initially responded by stating that it would agree to "abide by" the terms of the Chicago Action TRO. Eager to avoid unnecessary motion practice, loanDepot agreed and drafted a written agreement that closely tracked the terms of the Chicago Action TRO in order to document CrossCountry's offer. But CrossCountry's offer was apparently a ruse. CrossCountry and the Departed NY Employees repeatedly refused to execute the agreement that they themselves had proposed, while using the delay to put the finishing touches on their illicit raid. During this protracted delay, no fewer than eight additional loanDepot employees were improperly solicited and resigned to join CrossCountry.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of these allegations in this paragraph and therefore denies the same.

15.     After this action was filed in July 2022, the parties—at the Court's urging—again tried to reach an agreement to prevent Defendants from improperly using loanDepot's confidential information and trade secrets. During these negotiations it became clear that Defendants would only agree to an order with a broad carve out for "basic customer contact" information that would allow Defendants to continue to use loanDepot's stolen trade secret documents and information to convert loanDepot's customers. Unsurprisingly, this was unacceptable to loanDepot. After numerous letters detailing the "basic customer contact" dispute, the Court entered a TRO enjoining Defendants from using or disclosing any loanDepot document or information "that (i) was obtained because of or through the Individual Defendants' employment with loanDepot and (ii) contains non-public customer information that was downloaded or obtained from loanDepot's files, systems or databases." ECF No. 91 at 5.

**ANSWER:**  Hossain admits the Court has entered a TRO in this case, prior to loanDepot adding him as a Defendant. Hossain otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

16.     Absent appropriate judicial intervention, CrossCountry will continue building its business by unlawful means—raiding loanDepot for its employees, trade secrets, and other confidential information that loanDepot spent many years and significant resources developing. Unless checked, CrossCountry's and the Departed NY Employees' ongoing attack on loanDepot's New York branches and business will continue to cause irreparable harm to loanDepot by, among other things: (a) impairing loanDepot's goodwill and reputation with its customers and referral sources; (b) destroying loanDepot's customer, referral, and employee relationships; (c) disrupting

the continuity of loanDepot's workforce; and (d) threatening the continued disclosure, misuse, and misappropriation of loanDepot's confidential and trade secret information, including legally protected consumer information.

**ANSWER:** Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

17.     Accordingly, loanDepot brings this action to obtain not just compensatory and punitive damages but preliminary and permanent injunctive relief enjoining Defendants from continuing to inflict irreparable harm on loanDepot by (a) their wrongful, threatened, and inevitable disclosure, taking, and using of loanDepot confidential, trade secret, and proprietary information; (b) wrongful solicitation of loanDepot employees; and (c) wrongful solicitation of loanDepot clients and customers.[2]

**ANSWER:** Hossain admits that loanDepot has filed this lawsuit which seeks compensatory and punitive damages as well as preliminary and permanent injunctive relief, but Hossain denies that loanDepot is entitled to such relief, or to any relief whatsoever, and denies that he has engaged in any conduct that has or would inflict irreparable harm on loanDepot.

## THE PARTIES

18.     Plaintiff loanDepot.com, LLC is a Delaware limited liability company with its principal place of business in Orange County, California. loanDepot is registered to do business in New York and operates multiple branches in New York, including in Manhattan, Queens, and Brooklyn.

---

[2] Pursuant to the Departed NY Employees' arbitration agreements with loanDepot, loanDepot will in parallel file a Demand for Arbitration and a Verified Statement of Claim against those Departed NY Employees who have agreed to arbitrate. To be clear, loanDepot does not seek to prevent the Departed NY Employees from working for CrossCountry, either through this action or in that arbitration. Rather, as against those Departed NY Employees in this action, loanDepot seeks to enforce their limited and tailored confidentiality and non-solicitation covenants.

139734134.1

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

19.     Defendant CrossCountry is a Delaware limited liability company, with its principal place of business in Brecksville, Ohio. CrossCountry is registered to do business in New York and has offices in New York.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

20.     Defendant Stan Aleshin is a natural person who, upon information and belief, resides in Brooklyn, New York. Aleshin was a loan consultant at loanDepot until March 11, 2022, when he voluntarily resigned to work for CrossCountry.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

21.     Defendant Keisha Antoine is a natural person who, upon information and belief, resides in Bay Shore, New York. Antoine was a production assistant at loanDepot until April 15, 2022, when she voluntarily resigned to work for CrossCountry.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

22.     Defendant Tony Ayala is a natural person who, upon information and belief, resides in Oceanside, New York. Ayala was a sales manager at loanDepot until March 30, 2022, when he voluntarily resigned to work for CrossCountry.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

139734134.1

23.     Defendant Scott Bonora is a natural person who, upon information and belief, resides in Westfield, New Jersey. Bonora was an area manager at loanDepot until March 22, 2022, when he voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

24.     Defendant Faheem Hossain is a natural person who, upon information and belief, resides in New Hyde Park, New York. Hossain was a loan consultant at loanDepot until May 03, 2022, when he voluntarily resigned to join CrossCountry.

**ANSWER:** Admit.

25.     Defendant Stuart Kolinsky is a natural person who, upon information and belief, resides in New York, New York. Kolinsky was a loan consultant at loanDepot until April 29, 2022, when he voluntarily resigned to work for CrossCountry's branch in Purchase, New York.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

26.     Defendant Barry Koven is a natural person who, upon information and belief, resides in Brooklyn, New York. Koven was a branch manager at loanDepot until March 22, 2022, when he voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

27.     Defendant Dan Kwiatkowski is a natural person who, upon information and belief, resides in Stamford, Connecticut. Dan Kwiatkowski was a loan consultant at loanDepot until March 22, 2022, when he voluntarily resigned to work at CrossCountry.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the

139734134.1

allegations in this paragraph and therefore denies the same.

28.     Defendant Jarek Kwiatkowski is a natural person who, upon information and belief, resides in Oceanside, New York. Jarek Kwiatkowski was a loan consultant at loanDepot until March 22, 2022, when he voluntarily resigned to work at CrossCountry.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

29.     Defendant Ron Liu is a natural person who, upon information and belief, resides in Bayside, New York. Liu was a loan consultant at loanDepot until March 18, 2022, when he voluntarily resigned to join CrossCountry.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

30.     Defendant Robert London is a natural person who, upon information and belief, resides in New York, New York. London was a loan consultant at loanDepot until March 28, 2022, when he voluntarily resigned to join CrossCountry.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

31.     Defendant Rick Martino is a natural person who, upon information and belief, resides in Brooklyn, New York. Martino was a loan consultant at loanDepot until April 11, 2022, when he voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

139734134.1

32.     Defendant Daniel Meidan is a natural person who, upon information and belief, resides in Tenafly, New Jersey. Meidan was a loan consultant at loanDepot until March 18, 2022, when he voluntarily resigned to work at CrossCountry.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

33.     Defendant Scott Nadler is a natural person who, upon information and belief, resides in New York, New York. Nadler was a loan consultant at loanDepot until March 21, 2022, when he voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

34.     Defendant Giovanni Narvaez is a natural person who, upon information and belief, resides in Yonkers, New York. Narvaez was a loan consultant at loanDepot until March 18, 2022, when he voluntarily resigned to work for CrossCountry.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

35.     Defendant Ostrowsky is a natural person who, upon information and belief, resides in New York, New York. Ostrowsky was a loan consultant at loanDepot until April 28, 2022, when he voluntarily resigned to join CrossCountry.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

36.     Defendant Emeline Ramos is a natural person who, upon information and belief, resides in Pensacola, Florida. Ramos was a production assistant at loanDepot at the Fishkill, New

139734134.1

York loanDepot branch until February 24, 2022, when she voluntarily resigned to work for CrossCountry.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

37.    Defendant Robert Raush is a natural person who, upon information and belief, resides in Wyckoff, New Jersey. Raush was a loan consultant at loanDepot until March 18, 2022, when he voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

38.    Defendant Rafael Reyes is a natural person who, upon information and belief, resides in Arverne, New York. Reyes was a Sales Manager until March 22, 2022, when he voluntarily resigned to work for CrossCountry.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

39.    Defendant Michael Secor is a natural person who, upon information and belief, resides in Poughkeepsie, New York. Secor was a loan consultant at loanDepot until February 23, 2022, when he voluntarily resigned to work for CrossCountry's branch in Danbury, Connecticut.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

40.    Defendant Llewellyn Tejada is a natural person who, upon information and belief, resides in Elmsford, New York. Tejada was a loan consultant at loanDepot until March 18, 2022, when he voluntarily resigned to work for CrossCountry.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the

16

139734134.1

allegations in this paragraph and therefore denies the same.

41.     Defendant Ilya Vaysberg is a natural person who, upon information and belief, resides in Staten Island, New York. Vaysberg was a loan consultant at loanDepot until May 04, 2022, when he voluntarily resigned to work for CrossCountry.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

42.     Defendant Erika Vignola is a natural person who, upon information and belief, resides in New York, New York. Vignola was a loan processor at loanDepot until April 11, 2022, when she voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

43.     Defendant Jenny Zheng is a natural person who, upon information and belief, resides in Glen Head, New York. Zheng was a loan consultant at loanDepot until April 27, 2022, when she voluntarily resigned to work for CrossCountry's branch in Brooklyn, New York.

**ANSWER:** Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

## **JURISDICTION AND VENUE**

44.     This Court has federal subject matter jurisdiction over Count I, a claim under the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. ("DTSA"). 28 U.S.C. § 1331. This Court further has supplemental jurisdiction over the other counts in this Complaint because they form part of the same case or controversy as Count I. 28 U.S.C. § 1367.

**ANSWER:**  Deny.

45.     Under 28 U.S.C. § 1391(b)(2), venue is proper in the Southern District of New York because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this judicial district. See also 28 U.S.C. § 1391(b)(3).

**ANSWER:**  Deny.

46.     CrossCountry is subject to personal jurisdiction in New York given its maintenance of multiple office locations in New York, misappropriation of trade secrets in New York, tortious interference in New York, and other suit-related conduct in New York.

**ANSWER:**   Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

47.     The Departed NY Employees are subject to personal jurisdiction in New York given that they reside and/or work in New York, maintain continuous contacts in New York, misappropriated trade secrets and confidential information in New York, improperly solicited employees in New York, and otherwise purposefully avail themselves of New York.

**ANSWER:** Hossain admits only that he resides and works in New York and denies the remaining allegations contained in this paragraph.

## FACTUAL ALLEGATIONS

### I.     loanDepot's Business and Employment of the Departed NY Employees

48.     loanDepot opened in 2010 with approximately 50 employees. The following year, loanDepot achieved $3 billion in annual loan volume, and thereafter quickly grew to become one of the country's largest and most successful mortgage lenders. Today, loanDepot has over 5,000 employees and is the second largest non-bank consumer lender in the U.S.

**ANSWER:**   Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

49.     The Departed NY Employees were integral to loanDepot's rapid growth and success.

**ANSWER:** Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### a)     **Defendant Aleshin**

50.     Aleshin started with loanDepot after previously working with Mortgage Master. At the time of his resignation, he was a loan consultant who reported to Defendant Bonora. As a loan consultant, he was responsible for cultivating loan referrals, including through referral partners, clients, and agents. He collaborated with borrowers to determine the best loan programs to meet their individual needs and preferences, based on their income, assets, credit, and property. Aleshin collected documentation from borrowers, including pay statements, bank account statements, and other highly personal, confidential, and protected financial information. He negotiated and confirmed rates, fees, and lock in terms with clients. Aleshin then locked in loans in loanDepot's system on the agreed-upon terms, and managed the locked pipeline through the funding of the loan. He was expected to communicate regularly with clients to meet their expectations and to further develop the customer relationship. Aleshin was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

51.     Aleshin is a licensed mortgage loan originator ("MLO"). Aleshin obtained licenses in four states, with only his New York license currently active. His MLO license is regulated by the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

52.     In 2021, Aleshin's pay was well into the six-figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### b)      Defendant Antoine

53.     Antoine started with loanDepot in 2020. At the time of her resignation, she was a production assistant for Defendant Bonora. As a production assistant, Antoine supported Bonora in administrative marketing and servicing clients and business partners. She helped manage Bonora's active pipeline and was responsible for, among other things, reviewing customer loan files for completeness. Antoine was expected to go the "extra mile" for customers to build trust, loyalty, and satisfaction through the loan process. Antoine was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

54.     In 2021, Antoine's total gross pay was just under six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### c)      Defendant Ayala

55.     Ayala started with loanDepot in 2021. Ayala was a sales manager who reported to Bonora until Bonora's resignation. As a sales manager, Ayala was responsible for supervising and managing the day-to-day affairs of numerous loan consultants. Ayala was also responsible for selling mortgage loan products and services to residential mortgage customers as well as developing and maintaining a network of relationships with existing and prospective clients. Ayala was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the

20

allegations in this paragraph and therefore denies the same.

56.     Ayala is a licensed MLO in three states, including New York. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

57.     In 2021, Ayala's pay was well into the six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### d)     **Defendant Bonora**

58.     Bonora came to loanDepot through loanDepot's acquisition of Mortgage Master. Bonora started with loanDepot as a producing branch manager in Manhattan. Over the last decade, and with substantial support and investment from loanDepot, Bonora helped grow loanDepot's New York operations, expanding the business to three branches and developing it into one of loanDepot's top-three producing branches in the country.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

59.     At the time of his resignation, Bonora was an area sales manager for New York City. As an area sales manager, Bonora was responsible for supervising and managing the day- to-day affairs of 55 loan consultants, branch and sales managers, and production assistants. Bonora was also responsible for selling mortgage loan products and services to residential mortgage customers as well as developing and maintaining a network of relationships with existing and prospective clients. Bonora was a highly trusted employee who owed a fiduciary duty to loanDepot.

139734134.1

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

60.     As one of loanDepot's highest performing employees, Bonora achieved loanDepot's Chairman's Elite status, an accolade awarded to the company's top 250 loan consultants. In 2021, Bonora generated over $100 million in loan applications (the third highest among all of loanDepot's branches in the northeastern states) and in funded loans (the fifth highest in the region).

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

61.     Bonora obtained MLO licenses in eight states, six of which are currently active, including New York. Each of his active MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

62.     In 2021, Bonora's total gross pay was well into the seven figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

e)     **Defendant Hossain**

63.     Hossain joined loanDepot in 2021 as a loan consultant reporting to Scott Bonora. At the time of his resignation, he was still a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Hossain was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  This paragraph contains legal conclusions to which on response is required. To the extent any response is required, Hossain denies the same. Hossain admits he joined

loanDepot in 2021 as a loan consultant and reported to Bonora. Hossain admits the general description of his job duties as detailed in paragraph 50 is accurate.

64.     Hossain is a licensed MLO in five states, including New York. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER**:  Admit.

65.     In 2021, Hossain's pay was in the six figures.

**ANSWER**:  Admit.

> **f)      Defendant Kolinsky**

66.     Kolinsky came to loanDepot through loanDepot's purchase of another mortgage lender, Mortgage Master. At the time of his resignation, he was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Kolinsky was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

67.     Kolinsky obtained MLO licenses in five states, four of which are currently active, including New York. Each of his active MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

68.     In 2021, Kolinsky's total gross pay was over six figures.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

> **g)      Defendant Koven**

69.     Koven joined loanDepot in 2018 as a loan officer reporting to Bonora. At the time of his resignation, he was a branch manager at the Brooklyn branch. As a branch manager, Koven was responsible for supervising and managing the day-to-day affairs of 15 loan consultants and production assistants. Koven was also responsible for selling mortgage loan products and services to residential mortgage customers as well as developing and maintaining a network of relationships with existing and prospective clients. Koven was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**   Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

70.     Koven is a licensed MLO in five states, including New York. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**   Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

71.     In 2021, Koven's total gross pay was well into the six figures.

**ANSWER:**   Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

**h)**     **Defendant Dan Kwiatkowski**

72.     Dan Kwiatkowski joined loanDepot in 2021. At the time of his resignation, he was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Dan Kwiatkowski was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**   Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

139734134.1

73.     Dan Kwiatkowski is a licensed MLO in five states, including New York. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

74.     In the six months he was employed by loanDepot in 2021, Dan Kwiatkowski's total gross pay was over five figures.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

> i)     **Defendant Jarek Kwiatkowski**

75.     Jarek Kwiatkowski joined loanDepot in 2019. At the time of his resignation, he was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Jarek Kwiatkowski was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

76.     Jarek Kwiatkowski is a licensed MLO in four states, including New York. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

77.     In 2021, Jarek Kwiatkowski's pay was well into the six figures.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

j)      **Defendant Liu**

78.      Liu joined loanDepot in 2017. At the time of his resignation, he was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Liu was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

79.      Liu obtained MLO licenses in nine states, six of which are currently active, including New York. Each of his active MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

80.      In 2021, Liu's total gross pay was well into the six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

k)      **Defendant London**

81.      London joined loanDepot through loanDepot's acquisition of Mortgage Master. At the time of his resignation, he was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. London was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

82.      London is a licensed MLO in two states, including New York. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

83.    In 2021, London's total gross pay was over six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

> **l)    Defendant Martino**

84.    Martino joined loanDepot in 2017. At the time of his resignation, he was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Martino was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

85.    Martino is a licensed MLO in New York. His MLO license is regulated by the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

86.    In 2021, Martino's total gross pay was over six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

> **m)    Defendant Meidan**

87.    Meidan joined loanDepot in 2017. At the time of his resignation, he was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Meidan was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

88.     Meidan is a licensed MLO in four states, including New York. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

89.     In 2021, Meidan's total gross pay was well into the six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### n)     Defendant Nadler

90.     Nadler joined loanDepot in connection with loanDepot's acquisition of Mortgage Master. At the time of his resignation, he was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Nadler was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

91.     Nadler is a licensed MLO in six states, including New York. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

92.     In 2021, Nadler's total gross pay was well into the six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

o) **Defendant Narvaez**

93.     Narvaez joined loanDepot in 2019. At the time of his resignation, he was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Narvaez was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

94.     Narvaez is a licensed MLO in two states, including New York. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

95.     In 2021, Narvaez's gross pay was just under six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

p) **Defendant Ostrowsky**

96.     Ostrowsky joined loanDepot in 2017. At the time of his resignation, he was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Ostrowsky was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

97.     Ostrowsky is a licensed MLO in three states, including New York. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

29

139734134.1

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

98.     In 2021, Ostrowsky's gross pay was well over six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

>      q)      **Defendant Ramos**

99.     Ramos started at loanDepot in 2019. At the time of her resignation, she was a production assistant for Secor. As a production assistant, Ramos supported Secor and had the same duties and responsibilities as Antoine, described above. Ramos was expected to go the "extra mile" for customers to build trust, loyalty, and satisfaction through the loan process. Ramos was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

100.     Ramos is a licensed MLO in Florida. Her MLO license is regulated by the applicable state regulatory agency

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

101.     In 2021, Ramos's total gross pay was over six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

>      r)      **Defendant Raush**

102.     Raush came to loanDepot through loanDepot's purchase of another mortgage lender, Mortgage Master. At the time of his resignation, he was a loan consultant who had similar

duties and responsibilities to Aleshin and other loan consultants, described above. Raush was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

103.    Like Bonora, Raush belonged to loanDepot's Chairman's Elite, reflecting his status as one of loanDepot's highest-performing loan consultants.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

104.    Raush obtained MLO licenses in seven states, six of which are currently active, including New York. Each of his active MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

105.    In 2021, Raush's total gross pay was well into the six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

    **s)**  **Defendant Reyes**

106.    Reyes joined loanDepot in 2017. At the time of his resignation, Reyes was a sales manager who reported to Scott Bonora and had similar duties and responsibilities to Ayala, described above. Reyes was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

139734134.1

107.    Reyes is a licensed MLO in four states, including New York. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

108.    In 2021, Reyes's gross pay was well over six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

t)    **Defendant Secor**

109.    Secor started with loanDepot as a loan consultant in 2019. At the time of his resignation, he was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Secor was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

110.    Like Bonora and Raush, Secor belonged to loanDepot's Chairman's Elite, reflecting his status as one of loanDepot's highest-performing loan consultants.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

111.    Secor obtained MLO licenses in four states, two of which are currently active, including New York. Each of his active MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

139734134.1

112.    In 2021, Secor's total gross pay was nearly half a million dollars.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

   **u)**  **Defendant Tejada**

113.    Tejada joined loanDepot in 2021 as a loan consultant. At the time of his resignation, he was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Tejada was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

114.    Tejada is a licensed MLO in four states, including New York. Each of his MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

115.    In 2021, Tejada's gross pay was over six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

   **v)**  **Defendant Vaysberg**

116.    Vaysberg joined loanDepot in 2020 as a loan consultant. At the time of his resignation, he was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Vaysberg was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the

139734134.1

allegations in this paragraph and therefore denies the same.

117.    Vaysberg obtained MLO licenses in six states, five of which are currently active, including New York. Each of his active MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

118.    In 2021, Vaysberg's gross pay was well over six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### w)    **Defendant Vignola**

119.    Vignola came to loanDepot through its acquisition of Mortgage Master. At the time of her resignation, she was a loan processor. As a loan processor, Vignola assisted with the closing of loans by collecting and organizing application paperwork for the underwriting process. Vignola was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

120.    In 2021, Vignola's total gross pay was over six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### x)    **Defendant Zheng**

121.    Zheng joined loanDepot in 2018. At the time of her resignation, she was a loan consultant who had similar duties and responsibilities to Aleshin and other loan consultants, described above. Zheng was a highly trusted employee who owed a fiduciary duty to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the

34

allegations in this paragraph and therefore denies the same.

122.    Zheng is a licensed MLO in four states, including New York. Each of her MLO licenses is regulated by the applicable state regulatory agency, including the New York Department of Financial Services.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

123.    In 2021, Zheng's total gross pay was over six figures.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

## II.    The Departed NY Employees' Restrictive Covenants

124.    To safeguard its confidential, proprietary, and trade secret information from being used for any unauthorized purpose—i.e., for any purpose other than conducting loanDepot's business—and to protect its substantial investment in its employees, loanDepot requires its employees to agree to confidentiality, non-disclosure, and non-solicitation restrictions.

**ANSWER:**  Hossain admits only that he entered into the Employee Confidentiality, Work Product, Intellectual Property, and Non-Solicitation Agreement, attached as Exhibit E-2 to the Amended Complaint. Hossain lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

125.    The Departed NY Employees agreed to be bound by such obligations as a condition of their employment at loanDepot and receipt of loanDepot's confidential, proprietary, and trade secret information. The Departed NY Employees are bound by similar restrictive covenants under their Retail Master Incentive Plan Agreements ("Incentive Agreements") or Employee Confidentiality, Work Product, Intellectual Property, and Non-Solicitation Agreements

139734134.1

("Confidentiality Agreement").[3] While the Incentive Agreements and the Confidentiality Agreements have minor differences, they are identical in all material respects related to confidentiality, non-disclosure, and non-solicitation of employees. The Confidentiality Agreements contain a restrictive covenant prohibiting the solicitation of customers as well.

**ANSWER**:  Hossain admits only that he entered into the Employee Confidentiality, Work Product, Intellectual Property, and Non-Solicitation Agreement, attached as Exhibit E-2 to the Amended Complaint. Hossain lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

126.    Under the restrictive covenants contained in the Agreements, the Departed NY Employees agreed to, among other things, keep confidential loanDepot's proprietary, and trade secret information. The Departed NY Employees also agreed, while employed and for a period of one year following cessation of employment, to not solicit or induce an employee or independent contractor of loanDepot to, among other things, apply for employment with another business. Moreover, Defendants Aleshin, Antoine, Ayala, Hossain, Kolinsky, Koven, Dan Kwiatkowski, Jarek Kwiatkowski, Liu, London, Martino, Meidan, Nadler, Narvaez, Ostrowsky, Ramos, Raush, Secor, Tejada, Vaysberg, Vignola, and Zheng also agreed to non-solicitation clauses regarding loanDepot's customers.

**ANSWER**:  Hossain admits only that he entered into the Employee Confidentiality, Work Product, Intellectual Property, and Non-Solicitation Agreement, attached as Exhibit E-2 to the Amended Complaint. Hossain lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

---

[3] The executed agreements for the Departed NY Employees are attached as Exhibits A-X. Attached as Appendix I is an index detailing the attached agreements and their corresponding Exhibit lettering and numbering.

139734134.1

127.   As alleged herein, the Departed NY Employees have willfully breached these obligations, and CrossCountry has tortiously interfered with the same.

**ANSWER:**  Deny.

a)      **Confidentiality and Non-Disclosure Obligations**

128.   With respect to loanDepot's confidential, proprietary, and trade secret information, the Departed NY Employees agreed that they would keep strictly confidential and would not disclose to any person or entity any Confidential Information. While each Departed NY Employee has a slightly different agreement, the Departed NY Employees all agreed in sum and substance to the following confidentiality provision in the Confidentiality Agreement:

> Employee agrees that, while employed by loanDepot and at any time thereafter, Employee will keep strictly confidential and will not, directly or indirectly, disclose to any person or entity or use for the benefit of Employee or any other person or entity any "Confidential Information," as defined below, that Employee learned, obtained or had access to in the course of or as the result of Employee's employment with loanDepot or using loanDepot's systems, access means or computing or mobile devices. Employee agrees, at all times, to take appropriate and reasonable steps to safeguard Confidential Information and to protect it against disclosure, misuse, unauthorized access, espionage and theft.

*See, e.g.*, Ex. A-2, Confidentiality Agreement Section 2(A). The Incentive Agreements contain materially similar language. See Ex. B-3, Incentive Agreement VI(A).[4]

**ANSWER:**  Hossain admits that Exhibit E-2 (his agreement attached to the Amended Complaint) contains the foregoing language, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

129.   The Confidentiality Agreements and the Incentive Agreements define Confidential Information to include, among other things, information and materials that the Departed NY

---

[4] Each Departed NY Employee's Incentive Agreements or Confidentially Agreement is attached to the Complaint. *See* Ex A-[X]. While some agreements have slightly different numbering or different defined terms for loanDepot, the agreements contain the same or materially similar language as described.

139734134.1

Employees learned by virtue of their employment at loanDepot. The definition also includes customer information, including information about specific loans:

> "Confidential Information" means, information and materials in any medium learned, obtained or accessed by Employee because of or through Employee's employment with loanDepot, or using loanDepot's systems, access means or computing or mobile devices, about loanDepot's business, prospects, plans and operations, products, processes, methods of doing business, systems, databases and technology, inventions and other intellectual property, loan origination and marketing practices, training, services, and Customers (as defined herein) and that is not known or readily available through proper and lawful means to the general public. "Customers" means for purposes of this Agreement visitors or registrants to loanDepot websites, leads, callers to loanDepot call centers, loan or prequalification or preapproval applicants (whether or not a loan is approved or closed or denied), and loan customers, in each case, past, present and future.

*See, e.g.*, Ex. A-2, Confidentiality Agreement Section 2(B); Ex. B-3, Incentive Agreement Section VI(A)(2).

**ANSWER:**  Hossain admits that Exhibit E-2 (his agreement attached to the Amended Complaint) contains the foregoing language, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

130.    By virtue of either their Confidentiality Agreements or Incentive Agreements, the Departed NY Employees further agreed to return all Confidential Information and property to loanDepot upon termination of their employment or upon loanDepot's request. They further agreed to not share, copy, or transmit any Confidential Information except to the extent required solely for and in the course of their employment by loanDepot.

**ANSWER:**  Hossain states that Exhibit E-2 (his agreement attached to the Amended Complaint) speaks for itself and denies any allegations contained herein inconsistent with such agreement.

b)    **Employee Non-Solicitation Obligations**

131.    The Agreements also protect loanDepot's investment in its employees through a non-solicitation provision prohibiting the Departed NY Employees, during their employment with loanDepot and for one year thereafter, from soliciting an employee to "terminate that individual's employment" with loanDepot. *See, e.g.*, Ex. A-2, Confidentiality Agreements Sections 4(B-C). The Incentive Agreements include similar provisions. *See, e.g.*, Ex. B-3, Incentive Agreement Section VI(B).

**ANSWER:**  Hossain admits that Exhibit E-2 (his agreement attached to the Amended Complaint) contains the foregoing language, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### c)    Customer Non-Solicitation Obligations

132.    Defendants Aleshin, Antoine, Ayala, Hossain, Kolinsky, Koven, Dan Kwiatkowski, Jarek Kwiatkowski, Liu, London, Martino, Meidan, Nadler, Narvaez, Ostrowsky, Ramos, Raush, Secor, Tejada, Vaysberg, Vignola, and Zheng also agreed to customer non-solicitation provisions, which loanDepot included to protect its customer relationships. While some of the specific language varies across agreements, the Departed NY Employees are generally bound by the following non-solicitation clause from the Confidentiality Agreement:

> Employee agrees that, for a period of one (1) year following the termination of Employees employment, regardless of reason, Employee will not, under any circumstances, utilize or disclose trade secret o[r] Confidential Information of loanDepot, including non-public Confidential Information of a Customer obtained as a result of Employee's employment with loanDepot, in order to directly or indirectly call on, solicit, take away, or attempt to call on, solicit or take away any Customer with whom Employee became acquainted during the term of Employee's employment, as the direct or indirect result of Employee's employment with loanDepot. Employee agrees that the restrictions set forth in Sections 4(a) will not impose an undue hardship on Employee post-employment and are reasonably tailored to protect loanDepot's legitimate business interests.

*See, e.g.*, Ex. A-2, Confidentiality Agreement Section 4(A).

**ANSWER:**  Hossain admits that Exhibit E-2 (his agreement attached to the Amended

Complaint) contains the foregoing language, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

133.    The Departed NY Employees also expressly agreed that loanDepot would be entitled to injunctive relief for breaches of any of the foregoing provisions. Both the Confidentiality Agreements and the Incentive Agreements provide that loanDepot "shall be entitled to specific performance, injunctive relief, or such other equitable relief a court of competent jurisdiction or arbitrator deems appropriate." See, e.g., Ex. A-2, Confidentiality Agreement Section 6; see also, e.g., Ex. B-3, Incentive Agreement Section VI(C).

**ANSWER:**  Hossain admits that Exhibit E-2 (his agreement attached to the Amended Complaint) contains the foregoing language, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### d)    The Covenants Are Reasonable

134.    The Agreements are reasonable and tailored to protect loanDepot's legitimate interests including, but not limited to, its trade secrets, confidential customer information, customer goodwill, and its investment in its employees.

**ANSWER:**  This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Hossain denies the same.

135.    loanDepot expended substantial time, energy, money, and ingenuity in collecting and compiling its customer lists and documents, referral sources, and training materials. Because the mortgage loan industry is a competitive and regulated industry, information pertaining to loanDepot's business plans, products, services, training materials, strategies, employees, and customers is confidential and proprietary information, deserving trade-secret protection. loanDepot developed and marketed an extremely successful mortgage loan operation that is highly dependent upon maintaining the secrecy of this information.

**ANSWER:**  Hossain denies that loanDepot was involved in developing his customer lists and referral sources. Hossain self-generates his business. Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

136.    In addition, loanDepot also devotes substantial resources to the recruitment, training, mentoring, and compensation of its employees so that they can perform the necessary services for customers as well as develop and nurture the close relationships necessary to keep customers satisfied. The restrictive covenants that prohibit the direct or indirect solicitation of loanDepot employees are reasonable and narrowly tailored to protect loanDepot's legitimate interests in its investment in its employees and maintaining the stability of its workforce.

**ANSWER:**  With respect to the first sentence contained in this paragraph, Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same. The second sentence contained in this paragraph contains legal conclusions to which no response is required. To an extent a response is required, Hossain denies the same.

137.    In fact, CrossCountry's own employment agreements restrict its employees from using or disclosing the same confidential materials and define such information as "a trade secret." *CrossCountry Mortgage, LLC v. American Neighborhood Mortgage Acceptance Co., LLC, d/b/a AnnieMac Home Mortgage*, No. 2:22-cv-01119 (D.N.J. Mar. 1, 2022), Dkt. 1, ¶¶ 22-23. These same agreements prohibit the direct or indirect solicitation or hiring of CrossCountry employees for two years following the end of their employment. *CrossCountry Mortgage, Inc. v. Messina et al*, No. 1:19-cv-01021 (N.D. Ohio May 7, 2019), Dkt. 1, ¶ 17.

**ANSWER:**  This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Hossain denies the same. Hossain otherwise lacks sufficient

information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

138.     CrossCountry has emphasized that soliciting its customers, prospective customers, and referral sources "constitutes improper interference with [CrossCountry's] legitimate, actual and prospective business expectations and contractual relations with its customers, prospects and referral sources; constitutes misappropriation of [CrossCountry's] goodwill, and unfairly and unjustifiably harms [CrossCountry]." *Id*. ¶ 20.

**ANSWER:**  This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Hossain denies the same. Hossain otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

### III.     <u>LoanDepot's Policies Protecting Its Confidential Information</u>

139.     loanDepot takes seriously the protection of its confidential and trade secret information, including the security of confidential, non-public consumer information. Customers trust loanDepot with their most sensitive financial information, and expect loanDepot to take every reasonable measure to protect that information from improper use and disclosure.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

140.     Customer privacy, and the non-disclosure of confidential customer information, are vitally important to loanDepot, and loanDepot would be seriously harmed by the breach of customer privacy or unauthorized disclosure of its customers' confidential information.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

139734134.1

141.    As licensed loan originators, Aleshin, Ayala, Bonora, Hossain, Kolinsky, Koven,

Dan Kwiatkowski, Jarek Kwiatkowski, Liu, London, Martino, Meidan, Nadler, Narvaez,

Ostrowsky, Raush, Reyes, Secor, Tejada, Vaysberg, and Zheng were required to comply with the

Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801-6809 ("GLBA"), which governs the treatment of

confidential nonpublic information of consumers by financial institutions, along with comparable

state laws and regulations governing consumer privacy.

**ANSWER:**  This paragraph contains legal conclusions to which no response is required.

To the extent a response is required, Hossain denies the same.

142.    In addition to requiring that employees agree to confidentiality and non-disclosure

provisions, loanDepot has implemented significant controls to safeguard and secure its information

and that of its valued consumers.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the

allegations in this paragraph and therefore denies same.

143.    For example, loanDepot's proprietary databases that house confidential consumer

information are password-protected and require dual authentication. Once an employee accesses

these databases with unique credentials, the employee has access only to the information that the

employee needs to perform his or her duties on behalf of loanDepot.

**ANSWER:**  Deny. Hossain had access to all of his customer information, including post

close. Ayala lacks sufficient information to form a belief as to the truth of the allegations contained

in this paragraph and therefore denies the same.

144.    To further safeguard its data, information systems, and consumer and employee

information, loanDepot developed an Information Security Program ("ISP"), which is governed

43

by a written Information Security Policy ("ISP Policy"). Employees are required to read and acknowledge the ISP and ISP Policy. See Ex. Y.

**ANSWER:**  Hossain admits the ISP Policy is attached to the Amended Complaint as Exhibit Y, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

145.    Pursuant to the ISP, the following activities are strictly prohibited: (a) accessing data, a server, or an account for any purpose other than conducting company business, even if the employee otherwise has authorized access; (b) sharing company information with non-approved parties outside the company; and (c) storage of company information in non-company managed locations such as personal drives, personal cloud storage, and devices.

**ANSWER:**  Hossain admits the ISP Policy is attached to the Complaint as Exhibit Y, but otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies same.

146.    loanDepot's Employee Handbook also addresses safeguarding confidential information, including by (i) referencing a "Confidential and Consumer Information" policy, which states, "the Company has placed special emphasis on the appropriate collection, storage and use of customer information. Your role in privacy protection is critical," and (ii) incorporating the ISP Policy referenced above. The Departed NY Employees acknowledged that they received, read, and agreed to comply with the policies in the Employee Handbook.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

147.    These measures—confidentiality agreements, the ISP policy, loanDepot's detailed handbook, and password and database protection—are some of the significant and thorough steps loanDepot takes to protect its trade secret and confidential information.

**ANSWER:**  This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Hossain denies the same.

### IV.    The Coordinated Departure of the Departed NY Employees

148.    At the end of July 2021, having already raided loanDepot branches in Manhattan and San Diego, Leonhardt texted loanDepot's National Director of Business Development that he was offering CrossCountry's recruiters a $50,000 bounty for every loanDepot branch they could co-opt.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

149.    Since then, CrossCountry has received $400 million from outside investors, providing CrossCountry with fresh capital to fund its illegal aspirations. At the time, Leonhardt crowed that the "financing positions CrossCountry Mortgage for accelerated growth as we continue to expand our platform, geographical footprint and residential mortgage offering." One of CrossCountry's funders is likewise quoted as stating that "CrossCountry Mortgage continues to execute its organic and inorganic growth strategy."

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

150.    CrossCountry then began targeting loanDepot's operations in Chicago and New York.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

139734134.1

151.    Although the departures of loanDepot employees for CrossCountry in the New York region did not begin until late February 2022, in the months beforehand Defendant Bonora researched the details of CrossCountry's 2018 raid of loanDepot's New York branches. From this, Bonora would have been keenly aware of the pitfalls by CrossCountry and that cohort of departed employees that led to loanDepot's 2018 lawsuit.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

152.    Thus, in this case, the first wave of departures included seven of Bonora's deputies, but not himself. In the immediate aftermath, Bonora feigned to show his loanDepot superiors that he was attempting to stem the tide of additional departures. In reality, Bonora had already engaged in wide-scale copying of loanDepot's confidential information and spent a weekend day alone in loanDepot's New York City office under false pretenses, described further below. Two weeks later, it was Bonora's turn and he abruptly resigned. A surge of additional departures followed thereafter.

**ANSWER:**  Hossain admits only that he left loanDepot in May 2022. Hossain lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

153.    According to NMLS Consumer Access and the CrossCountry website, at least 17 of the departed employees, including Bonora and 11 of his deputies, joined the same CrossCountry branch at 37 N. 15 Street, Suite 108, Brooklyn, New York 11222.

**ANSWER:**  Hossain admits that he joined the CrossCountry branch at 37 N. 15 Street, Suite 108, Brooklyn, New York 11222. Hossain lacks sufficient information to form a belief as to the remaining allegations in this paragraph and therefore denies the same.

154.     The nature and circumstances of these closely-timed coordinated departures, along with CrossCountry's well documented history of facilitating similar raids across the country, leads to only one explanation: the departures were the result of rampant improper solicitation of loanDepot employees by the Departed NY Employees, with the knowledge and support of CrossCountry.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Hossain denies the same.

155.     Specifically, the departures began on February 23, 2022 when Defendant Secor resigned. The next day, February 24, Secor's production assistant, Defendant Ramos, resigned. According to NMLS Consumer Access, Secor commenced employment with CrossCountry effective February 24, 2022 at a branch location in Danbury, Connecticut. According to his LinkedIn profile, Secor is now a "Loan Officer" for CrossCountry. Upon information and belief, this position is virtually identical to the position Secor held at loanDepot. Upon information and belief, Ramos joined CrossCountry in a position virtually identical to her position at loanDepot on February 24, 2022.

**ANSWER:** Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

156.     The Ramos and Secor resignations were a harbinger of things to come. Just two weeks later, on March 11, 2022, Defendant Aleshin resigned from loanDepot's Manhattan branch. Aleshin had worked at loanDepot as a loan consultant since 2019 and reported to Defendant Bonora. According to NMLS Consumer Access, Aleshin commenced employment with CrossCountry, effective March 11, 2022, at the Brooklyn Branch. According to his LinkedIn

profile, Aleshin is now a "Senior Mortgage Loan Officer" for CrossCountry. Upon information and belief, this position is virtually identical to the position Aleshin held at loanDepot.

**ANSWER:** Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

157.    Then the dam broke. On March 18, five additional loan consultants, all of whom reported to Defendant Bonora, resigned: Defendant Liu, Defendant Meidan, Defendant Narvaez, Defendant Raush, and Defendant Tejada. According to NMLS Consumer Access, Liu and Tejada commenced employment with CrossCountry effective March 18, 2022, at the Brooklyn Branch. Defendant Raush commenced employment with CrossCountry at the Brooklyn Branch effective March 21, 2022. Meidan commenced employment with CrossCountry effective March 21, 2022, in Cranford, New Jersey. Narvaez commenced employment with CrossCountry effective March 30, 2022, in Boca Raton, Florida. According to their LinkedIn profiles, Defendants Meidan, Narvaez, Raush, and Tejada are Senior Loan Officers at CrossCountry. Upon information and belief, these positions are virtually identical to the positions they held at loanDepot.

**ANSWER:** Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

158.    Since these coordinated resignations on March 18, loanDepot lost 24 more loan consultants, managers, loan processors, and production assistants from its New York branches to CrossCountry.

**ANSWER:**  Hossain admits on or about May 2022 he resigned from loanDepot and has subsequently joined CrossCountry. Hossain lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

159.     On March 21, 2022, Defendant Nadler, who also reported to Bonora, abruptly resigned. He joined Aleshin, Liu, Raush, and Tejada at the Brooklyn Branch of CrossCountry, effective March 23, 2022.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

160.     On March 22, 2022, five more loanDepot employees left, including three managers, for the Brooklyn Branch of CrossCountry. That day, Defendant Bonora resigned, joining the Brooklyn Branch of CrossCountry effective March 29, 2022. In tandem, Defendants Reyes and Koven, both of whom reported to Bonora, resigned, and both joined the Brooklyn Branch of CrossCountry effective March 24, 2022. Defendants Dan and Jarek Kwiatkowski, loan consultants at loanDepot who reported to Defendant Koven, also resigned on March 22, 2022. Jarek Kwiatkowski joined CrossCountry's Brooklyn Branch, effective March 25, 2022, and Dan Kwiatkowski joined the Brooklyn Branch of CrossCountry, effective March 30.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

161.     On March 28, 2022, Defendant London, a loan consultant who reported to Bonora, resigned and joined the Brooklyn Branch of CrossCountry, effective the next day.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

162.     On March 30, 2022, Defendant Ayala, a sales manager who reported to Bonora, resigned and joined the Brooklyn Branch of CrossCountry, effective the next day.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

139734134.1

163.    On April 5, 2022, Henry Greenberg, a loan specialist who reported to Bonora, resigned and joined the CrossCountry branch located in Cranford, New Jersey, effective April 12, 2022.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

164.    Over the next month, Defendant Vignola, a loan processor, and production assistants Defendant Antoine, Emilio Sosa, Alexandra Gong, Alesia Khan, and Patricia Zielenski resigned from loanDepot and joined CrossCountry. Antoine, Sosa, and Khan previously supported Bonora at loanDepot. Gong supported Liu at loanDepot.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

165.    On April 11, 2022 Defendant Martino, a loan consultant who reported to Bonora, resigned and joined the Brooklyn Branch of CrossCountry, effective April 15, 2022.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

166.    On April 22, 2022 Robert LePanto, a loan processor, resigned from loanDepot and joined the Brooklyn Branch of CrossCountry, effective May 2, 2022.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

167.    On April 27, 2022 Defendant Zheng, a loan consultant who reported to Bonora, resigned and joined the Brooklyn Branch of CrossCountry, effective May 2, 2022.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

168.     On April 28, 2022 Defendant Ostrowsky, a loan consultant who reported to Koven and previously reported to Bonora, resigned and joined the Brooklyn Branch of CrossCountry, effective May 2, 2022.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

169.     On April 29, 2022 Defendant Kolinsky, a loan consultant who reported to Bonora, resigned from loanDepot and joined the CrossCountry branch located in Purchase, NY, effective May 2, 2022.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

170.     On May 3, 2022 Defendant Hossain, a loan consultant who reported to Bonora, resigned from loanDepot and joined the Brooklyn Branch of CrossCountry, effective that same day.

**ANSWER**:  Admit.

171.     On May 4, 2022 Defendant Vaysberg, a loan consultant who reported to Koven, and Natalya Trejos, Vaysberg's production assistant, resigned from loanDepot. Vaysberg joined the Brooklyn Branch of CrossCountry effective May 9, 2022.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

172.     On May 16, 2022 Katara Bush, a loan processor, resigned from loanDepot to join CrossCountry that same day.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

173.    The coordinated nature of these departures, combined with their rapid succession, erases any doubt that rampant solicitation was involved. *See Speedmark Transp., Inc. v. Mui*, 778 F. Supp. 2d 439, 443 (S.D.N.Y. 2011) (suspicious timing of defendants' resignations "support[s] a plausible claim that [defendants] violated the terms of their employment contracts" by soliciting employees with whom they worked to leave).

**ANSWER:**  Deny.

**V.**     **The Departed NY Employees Breach Their Contractual Obligations to loanDepot, with the Knowledge, Encouragement, and Assistance of CrossCountry**

174.    During their employment at loanDepot, and continuing after they left loanDepot to join CrossCountry, the Departed NY Employees schemed with CrossCountry to solicit additional loanDepot employees and to misappropriate loanDepot's confidential information, trade secrets, employees, and customers.

**ANSWER:**  Deny.

175.    Upon information and belief, CrossCountry induced at least some Departed NY Employees with both a signing bonus and an additional bonus if later-solicited employees achieved a certain dollar amount of loan origination. This incentivized the Departed NY Employees to not only leave loanDepot but also to then solicit other existing loanDepot employees to leave loanDepot and join CrossCountry. It further incentivized the Departed NY Employees to abscond with vast quantities of protected and confidential information that would enable them to transfer existing and prospective business to CrossCountry and hit the ground running with a ready-made book of business developed at loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

176.    Upon information and belief, the Departed NY Employees also agreed to misappropriate loanDepot confidential and trade secret information, including accessing, copying, and transferring to CrossCountry detailed customer lists with confidential information about thousands of loanDepot customers and referral sources.

**ANSWER**: Deny.

177.    Upon information and belief, as part of their scheme with CrossCountry, the Departed NY Employees also deliberately stalled borrowers and potential borrowers from doing business with loanDepot so that they could convert this business to CrossCountry.

**ANSWER**: Deny.

178.    CrossCountry knew the identity of the loanDepot employees who were the highest producing loan consultants and could wield influence over other employees.[5] CrossCountry communicated with loanDepot employees through the loanDepot employee's personal email accounts to deliberately conceal Defendants' knowingly wrongful misconduct.

**ANSWER**: Deny.

179.    CrossCountry was also aware of, or reasonably should have been aware of, the Departed NY Employees' restrictive covenants and legal obligations owed to loanDepot. loanDepot has filed suit against CrossCountry in three jurisdictions, including a lawsuit relating to the same offices at issue here (the Manhattan branch raid in 2018). Indeed, agreements containing identical restrictive covenants were part of the record in the San Diego Action as recently as June 2021, putting CrossCountry on notice of the form agreements applicable to all loanDepot

---

[5] An independent forensic investigation of the devices of defendants in the Chicago Action revealed that before leaving for CrossCountry certain loanDepot loan consultants emailed to their personal email addresses screenshots of a loanDepot Retail "leaderboard," which included information regarding the performance of loanDepot's top originators by purchase volume and units and loan amount volume and units. Not coincidentally, this leaderboard identified multiple individuals who resigned from loanDepot's New York branches to join CrossCountry, and was likely used by CrossCountry to target and solicit loanDepot's top originators.

139734134.1

employees at least as of that date. Moreover, CrossCountry requires its own employees to execute employment agreements with similar restrictive covenants. *See, e.g., CrossCountry Mortgage, Inc. v. Messina et al.*, 1:19-cv-01021 (N.D. Ohio) (alleging that two former CrossCountry employees violated the restrictive covenants of their employment agreements, including confidentiality, non-disclosure, and non-solicitation provisions, when they set up shop for a competing mortgage lender). It is not plausible that CrossCountry was unaware of the Departed NY Employees' restrictive covenants. In fact, Defendant Nadler discussed his contractual obligations with CrossCountry.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

180.    Defendants' ongoing and improper misappropriation of loanDepot's confidential and trade secret information and solicitation of loanDepot employees has caused, is continuing to cause, and threatens to cause, irreparable harm to loanDepot by, among other things, (a) impairing loanDepot's goodwill and reputation with its customers and referral sources; (b) destroying loanDepot's customer, referral, and employee relationships; (c) disrupting the continuity of loanDepot's workforce; and (e) threatening the continued disclosure, misuse, and misappropriation of loanDepot's confidential and trade secret information, including legally protected consumer information and proprietary operational, training, and educational materials.

**ANSWER:**  Deny.

181.    Prior litigation filed by loanDepot against CrossCountry in multiple jurisdictions has reinforced to CrossCountry and would-be-departing loanDepot employees that loanDepot will vigorously pursue its rights and the protection of its confidential information and trade secrets. This knowledge certainly resulted in efforts by Defendants to mask their wrongdoing to cover up

the coordinated exodus from loanDepot. Nevertheless, based upon an initial independent forensic examination of the Departed NY Employees' loanDepot devices and available emails, loanDepot was still able, in a short amount of time, to identify significant evidence of misconduct. A few examples of the Departed NY Employees' misconduct are described below. loanDepot's investigation is ongoing.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

a)     <u>**Defendant Bonora**</u>

182.     In September 2021, Bonora used his loanDepot-issued computer to review an opinion from the District Court of New Jersey denying CrossCountry's motion to dismiss as to all but one claim in the New Jersey Action. This opinion detailed CrossCountry's and the New Jersey defendants' specific wrongdoing, including how certain former loanDepot employees emailed private customer information, loan-related documents, and pipeline reports to personal email addresses. This opinion would have allowed Bonora to gain an in-depth understanding of how to attempt to avoid tipping off loanDepot to his and CrossCountry's scheme.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

183.     In November and December 2021, Bonora began to read extensively about CrossCountry online, including about the "Carbon Team," which includes the former loanDepot employees who were the subject of the 2018 CrossCountry raid and legal action. Bonora also researched CrossCountry's capital raising efforts, including the $400 million referenced above.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

55

184.    On January 23, 2022, Defendant Bonora transferred his "Clients" folder from his desktop to a USB drive. This folder contained over 200 folders named after clients, and those folders in turn contained hundreds of files. These files contained details about loanDepot's former, existing, and potential customers, and included extensive non-public customer information, such as pre-approvals, client-specific property appraisals, and mortgage applications.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

185.    Less than two weeks later, on February 8, 2022, Bonora suspiciously researched several CrossCountry employees, including Sam Hansen. Hansen had operated a mortgage team at a loanDepot branch in San Diego and subsequently took his entire team to CrossCountry in November 2021. Bonora had no legitimate business reason to do so, other than to prepare for his own impending departure to CrossCountry.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

186.    On March 9, 2022, Bonora looked up several more CrossCountry employees, including Steven Lo Bue, a Regional Vice President based in Hackensack, New Jersey.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

187.    On Sunday, March 6, 2022, roughly two weeks before his abrupt departure from loanDepot, Bonora made an unusual and out of the ordinary request: he asked a loanDepot employee to provide him weekend access to loanDepot's Manhattan office so that Bonora could supposedly retrieve a "cornhole game" for his vacation house. This was particularly out of character because Bonora did not typically come to the Manhattan office, let alone on a weekend.

139734134.1

Nevertheless, Bonora spent several hours in the office alone that Sunday. Despite having claimed that he needed access to the office to retrieve the cornhole game, Bonora conspicuously left the game in his office that day.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

188.    On March 11, 2022, Bonora emailed with Justin Lieberman, a Senior Vice President at CrossCountry, about his indemnification agreement with CrossCountry. Lieberman responded, "I will get you a copy of the contract today."

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

189.    On March 18, 2022, after five of Bonora's team members left for CrossCountry, Bonora wrote to his loanDepot supervisor: "Need to talk. I need a little time to digest but we have multiple resignations today. Please give me a few [sic] I am going to take a walk and get my emotions and stress in check." Upon information and belief, Bonora deliberately intended to deceive his supervisor by claiming "stress" so that he could continue collecting loanDepot's confidential information undetected and prepare for his own impending departure.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

190.    Thereafter, on March 21, 2022, the day before he left loanDepot for Cross Country, Bonora asked a loan processing manager to supply him with the pipeline reports for Liu, Raush, Tejada, and Narvaez, which he received shortly thereafter. Each of these loan consultants reported to Bonora prior to leaving for CrossCountry on March 18, 2022. The pipeline reports identified, among other things, the loan number, borrower's name, credit score, property address, status of

the loan, loan type, product type, and rate and rate-lock information. Also on March 21, Bonora received an email forwarded from Nadler, who resigned that same day and joined CrossCountry. Nadler's email included his notes on the status of each of his clients.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

191.    Then, on March 22, 2022, Bonora suddenly resigned from loanDepot. Before returning his laptop to loanDepot on the day of his departure, Bonora purged the "Clients" folder from his computer and cleared his email from Outlook, clearly in an effort to try and hide his prior transfer of the "Clients" folder to the USB drive.[6]

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

192.    On May 20, 2022, after joining CrossCountry, Bonora wrote Defendants Koven, Defendant Reyes, and Defendant Ayala about a purported work around to allow Defendants to continue to solicit loanDepot customers. Bonora wrote that it is "[b]est to hold off of [soliciting loanDepot customers] any other way [other than the purported work around] until we're past the thick of it." The clear implication is that Defendants Bonora, Koven, Reyes, and Ayala knew their contractual obligations prevented the solicitation of loanDepot customers but, notwithstanding these obligations, they were scheming about ways to continue converting loanDepot's customers.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

---

[6] The day before he left loanDepot, Bonora enclosed a USB drive in an envelope with a contrived letter addressed to his supervisor purporting to claim that Bonora copied data onto the USB drive when his company computer was not working properly, and he was compelled to preserve information before it became irretrievable. He further claimed that he deleted his personal data from the USB drive and was returning the customer data, having not made any copies of the USB drive. Bonora's claim that he needed to copy extensive amounts of loanDepot's confidential information to a USB drive is transparently a pretext for his misappropriation.

193.     Also on May 20, 2022, Bonora sent a similar email to Defendants Meidan, Zheng, Raush, Nadler, Aleshin, Kolinsky, and Liu. This email also concerned the purported work around and noted CrossCountry's marketing efforts to attempt to advertise to the Departed NY Employees "old customers" using public information "at least until [the Departed NY Employees were] past any noise with them." Once past the "noise" of this litigation, the Departed NY Employees intend to utilize their stolen trade secrets unencumbered.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

194.     Not surprisingly given Bonora's discussions related to loanDepot customers around this saine time period, on May 24, 2022, Bonora, on behalf of CrossCountry, recorded a loan for borrower J.C.[7] While at loanDepot, Bonora was working with and had confidential information about J.C.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

195.     On June 6, 2022, Bonora corresponded with Joseph Platek III, CrossCountry's Chief Strategy Officer, and Michael Magyar, another CrossCountry employee, about the purported work around and, with respect to customer contact information, informed Magyar and Platek that "[m]ost of us have the [loanDepot customers'] phone/email address in our phones anyway so we can build them back in." Bonora sent yet another email on June 6, 2022, this time to Justin Lieberman, a CrossCountry Senior Vice President, about the information contained in the Departed NY Employees' phones.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the

---

[7] For privacy reasons, loanDepot customers referenced in this Complaint will be referred to only by the initials of their first and last names.

allegations in this paragraph and therefore denies the same.

196.    On June 23, 2022, Bonora, on behalf of CrossCountry, recorded a loan belonging to L.F. While at loanDepot, Bonora exchanged numerous emails with L.F., including emails where L.F. shared confidential financial information with Bonora.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

197.    On July 25, 2022, Bonora, on behalf of CrossCountry, recorded a loan belonging to E.L.P and S.L.P. E.L.P and S.L.P. had previously submitted an application to loanDepot, which Bonora reviewed. While at loanDepot, Bonora exchanged numerous emails with E.L.P and S.L.P.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

198.    On July 28, 2022, Bonora, on behalf of CrossCountry, recorded a loan belonging to K.M. loanDepot had previously issued a pre-approval for and corresponded with K.M. Bonora exfiltrated a folder with K.M.'s name while he worked at loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

b)    **Defendant Secor**

199.    On February 22, 2022, the day before he left loanDepot, Defendant Secor forwarded numerous emails from his loanDepot email account to his personal email. These emails included loanDepot's "2021 Region 12 LO Rankings," which identified the company's top producers in New York, New Jersey, Connecticut, Massachusetts, and New Hampshire, as well as a loanDepot "guide to extended rate locks." That same day, Secor copied over 1,000 documents to a USB drive, including pre-approvals with income statements, pay stubs, tax returns, and other information typically supplied by borrowers in support of their mortgage applications, which

60

139734134.1

documents contained non-public information regarding scores of customers. Secor also copied folders named: (a) "purchase leads," which contained, among other documents, income documentation, financial statements, pay stubs, tax forms, copies of identifications, loan estimates, and rate information for loan applicants; (b) "Refi leads," which contained, among other documents, loan applications, pay stubs, tax forms, and loan estimates; (c) "work folder," which contained, among other documents, loanDepot's pricing and rankings; and (d) "2019 Closed LD," "2020 closed LD," "2021 closed LD," and "2022 Closed Files."

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

200.    On February 24, 2022, Secor sent several emails containing loanDepot files from his personal email to his CrossCountry email. Those emails contained information related to loans that were ultimately closed and recorded by CrossCountry.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

201.    On February 24, the day after he left, Defendant Secor copied two more folders of files to a USB drive: "new info 2022," which contained subfolders with loan applicants' names including G.R., B.M. and L., emails, asset lists, credit reports, and other documents relating to their applications; and "updates Feb," which contained pricing data, appraisals, final lists of Secor's closings from prior years, and a calculator spreadsheet.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

202.    In addition to this blatant conversion of loanDepot information, Defendant Secor also repeatedly advised customers to call or text his cell phone regarding pre-approvals in the lead-

61

up to his departure. Upon information and belief, Secor was intentionally stalling these customers and providing them with his personal contact information so that he could bring these opportunities to CrossCountry.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

203.    On February 24, 2022, the day after he resigned from loanDepot and the day he commenced employment with CrossCountry, Secor sent himself emails from his personal email address to his CrossCountry email address, attaching a file named "docs [B.].pdf" containing the name of a customer whose loan Secor ultimately closed and recorded at CrossCountry, and multiple files relating to loanDepot customers G. R. and B. M.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

204.    On March 17, 2022, Secor sent several emails containing loanDepot files from his personal email to his CrossCountry email address. Those emails contained information related to loanDepot customer D. L., whose loan Secor ultimately closed and recorded at CrossCountry.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

205.    On March 31, 2022, Secor sent yet another email from his personal email to his CrossCountry email account containing information belonging to loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

206.    On April 12, 2022, Secor was recorded as the loan officer for a loan to D. B., a loanDepot client to whom Secor had issued a loanDepot preapproval dated February 9, 2022.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

207.    The "new info 2022" folder Secor copied on February 24 contained a folder named after D. B., and the folder contained at least one file named "docs [B.].pdf."

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

208.    Similarly, on April 20, 2022, a CrossCountry loan where Secor is identified as the loan officer was recorded for loanDepot customer G. R. When an attorney involved with the purchase received an email from CrossCountry prior to closing, she forwarded the email to Secor's loanDepot email account and wrote "Do you know anything about this? I thought they were working with Loan Depot [. . .]. Who are these people?"

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

209.    The "new info 2022" folder Secor copied on February 24 contained a folder named after G. R., which contained subfolders named "Assets" and "Misc." The "Misc" folder contained at least a file named "credit [G.] Dec 24 21.pdf."

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

210.    Also on April 20, 2022, a CrossCountry loan with Secor as the loan officer was recorded to B. M., a loanDepot customer. Secor worked with B. M. in early February 2022 while at loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

211.     The "new info 2022" folder Secor copied on February 24 contained a folder named after B. M. The folder contained subfolders named "Emails," "Property," "Income," and "Misc." These folders contained at least an email named "Fwd Sale Memo - [Seller] to [M. and presumably M.'s spouse] - [Address].msg," "Agent Full_[Address].pdf," and "2020 W2 [B.].pdf."

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

212.     On April 26, 2022, a CrossCountry loan with Secor as the loan officer was recorded to J. T., a loanDepot client to whom Secor had issued a loanDepot preapproval dated December 13, 2021.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

213.     On April 27, 2022, a CrossCountry loan with Secor as the loan officer was recorded to D. L., a lead loanDepot assigned to Secor on November 13, 2021 and for whom Secor issued loanDepot preapprovals on January 22 and February 12, 2022. D. L. was a loanDepot client who appeared on Secor's pipeline spreadsheets.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

214.     On May 31, 2022, Secor, on behalf of CrossCountry, recorded a loan for M.M. Secor had previously communicated with that borrower while employed at loanDepot.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

215.     On June 13, 2022, Secor, on behalf of CrossCountry, recorded a loan for A.T. Secor had previously communicated with A.T. and their spouse while Secor was employed at loanDepot.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

216.    On June 16, 2022, Secor, on behalf of CrossCountry, recorded a loan for C.M. While at loanDepot, Secor exfiltrated a pre-approval issued by loanDepot to C.M. via a USB storage device. Defendant Ramos, Secor's production assistant, deleted contact information for C.M. as part of his mass deletion activities.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

217.    On July 5, 2022, Secor, on behalf of CrossCountry, recorded a loan for M.P. and J.P. loanDepot had previously issued a pre-approval for this loan. Secor exfiltrated this pre-approval from his loanDepot computer prior to his resignation.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

218.    On July 27, 2022, Secor, on behalf of CrossCountry, recorded a loan for J.R and L.R. loanDepot had previously issued a pre-approval to J.R. and L.R.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

c)    **Defendant Ramos**

219.    Between approximately February 16 and February 23, Secor's production assistant, Defendant Ramos, copied over 1,000 documents to a USB drive, including realtor lists, title reports, appraisals, disclosures, pre-approvals, tax documents, paystubs, and other non-public information typically supplied by borrowers in support of their mortgage loan applications. The folders Defendant Ramos copied to the USB drive also included those titled, ''NEW LEADS" for 2019, 2020, 2021, and 2022 as well as "CLOSED LOANS" and "CLOSED LOANS 2022."

Defendant Ramos subsequently deleted over 3,500 folders and subfolders from her OneDrive and 1,430 files from her email account. Among the files and folders that Defendant Ramos deleted were the ''NEW LEADS 2021" and 1,352 subfolders that she had copied to the USB drive just nineteen minutes earlier, as well as email folders titled "Michaels loans," "Mello Leads," "Zillow leads," "Referrals," and "ESTIMATED CLOSINGS." "Mello" is the name of loanDepot's proprietary point of sale (POS) software, and also houses loanDepot's customer relationship management (CRM) tool. Also during this period, Defendant Ramos forwarded to her personal email address a February 19 inquiry from a borrower regarding the effect of a temporary pay increase on her loan application and approval amount.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

     d)     **Defendant Martino**

220.     In the weeks before his departure, Defendant Martino copied over 9,500 documents to USB drives and an external hard drive. These documents included non-public client information such as financial statements, credit reports, pay stubs, tax returns, pre-approvals, and loan consultant pipelines.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

221.     On April 5, 2022, the week before he left, Martino also copied to a USB drive a list of contacts and leads.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

222.     On April 25, 2022, Martino wrote an email entitled "HARD DRIVE with date [sic] I need to import" to CrossCountry employees Christopher Albanese and Justin Lieberman, as well

as Defendant Koven, explaining that he has a "hard drive that contains all my client contacts, new leads that are now under contract and other data I require to upload to my laptop." Justin Lieberman, on behalf of CrossCountry, wrote in response to issues with the upload: "I would download those to google drive and download from there."

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

223.    On July 8, 2022, Martino, on behalf of CrossCountry, closed a loan for M.Y. Martino exfiltrated multiple folders and files containing M.Y.'s name or the name of M.Y.'s businesses shortly before his departure, including files and folders copied to an external hard drive on March 20, 22, 24, 25, and 30, and April 7, 2022.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

      e)        **Defendant Nadler**

224.    While at loanDepot, Nadler accessed numerous folders containing information belonging to loanDepot. Nadler also repeatedly accessed his personal email account right after accessing loanDepot's internal Mello site, which contains sensitive and confidential loanDepot information. Specifically, Mello includes all documents and information related to past, present, or potential customers, including financial documents, contact information, rate and pricing information, and other highly sensitive and confidential information regarding loans and the loan process. Nadler also repeatedly accessed his personal email inbox while using his loanDepot-issued computer. Nadler also frequently interacted with Google Drive, Google Docs, and Google Contacts in close proximity to when he viewed confidential client information on loanDepot's systems.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the

allegations in this paragraph and therefore denies the same.

225.    Google Drive, Google Docs, and Google Contacts are all applications of a cloud-based storage account that allow the user to retrieve information from other devices after signing in with their account credentials. By uploading documents to Google Drive, or entering information into Google Docs or Google Contacts, the person to whom the account belongs can then retrieve that information from any other device by accessing their Google account.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

226.    Upon information and belief, Nadler was copying or otherwise exporting loanDepot's sensitive and confidential information to his Google account and personal email account.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

227.    loanDepot assigned a customer lead for J. G. to Nadler on October 25, 2021.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

228.    Nadler issued loanDepot preapprovals to J. G. on October 25, 2021, October 27, 2021, February 12, 2022, and February 15, 2022. On March 15, 2022, Nadler exchanged text messages with Justin Lieberman, of CrossCountry, in which Nadler wrote: "there's language in my current agreement with LD about solicitation and confidential information, which is a little concerning to me. I would appreciate if the contract could include indemnification language that provides me security in the event that LD went after me for breach of the agreement."

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the

allegations in this paragraph and therefore denies the same.

229.    On March 20, 2022, CrossCountry's Justin Lieberman emailed Nadler to "[o]k the indemnification letter I sent you the other day" and note that "[o]nce you start it will be signed by all the parties."

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

230.    On April 28, 2022, a CrossCountry loan with Nadler as the loan officer was recorded to J. G.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

231.    On June 14, 2022, Nadler, on behalf of CrossCountry, recorded a loan belonging to D.P. Nadler was assigned D.P. from loanDepot and had previously issued loanDepot pre-approvals to this customer.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

232.    On June 24, 2022, Nadler, on behalf of CrossCountry, recorded a loan belonging to M.K. Family Trust. On information and belief, Nadler had issued loanDepot pre-approvals to a representative for the M.K. Family Trust.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

233.    On June 27, 2022, Nadler, on behalf of CrossCountry, recorded a loan belonging to L.E. loanDepot had previously issued a pre-approval for and corresponded with L.E.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the

allegations in this paragraph and therefore denies the same.

234.    On July 11, 2022, Nadler, on behalf of CrossCountry, recorded a loan belonging to B.J. loanDepot had previously had a transaction with B.J.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

235.    On July 27, 2022, Nadler, on behalf of CrossCountry, recorded a loan belonging to B. P. & S. loanDepot had previously issued a pre-approval for B.P. & S.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

236.    On August 9, 2022, Nadler, on behalf of CrossCountry, recorded a loan belonging to P.R. loanDepot had previously issued a pre-approval for P.R.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

237.    On August 15, 2022, Nadler, on behalf of CrossCountry, recorded a loan belonging to S.A.D. S.A.D. had previously solicited a pre-approval from loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

238.    On August 18, 2022, Nadler, on behalf of CrossCountry, recorded a loan belonging to R.G. loanDepot had previously issued a pre-approval to R.G.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

239.    On August 22, 2022, Nadler, on behalf of CrossCountry, recorded a loan belonging to J.W. J.W. was previously listed in a loanDepot pipeline spreadsheet listing leads for potential loans.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

240.    On August 25, 2022, Nadler, on behalf of CrossCountry, recorded a loan belonging to A.R. A.R. was a customer lead that loanDepot purchased.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### f)      **Defendant Aleshin**

241.    On June 15, 2022, Aleshin, on behalf of CrossCountry, recorded a loan for D.L. loanDepot had previously issued a pre-approval to L.D. on March 7, 2022 after L.D. provided confidential financial documentation to loanDepot.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### g)      **Defendant Antoine**

242.    On February 4, 2022, Antoine copied a file named "Lender Contacts" to a USB.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

243.    Three days later, on February 7, 2022, Antoine copied the files "Rental Agreements" and "Traderkeish 2022" to a USB.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

244.     On April 16, 2022, one day after she resigned, Antoine deleted 677 files from the recycle bin on her loanDepot computer, the names of which are not recoverable.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### h)        **Defendant Ayala**

245.     While at loanDepot, Ayala accessed loanDepot's internal Mello site, which contains sensitive and confidential customer and loan information, and then proceeded to toggle between that website and a non-loanDepot Google Drive account. Upon information and belief, Ayala was copying or otherwise exporting loanDepot's sensitive and confidential information to the Google Drive account.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

246.     On June 3, 2022, Ayala, on behalf of CrossCountry, recorded a loan for A.G. Before departing loanDepot, Ayala accessed a "customer" folder on his computer that included information about A.G.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

247.     On June 23, 2022, Ayala, on behalf of CrossCountry, recorded a loan for J.S. Before departing loanDepot, Ayala accessed a loanDepot "customers" folder that included information about J.S. J.S. was also reflected on Bonora's pipeline document.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

248.     On June 27, 2022, Ayala, on behalf of CrossCountry, recorded a loan for A. L. A.L. was previously on Bonora's and other pipelines at loanDepot. Before departing loanDepot, Ayala accessed a loanDepot "customers" folder that included A.L.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

249.     On August 8, 2022, Ayala, on behalf of CrossCountry, recorded a loan for B.C. That loan was previously in loanDepot's potential customer pipeline. Indeed, Ayala retained a customer folder containing information about B.C. on his loanDepot computer.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

     **i)**       **Defendant Hossain**

250.     While at loanDepot, Hossain used his loanDepot-issued computer to send an email attaching multiple spreadsheets to his personal email address, including one named "past client list.xlsx."

**ANSWER:**  Hossain admits to sending emails containing spreadsheets to his personal email, including a spreadsheet containing customer information for customers he has developed over his last approximately 9 years working as mortgage broker, including all customers developed prior to Hossain joining loanDepot in November 2021. Hossain denies that sending these emails was for any improper purpose.

251.     Before departing for CrossCountry, Hossain also deleted numerous documents *en masse*, including customer pay stubs and tax returns, customer correspondence, and other documents related to customer loan applications.

**ANSWER:**  Hossain admits to deleting documents while at loanDepot, but denies it was for any improper purpose. Hossain generally deletes information, emails, files and other

documents when no longer necessary for work purposes and to maintain a fast-running computer. Hossain. loanDepot sent an email in approximately March or April 2022 instructing employees to delete information, and upon receiving such email Hossain complied and ceased deleting his materials. Hossain denies that any deletion of documents was for any improper purpose.

### j)   **Defendant Kolinsky**

252.   On December 23, 2021, Defendant Kolinsky copied his computer's Documents, Desktop, and Downloads folders to a USB drive.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

253.   Also on December 23, 2021, Kolinsky created personal storage table (PST) files, a file format used by Microsoft programs such as Outlook to store items like calendar events, contacts, and email messages.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

254.   In addition, Kolinsky impermissibly installed Dropbox on his work computer, allowing him to transfer loanDepot files to Dropbox and thereafter access loanDepot information from personal or other devices. The Dropbox directly on Kolinsky's computer contained, among other things, subfolders named "Rental Income," "pre-qual," "Income Calculator LD," "marketing," and a file named "1039.xlsx."

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

255.   On March 22, 2022, a week before resigning, Kolinsky generated a contact list from loanDepot's proprietary database that included names, email addresses, mailing and property

addresses, cell phone, home, and office numbers, and birth dates for over 1,850 contacts. Kolinsky emailed the report from his work email address to his personal email address.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

256.    On May 12, 2022, Defendant Kolinsky sent an email from his personal email to his CrossCountry email attaching a document entitled "contact list May 2022.xlsx." Also on May 12, 2022, Kolinsky emailed that same file to CrossCountry's Carbon Team listserv. Of the 1,580 contacts that are on this spreadsheet, 1,513 names appeared on the document Kolinsky emailed from his loanDepot email address to his personal email address on March 22, 2022.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### k)      **Defendant Koven**

257.    On multiple occasions while at loanDepot, Koven used his loanDepot-issued computer to access loanDepot's internal Mello site, which contains highly sensitive and confidential customer and loan information, while also accessing non-loanDepot Google Docs within a short period. Koven likewise accessed a non-loanDepot Dropbox within a short period of time after accessing sensitive customer communications on loanDepot's internal website. Upon information and belief, Koven was copying or otherwise exporting loanDepot's sensitive information to Google Docs and Dropbox.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

258.    loanDepot assigned a customer lead for A. P. to Koven on March 17, 2022, just days before his March 22 departure. On May 26, 2022, a CrossCountry loan with Koven as the loan officer was recorded to A.P.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

259.    On June 23, 2022, Koven, on behalf of CrossCountry, closed a loan for D.D. While at loanDepot, Koven issued D.D. a preapproval on March 7, 2022. Koven also accessed loanDepot files on his computer regarding D.D.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

260.    On July 11, 2022, Koven, on behalf of CrossCountry, recorded a loan for A.F. loanDepot had previously issued pre-approvals for A.F. Koven's computer at loanDepot also contained file folders relating to A.F.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

**l)      Defendant Dan Kwiatkowski**

261.    On June 23, 2022, Dan Kwiatkowski, on behalf of CrossCountry, recorded a loan for J.C. That loan was previously assigned as a lead to Dan Kwiatkowski who then, on behalf of loanDepot, issued a pre-approval to J.C.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

**m)     Defendant Jarek Kwiatkowski**

262.    On June 28, 2022, Jarek Kwiatkowski, on behalf of CrossCountry, recorded a loan for I.J. I.J. had previously provided confidential information to Defendant Jaroslaw Kwiatkowski while he worked at loanDepot.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

139734134.1

263.    On July 5, 2022, Jarek Kwiatkowski, on behalf of CrossCountry, recorded a loan for A.W. loanDepot had previously issued a pre-approval to A.W. A.W. also provided loanDepot with confidential financial documentation.

**ANSWER:**   Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

264.    On August 5, 2022, Jarek Kwiatkowski, on behalf of CrossCountry, recorded a loan for M.T. Information pertaining to M.T. was on Jarek Kwiatkowski's loanDepot computer before he departed loanDepot.

**ANSWER:**   Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

**n)      Defendant Liu**

265.    On May 16, 2022, Liu, on behalf of CrossCountry, recorded a loan belonging to X. & W. Z. loanDepot maintained large amounts of confidential information regarding X. & W. Z. that they sent to Liu when he was working at loanDepot.

**ANSWER:**   Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

266.    On July 15, 2022, Liu, on behalf of CrossCountry, recorded a loan belonging to W. & L. L, a customer that loanDepot had assigned to Liu on November 9, 2021. loanDepot had previously had a transaction with W. & LL.

**ANSWER:**   Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

139734134.1

o)      **Defendant London**

267.    While at loanDepot, London saved a spreadsheet entitled "Copy of Big List.xlsx" to an external hard-drive. On information and belief, London had no legitimate business purpose to download this information that was on his loanDepot-issued computer.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

268.    On August 12, 2022, London, on behalf of CrossCountry, recorded a loan belonging to R.M. & A.M. loanDepot had previously issued a pre-approval for and corresponded with R.M. & A.M. London also maintained a file containing customer information about R.M. & A.M. on his loanDepot computer.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

p)      **Defendant Meidan**

269.    While at loanDepot, Meidan used his loanDepot-issued computer to access confidential loanDepot information around the same time as Meidan accessed his personal email and Google Drive. Further, right before departing loanDepot, Meidan created files containing thousands of sensitive internal loanDepot communications. Thereafter, Meidan again accessed Google Drive and his personal email account. Meidan also connected a USB drive to his work computer. Upon information and belief, Meidan was copying or otherwise exporting loanDepot's sensitive and confidential information to Google Drive and his personal email account.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

270.    On July 11, 2022, Meidan, on behalf of CrossCountry, recorded a loan for Z.S. loanDepot had previously issued pre-approvals to Z.S.

139734134.1

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

271.    On August 10, 2022, Meidan, on behalf of CrossCountry, recorded a loan for H.K. loanDepot had previously received a lead for H.K. from its call center.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

272.    On August 16, 2022, Meidan, on behalf of CrossCountry, recorded a loan for M.S. loanDepot had previously issued a pre-approval to M.S.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

273.    On August 22, 2022, Meidan, on behalf of CrossCountry, recorded a loan for C.O. loanDepot was previously in the process of underwriting a loan for C.O.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

q)    **Defendant Narvaez**

274.    While at loanDepot, Narvaez frequently accessed his personal account and Google Drive in close temporal proximity to when he accessed loanDepot's internal Mello site, which contains loanDepot's confidential and sensitive information relating to customers and loans. Narvaez also repeatedly connected and disconnected a USB device and within a short period accessed confidential client communication. Narvaez's computer activity also demonstrated his deletion of loanDepot files related to preapprovals, and bank statements for customers *en masse*. Upon information and belief, Narvaez was copying or otherwise exporting loanDepot's sensitive information to Google Drive, his personal account, and a USB drive.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the

139734134.1

allegations in this paragraph and therefore denies the same.

275.    On July 5, 2022, Narvaez, on behalf of CrossCountry, closed a loan for A.M. While at loanDepot, Narvaez had a file on his loanDepot-issued computer for A.M.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### r)    **Defendant Ostrowsky**

276.    While at loanDepot, Ostrowsky on multiple occasions during the months leading up to his resignation used his loanDepot-issued computer to access confidential loanDepot files and, within a short period, accessed his personal email account.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

277.    On July 8, 2022, Ostrowsky, on behalf of CrossCountry, recorded a loan for R.S. loanDepot had previously issued a pre-approval to R.S.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### s)    **Defendant Raush**

278.    In the weeks prior to his departure, Defendant Raush searched for and downloaded contact lists, including exporting to a .csv file pipeline documents and contacts from his loanDepot Outlook account. Raush also deleted documents related to customers' personally identifiable information and lists of potential leads and contacts.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

279.    Over the days leading up to his departure, Defendant Raush told several potential borrowers to call his cell phone to discuss their loan applications, including one potential borrower

who expressed that he wanted to wait until he returned from vacation to have further discussions. On March 18, Defendant Raush instructed a loanDepot customer, M.T., to "hold off" sending a tax return to him because he was "literally resigning from loanDepot."

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

280.    Not coincidentally, loanDepot recently discovered that, on May 4, 2022, Raush was identified as the loan officer on a CrossCountry loan recorded to M. T., the same loanDepot customer that Raush told to "hold off" due to his resignation on March 18, 2022 and for whom Raush issued loanDepot preapprovals on February 4 and March 1, 2022.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

281.    In addition, on May 10, 2022, a CrossCountry loan with Raush as the loan officer was recorded to J. M., a lead loanDepot assigned to Raush on December 6, 2021 and for whom Raush issued a loanDepot preapproval on December 6, 2021.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

282.    On August 3, 2022, Raush, on behalf of CrossCountry, recorded a loan belonging to Z. M. & P. While employed at loanDepot, Raush maintained a customer folder on his computer containing information about Z.M. & P.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

283.    On August 24, 2022, Raush, on behalf of CrossCountry, recorded a loan belonging to L.M. & M. loanDepot had previously issued a preapproval for and corresponded with L.M. & M.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

t)    **Defendant Reyes**

284.    While at loanDepot, Defendant Reyes used his loanDepot-issued personal computer to save documents from his loanDepot computer to Google Drive. Reyes also frequently accessed his personal email in close temporal proximity to when he accessed confidential client communications. Reyes also used his loanDepot-issued computer to insert a USB drive, which is consistent with efforts to exfiltrate data from loanDepot. Upon information and belief, Reyes copied or otherwise exported loanDepot's sensitive information to Google Drive, and his personal email account.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

285.    On May 27, 2022, Reyes, on behalf of CrossCountry, recorded a loan belonging to C.E. loanDepot previously had issued a pre-approval to C.E. Reyes also maintained a file containing customer information about C.E. on his loanDepot-issued computer.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

286.    On June 23, 2022, Reyes, on behalf of CrossCountry, recorded a loan belonging to M.B. loanDepot had previously assigned M.B. to Reyes. loanDepot also issued a preapproval to M.B.

**ANSWER**:  Hossain lacks sufficient information to form a belief as to the truth of the

allegations in this paragraph and therefore denies the same.

287.    On June 27, 2022, Reyes, on behalf of CrossCountry, recorded a loan belonging to O.R. to whom Reyes issued a loanDepot preapproval on March 8, 2022.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

288.    On July 13, 2022, Reyes, on behalf of CrossCountry, recorded a loan belonging to C.K. & M. Reyes maintained a file containing customer information about C.K. & M. on his loanDepot-issued computer.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

289.    On July 26, 2022, Reyes, on behalf of CrossCountry, recorded a loan belonging to G.J. loanDepot previously had issued a pre-approval to G.J. and G.J. had shared tax returns with loanDepot. Reyes also maintained a file containing customer information about G.J. on his computer.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

290.    On August 4, 2022, Reyes, on behalf of CrossCountry, recorded a loan belonging to A.M. loanDepot had previously issued a pre-approval to A.M. after the customer applied and sought the pre-approval.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

291.    Also on August 4, 2022, Reyes, on behalf of CrossCountry, recorded a loan belonging to M.J. Reyes maintained a file containing customer information on M.J. on his loanDepot-issued computer.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

292.    On August 5, 2022, Reyes, on behalf of CrossCountry, recorded a loan belonging to C.C. Reyes maintained files on C.C. on his loanDepot-issued computer and used a personal email address to view a message with a subject line referring to C.C.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

293.    On August 11, 2022, Reyes, on behalf of CrossCountry, recorded a loan belonging to F.J. loanDepot had previously issued a pre-approval to F.J.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### u)    **Defendant Tejada**

294.    On August 10, 2022, Tejada, on behalf of CrossCountry, recorded a loan for J.T. That loan was previously in loanDepot's customer pipeline.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### v)    **Defendant Vaysberg**

295.    While at loanDepot, Vaysberg downloaded confidential information from his loanDepot computer, including contact and loan information for hundreds of customers. In addition, while at loanDepot, Vaysberg accessed two Google Drive folders close in time to accessing confidential loan and client information belonging to loanDepot. The similarity of the

84

names of the folders Vaysberg accessed on company resources and on his personal Google Drive make it very likely that he copied the folder and its contents.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

296.    On May 20, 2022, Vaysberg emailed Defendant Koven about uploading 1,600 client contacts to CrossCountry's computer systems.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

297.    On June 29, 2022, Vaysberg, on behalf of CrossCountry, recorded a loan for T.P. While employed at loanDepot, Vaysberg had a folder on his computer dedicated to information relating to T.P.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

298.    On July 12, 2022, Vaysberg, on behalf of CrossCountry, recorded a loan for T.C. While employed by loanDepot, Vaysberg was using loanDepot resources to potentially close a loan with T.C.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### w)    **Defendant Vignola**

299.    On March 23, 2022, less than a month before her resignation, Vignola copied a folder of loanDepot documents to a USB drive. This folder included hundreds of documents such as profit and loss statements, gift letters, employment verification forms, tax returns and forms, contracts, and customers' social security numbers.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the

139734134.1

allegations in this paragraph and therefore denies the same.

x)   **Defendant Zheng**

300.   Between March 4, 2022 and her departure on April 27, 2022, Zheng sent multiple emails from her work email, jzheng@loandepot.com, to jzheng@yzrcapital.com. These emails contained confidential, non-public financial documents that loanDepot clients had sent to Zheng, including tax returns, bank statements, pay stubs, employment contracts, and driver's licenses.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

301.   On March 29, 2022, Zheng accessed Mello—loanDepot's proprietary internal site that houses all documents and information related to customers, leads, and loans—and loanDepot's Microsoft SharePoint web pages within ten minutes prior to accessing a personal Gmail account.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

302.   Upon information and belief, each of the Departed NY Employees improperly accessed, used, and disclosed loanDepot trade secrets and confidential information as well as solicited loanDepot employees and customers in violation of their Employment Agreements.

**ANSWER:**  Deny.

VI.   **The Information Taken by the Departed NY Employees Constitutes Trade Secrets**

303.   The information and documents described above are trade secrets. In the Chicago Action, the United States District Court for the Northern District of Illinois entered a TRO on the basis that equivalent types of loanDepot information constituted protected trade secret information. See Chicago Action, Dkt. 21 at 3.

**ANSWER:**  This paragraph contains legal conclusions to which no response is required;

to the extent a response is required, Hossain denies the same.

304.    Similarly, the TRO order in this action provides that, "[i]t is well established that, in some instances, 'internal directories containing contact information for . . . current and prospective customers' may be trade secrets'" and that "Defendants do not dispute that at least some of the thousands of allegedly misappropriated documents may be trade secrets." EFC No. 91 (citations omitted).

**ANSWER:**  Hossain admits the TRO contains the foregoing language.

305.    That the types of information at issue are protectable trade secrets is also established by CrossCountry itself. In fact, CrossCountry has recently alleged the same with respect to its own comparable information in a different federal lawsuit. *CrossCountry Mortgage, Inc. v. Messina et al.*, No. 1:19-cv-01021, Dkt. 1 at ¶¶ 55, 66 (N.D. Ohio, May 7, 2019) (CrossCountry arguing that "customer data, including names and other information regarding CrossCountry's loan customers and potential customers, including credit information, constitute trade secrets" under the DTSA). It doubled down on that contention earlier this year, asserting that its non-public borrower and pricing information "constitute[s] trade secrets under federal law." *CrossCountry Mortgage, LLC v. American Neighborhood Mortgage Acceptance Co., LLC, d/b/a AnnieMac Home Mortgage*, No. 2:22-cv-01119 (D.N.J. Mar. 1, 2022), Dkt. 1, ¶¶ 22, 23, 74.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

### COUNT I

### FEDERAL DEFEND TRADE SECRETS ACT
### (FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND MONETARY DAMAGES AGAINST CROSSCOUNTRY, KOLINSKY, RAUSH, AND VIGNOLA)

306.    loanDepot incorporates the preceding allegations as if fully set forth herein.

**ANSWER:**  Hossain restates his answers to Paragraphs 1 – 305 as and for his answer to

this paragraph.

307.    The Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate foreign commerce." 18 U.S.C. § 1836.

**ANSWER:**  This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Hossain denies the same.

308.    Under the DTSA, "trade secret" means

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically . . . or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

**ANSWER:**  Hossain admits 18 U.S.C. § 1839(3) contains the foregoing language.

309.    Under the DTSA, "misappropriation" means

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5).

**ANSWER:** Hossain admits 18 U.S.C. § 1839(3) contains the foregoing language.

310. Under the DTSA, "improper means". . . "(A) includes theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

**ANSWER:** Hossain admits 18 U.S.C. § 1839(3) contains the foregoing language.

311. By engaging in the above conduct, CrossCountry and the Departed NY Employees have misappropriated, threaten to misappropriate, or inevitably will misappropriate loanDepot's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce in violation of the DTSA.

**ANSWER:** Deny.

312. In particular, the Departed NY Employees downloaded to external drives, emailed to their personal email addresses, and/or otherwise absconded with the identities of customers that use loanDepot services, and the non-public personal information provided by customers or potential customers to loanDepot, compilations of customer information, as well as loanDepot employee sales information, the identities and volume of business of loanDepot "leaders," and loanDepot customized job aids and training materials.

**ANSWER:** Deny.

313. This information is used in connection with loanDepot's services, which are offered in New York and throughout the country.

**ANSWER:** Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

139734134.1

314.    loanDepot expended substantial resources and ingenuity collecting, compiling, and protecting this confidential and proprietary information. This information also derives actual and potential independent economic value from not being generally known to, and not being readily ascertainable by proper means by, others. This is especially true in the non-bank consumer loan industry where successfully acquiring business from customers depends largely upon pricing.

**ANSWER:**  Hossain lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

315.    Accordingly, loanDepot has taken reasonable steps as part of its ongoing standard operating procedures to maintain the confidential nature of this information including through confidentiality and non-disclosure provisions, an Information Security Program, housing confidential information and trade secrets in password-protected proprietary databases, and restricting employee access to those who have a reasonable need to know.

**ANSWER:**  Deny.

316.    The Departed NY Employees were subject to the provisions designed to protect loanDepot's proprietary and confidential information through their Agreements, which required that they maintain the confidentiality of loanDepot's information and prohibited them from using such information other than as necessary in the course of performing their duties for loanDepot. The Departed NY Employees were further subject to provisions in the loanDepot Employee Handbook and Information Security Policy, which prohibit, among other things, (a) accessing data, a server, or an account for any purpose other than conducting company business, even if the employee has authorized access; (b) sharing company information with non-approved parties outside the company; and (c) storage of company information in non-company-managed locations such as personal drives, personal cloud storage, and devices.

**ANSWER**: Deny.

317.    The Departed NY Employees had no right to retain or use any of loanDepot's trade secrets or other confidential and proprietary information after resigning from employment with loanDepot. At no point did loanDepot give the Departed NY Employees permission to download or take loanDepot's confidential information and trade secrets, transfer them to external storage devices, or email the information to personal email addresses. The Departed NY Employees knew or should have known that the information they retained upon their departure contained trade secrets belonging to loanDepot.

**ANSWER**: Deny.

318.    CrossCountry directed, participated in, and/or benefited from the misappropriation of loanDepot's confidential information. Upon information and belief, loanDepot's confidential information is now in CrossCountry's possession and on CrossCountry's systems and Defendants are retaining the misappropriated information to compete with and otherwise harm loanDepot. Upon information and belief, CrossCountry has permitted if not encouraged departed loanDepot employees from other branches to transfer to CrossCountry the customer relationship databases and other confidential information belonging to other raided loanDepot branches. Upon information and belief, CrossCountry further permits and encourages branches that depart for CrossCountry to operate as sub-entities of CrossCountry that control their own customer relationship management software through Salesforce or Jungo.

**ANSWER**: Deny.

319.    Defendants can obtain economic value for the disclosure and use of loanDepot's trade secrets, for example, by avoiding the years, and millions of dollars in investment, that it took

loanDepot to develop the trade secrets, and to convert loanDepot customers and employees to CrossCountry for their own financial gain.

**ANSWER**: Deny.

320.    As a consequence of the foregoing, loanDepot has suffered and will continue to suffer irreparable harm, injury, and loss that cannot be remedied through monetary damages. Unless enjoined, Defendants will continue to use loanDepot's trade secret information to unfairly compete and loanDepot will continue to suffer irreparable harm.

**ANSWER**: Deny.

321.    Pursuant to the DTSA, actual or threatened misappropriation of trade secrets may be enjoined.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Hossain denies the same.

322.    Additionally, the Departed NY Employees agreed in their respective Agreements that monetary damages alone would not be a sufficient remedy for the Departed NY Employees' breaches of any provision of the Agreement, and that in addition to other remedies available to loanDepot, loanDepot would be entitled to injunctive relief as well as its costs and expenses, including attorneys' fees incurred in bringing this action.

**ANSWER**: Deny.

323.    As a direct and proximate result of Defendants' willful and malicious conduct, loanDepot has suffered direct and consequential damages, and is entitled to recovery compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

**ANSWER**: Deny.

**COUNT II**

92

**BREACH OF CONTRACT**
**(FOR INJUNCTIVE RELIEF AGAINST DEPARTED NY EMPLOYEES AND**
**MONETARY DAMAGES AGAINST DEFENDANTS KOLINSKY, RAUSH, AND**
**VIGNOLA)**

324.     loanDepot incorporates the preceding allegations as if fully set forth herein.

**ANSWER:**  Hossain restates his answers to Paragraphs 1 – 324 as and for his answer to this paragraph.

325.     The Agreements are valid contracts between loanDepot and the Departed NY Employees. *See* **Exs. A-X.**

**ANSWER:**  This paragraph contains legal conclusions to which no response is required; to the extent a response is required, Hossain denies the same. Hossain otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

326.     In their respective Agreements, the Departed NY Employees agreed to not disclose Confidential Information, including about loanDepot's business, prospects, plans, operations, products, processes, methods of doing business, systems, databases and customer data. The Agreements further require the Departed NY Employees to return all Confidential Information to loanDepot upon termination of their employment and prohibit the Departed NY Employees from sharing the Confidential Information.

**ANSWER:**  Hossain admits to entering into his agreement attached to the Amended Complaint as Exhibit E-2 and states such agreement speaks for itself. Hossain denies any statement contained in this allegation inconsistent with such agreement.

327.     The Departed NY Employees also agreed to refrain from soliciting others to work with another person, business, or entity instead of loanDepot.

**ANSWER:**  Hossain admits to entering into his agreement attached to the Amended

93

139734134.1

Complaint as Exhibit E-2 and states such agreement speaks for itself. Hossain denies any statement contained in this allegation inconsistent with such agreement.

328.    Defendants Aleshin, Antoine, Ayala, Hossain, Kolinsky, Koven, Dan Kwiatkowski, Jarek Kwiatkowski, Liu, London, Martino, Meidan, Nadler, Narvaez, Ostrowsky, Ramos, Raush, Secor, Tejada, Vaysberg, Vignola, and Zheng also agreed to customer non-solicitation provisions that loanDepot included to protect its customer relationships. Under their agreements, these defendants agreed to restrictions on their ability to solicit customers with whom he or she became acquainted during the term of his or her employment, for a one-year period after their departure from loanDepot.

**ANSWER**:  Hossain admits to entering into his agreement attached to the Amended Complaint as Exhibit E-2 and states such agreement speaks for itself. Hossain denies any statement contained in this allegation inconsistent with such agreement.

329.    loanDepot performed all of its duties and obligations under the Agreements.

**ANSWER**:  Deny.

330.    As set forth above, the Departed NY Employees breached (and threaten to breach) their respective Agreements by, among other things, (1) using and disclosing loanDepot's Confidential Information; (2) removing Confidential Information from loanDepot; (3) soliciting and inducing loanDepot employees to terminate their employment with loanDepot.

**ANSWER**:  Deny.

331.    Defendants Aleshin, Antoine, Ayala, Hossain, Kolinsky, Koven, Dan Kwiatkowski, Jarek Kwiatkowski, Liu, London, Martino, Meidan, Nadler, Narvaez, Ostrowsky, Ramos, Raush, Secor, Tejada, Vaysberg, Vignola, and Zheng have breached their customer non-

solicitation obligations, including by soliciting, taking away, or attempting to call on customers with whom they became acquainted with while employed at loanDepot.

**ANSWER**: Deny.

332.    As a direct and proximate result of the above-referenced breaches, among others known and to be discovered, loanDepot suffers and continues to suffer damages, including, but not limited to, lost business, lost profits, costs of hiring and retaining former and new employees, costs of retaining customers, and damage to goodwill.

**ANSWER**: Deny.

333.    The Departed NY Employees agreed in their respective Agreements that monetary damages alone would not be a sufficient remedy for the Departed NY Employees' breaches of any provision of the Agreement, and that in addition to other remedies available to loanDepot, loanDepot would be entitled to injunctive relief as well as its costs and expenses, including attorneys' fees incurred in bringing this action.

**ANSWER**: Deny.

### **COUNT III**

### **TORTIOUS INTERFERENCE WITH CONTRACT (AGAINST CROSSCOUNTRY)**

334.    loanDepot incorporates the preceding allegations as if fully set forth herein.

**ANSWER**:  This Count is not alleged against Hossain or any other individual Defendant and thus Hossain makes no answer to this Count.

335.    The Agreements are valid contracts between loanDepot and the Departed NY Employees.

**ANSWER**:  This Count is not alleged against Hossain or any other individual Defendant and thus Hossain makes no answer to this Count.

139734134.1

336.     Upon information and belief, CrossCountry, which was not a party to the Agreements, was aware of the Agreements from times preceding the breaches thereof. CrossCountry's knowledge of the Agreements is derived at least in connection with repeated litigation between loanDepot and CrossCountry, including an action filed in New Jersey District Court involving loanDepot employment agreements containing similar restrictive covenants, confidentiality provisions, and non-solicitation provisions.

**ANSWER:** This Count is not alleged against Hossain or any other individual Defendant and thus Hossain makes no answer to this Count.

337.     Despite having this knowledge of the Agreements, CrossCountry intentionally induced, condoned, supported, and permitted the Departed NY Employees' violations of their respective Agreements without justification. CrossCountry offered a substantial monetary reward for poaching an entire loanDepot branch, and upon information and belief, CrossCountry offered indemnification for any litigation resulting from departed employees' violations of agreements with loanDepot.

**ANSWER:** This Count is not alleged against Hossain or any other individual Defendant and thus Hossain makes no answer to this Count.

338.     As a result of CrossCountry's conduct, loanDepot suffered and will continue to suffer irreparable harm. If not enjoined, CrossCountry will induce further breaches of the Agreements and other loanDepot employee agreements, which will result in additional damages and irreparable harm to loanDepot. Injunctive relief is necessary as loanDepot is without an adequate remedy of law to prevent this harm to loanDepot.

**ANSWER:** This Count is not alleged against Hossain or any other individual Defendant and thus Hossain makes no answer to this Count.

339.    As a direct and proximate result of this conduct, loanDepot has suffered direct and consequential damages, and is entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

**ANSWER:**  This Count is not alleged against Hossain or any other individual Defendant and thus Hossain makes no answer to this Count.

### COUNT IV

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND MONETARY DAMAGES AGAINST CROSSCOUNTRY AND DEFENDANTS KOLINSKY, RAUSH, AND VIGNOLA)

340.    loanDepot incorporates the preceding allegations as if fully set forth herein.

**ANSWER:**  Hossain restates his answers to Paragraphs 1 – 339 as and for his answer to this paragraph.

341.    loanDepot has and had protectable business relationships with all of the loanDepot employees that left loanDepot for CrossCountry, including the Departed NY Employees as well as the customers that Defendants have solicited or induced or attempted to solicit or induce to leave loanDepot.

**ANSWER:**  Deny.

342.    loanDepot had a reasonable expectation that (1) its employees would continue their employment with loanDepot; and (2) its customers would continue using loanDepot for its services.

**ANSWER:**  Deny.

343.    At all relevant times, Defendants knew of these prospective business relationships.

**ANSWER:**  Deny.

344.    Defendants intentionally induced, permitted, and encouraged the Departed NY Employees' breaches of their respective Agreements; and Defendants intentionally induced, permitted, and encouraged loanDepot's customers and employees to leave loanDepot.

**ANSWER:**  Deny.

345.    Defendants' conduct resulted in the severance of loanDepot's prospective business relationships with loanDepot employees and loanDepot customers.

**ANSWER:**  Deny.

346.    Defendants' conduct was done purposefully and with malicious, wrongful, and unjustifiable intent, through improper means, and for an improper purpose.

**ANSWER:**  Deny.

347.    As a direct and proximate result of this conduct, loanDepot has suffered and will continue to incur actual damages, including, but not limited to, lost business, lost profits, damage to goodwill, and the costs of hiring and retaining former and new employees, among other things, in an amount to be proven at trial.

**ANSWER:**  Deny.

348.    Punitive damages, lost profits, and attorneys' fees are warranted due to the malicious nature of the above conduct in an amount to be determined at trial.

**ANSWER:**  Deny.

## COUNT V

## BREACH OF FIDUCIARY DUTY
## (FOR INJUNCTIVE RELIEF AGAINST THE DEPARTED NY EMPLOYEES AND DAMAGES AGAINST DEFENDANTS KOLINSKY, RAUSH, AND VIGNOLA)

349.    loanDepot incorporates the preceding allegations as if fully set forth herein.

**ANSWER:**  Hossain restates his answers to Paragraph 1 – 348 as and for his answer to this paragraph.

139734134.1

350.     As employees of loanDepot, the Departed NY Employees owed certain fiduciary duties of care, loyalty, and good faith; to exercise good business judgment; to act prudently in the operation of loanDepot's business; to discharge their actions in good faith; and to act in the interests of loanDepot.

**ANSWER:**  Deny.

351.     The Departed NY Employees breached their fiduciary duties of loyalty to loanDepot by knowingly and intentionally acting adversely to loanDepot's interests during their employment with loanDepot by (a) soliciting loanDepot employees to leave loanDepot and join CrossCountry; (b) using loanDepot information for the benefit of CrossCountry; (c) planning a group departure designed to harm loanDepot; and/or (d) diverting business opportunities to CrossCountry.

**ANSWER:**  Deny.

352.     Because of the Departed NY Employees' actions, loanDepot has suffered, and will continue to suffer, irreparable harm, as well as damages and loss that will be determined in arbitration (except for Defendants Kolinsky, Raush, and Vignola who did not agree to arbitrate and will have damages adjudged against them decided by this Court). The Departed NY Employees' actions were intentional, willful, outrageous, and malicious, and justify the imposition of punitive damages.

**ANSWER:**  Deny.

## COUNT VI

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND DAMAGES AGAINST CROSSCOUNTRY AND DEFENDANTS KOLINSKY, RAUSH, AND VIGNOLA)

353.     loanDepot incorporates the preceding allegations as if fully set forth herein.

**ANSWER:** Hossain restates his answers to Paragraphs 1 – 352 as and for his answer to this paragraph.

354.    The Departed NY Employees breached their fiduciary duties to loanDepot.

**ANSWER:**

355.    The Defendants knew that their conduct breached the Departed NY Employees' and other loanDepot employees' duty of loyalty to loanDepot.

**ANSWER:** Deny.

356.    The Defendants gave each other substantial assistance or encouragement to breach the Departed NY Employees' and other loanDepot employees' respective fiduciary duties.

**ANSWER:** Deny.

357.    Defendants rendered this substantial assistance despite their knowledge that the Departed NY Employees were acting adversely to loanDepot's interests during their employment with loanDepot by (a) soliciting loanDepot employees to leave loanDepot and join CrossCountry; (b) using loanDepot information for the benefit of CrossCountry; (c) planning a group departure designed to harm loanDepot; and/or (d) diverting business opportunities to CrossCountry.

**ANSWER:** Deny.

358.    Because of the Departed NY Employees' and CrossCountry's conduct, loanDepot has suffered irreparable harm, as well as damages and loss, in an amount to be determined at trial.

**ANSWER:** Deny.

## COUNT VII

## UNFAIR COMPETITION
## (AGAINST CROSSCOUNTRY)

359.    loanDepot incorporates the preceding allegations as if fully set forth herein.

**ANSWER:** Hossain restates his answers to Paragraphs 1 – 358 as and for his answer to

139734134.1

this paragraph.

360.    loanDepot's confidential information, employee relationships, and customer goodwill and relationships are the result of loanDepot's skill, expenditures, and labor.

**ANSWER:**  This Count is not alleged against Hossain or any other individual Defendant and thus Hossain makes no answer to this Count.

361.    CrossCountry misappropriated loanDepot's confidential information, employee relationships, and customer goodwill and relationships when it induced, permitted, and encouraged the Departed NY Employees' breaches of their respective Agreements.

**ANSWER:**  This Count is not alleged against Hossain or any other individual Defendant and thus Hossain makes no answer to this Count.

362.    CrossCountry misappropriated loanDepot's confidential information, employee relationships, and customer goodwill and relationships to gain a commercial advantage over loanDepot.

**ANSWER:**  This Count is not alleged against Hossain or any other individual Defendant and thus Hossain makes no answer to this Count.

363.    CrossCountry intentionally, maliciously, and in bad faith induced, permitted, and encouraged loanDepot's customers and employees to leave loanDepot using loanDepot's misappropriated confidential information, employee relationships, and customer goodwill.

**ANSWER:**  This Count is not alleged against Hossain or any other individual Defendant and thus Hossain makes no answer to this Count.

364.    CrossCountry directed, participated, and/or benefited from the misappropriation of loanDepot's confidential information. Upon information and belief, loanDepot's confidential information is now in CrossCountry's possession and on CrossCountry's systems and

CrossCountry is retaining the misappropriated information to compete with and otherwise harm loanDepot. Upon information and belief, CrossCountry has permitted if not encouraged departed loanDepot employees from other branches to transfer to CrossCountry the customer relationship databases belonging to other raided loanDepot branches. Upon information and belief, CrossCountry further permits and encourages branches that depart for CrossCountry to operate as sub-entities of CrossCountry that control their own customer relationship management software through Salesforce or Jungo.

**ANSWER:**  This Count is not alleged against Hossain or any other individual Defendant and thus Hossain makes no answer to this Count.

365.     As a result of CrossCountry's conduct, loanDepot suffered and will continue to suffer irreparable harm. If not enjoined, CrossCountry will continue misappropriate loanDepot's confidential information, relationships, and goodwill, and will induce further breaches of the Agreements and other loanDepot employee agreements, which will result in additional damages and irreparable harm to loanDepot. Injunctive relief is necessary as loanDepot is without an adequate remedy of law to prevent this harm to loanDepot.

**ANSWER:**  This Count is not alleged against Hossain or any other individual Defendant and thus Hossain makes no answer to this Count.

366.     As a direct and proximate result of this conduct, loanDepot has suffered direct and consequential damages, and is entitled to recovery compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

**ANSWER:**  This Count is not alleged against Hossain or any other individual Defendant and thus Hossain makes no answer to this Count.

**AFFIRMATIVE DEFENSES**

139734134.1

## FIRST AFFIRMATIVE DEFENSE

### Equitable Estoppel

1.      When Hossain first began his employment at loanDepot, he was explicitly instructed to upload, to loanDepot's systems, contact and other customer information which he brought with him from his previous employer.

2.      loanDepot provided new employees with the "Marketing Get Started Checklist." The "Marketing Get Started Checklist!" explicitly instructed new employees to send their "[d]atabase," including "[p]ast/[c]urrent [c]lients, [and] B2B/[r]eferral [c]ontacts," to loanDepot's marketing department.

3.      That was not the only way that loanDepot took advantage of Hossain's preexisting customer database. Hossain was also instructed to send an announcement to his preexisting clients, informing them of his new employment at loanDepot; providing his updated loanDepot contact information; and instructing them to ask about finance options available through loanDepot.

4.      When the Departed NY Employees joined loanDepot they entered into the Key Employee Agreements. The Key Employee Agreements allowed the Departed NY Employees to retain their lists of customers they brought to loanDepot, as well as customers they developed while employed at loanDepot.

5.      Clearly, loanDepot did not consider the contact and other customer information which Hossain brought with him from his previous employer as confidential information and/or a trade secret belonging to Hossain's former employer. Otherwise, loanDepot would not have specifically instructed Hossain to upload such information onto its systems and utilize it to market its products and services and would not have entered into an employment agreement with the Departed NY Employees allowing them to maintain his customer information.

103

6.      Now, however, loanDepot seeks to claim that the exact same contact and other customer information *is* confidential and/or a trade secret belonging to loanDepot, in direct contradiction to its previous actions and instructions to its employees as well as in direct contradiction to the employment agreements employees entered into and relied upon when joining loanDepot.

7.      loanDepot is not only claiming that the preexisting customer information which Hossain gave loanDepot when he first started his employment there as confidential information and/or a trade secret.

8.      loanDepot also claims that the new contacts that Hossain developed, while at loanDepot *at his own expense*, also belong to loanDepot. However, loanDepot never paid Hossain to develop any new contacts or clients during his employment.

9.      When Hossain resigned from loanDepot, he was aware of loanDepot's prior position on contact and other customer information, and he reasonably relied on that knowledge when departing loanDepot and joining CrossCountry.

10.     Despite that, loanDepot now seeks to impose liability against Hossain for his reasonable reliance on his knowledge of loanDepot's previous position on contact and other customer information—namely, that such information is *not* confidential and/or a trade secret.

11.     Hossain had a right to reasonably rely on loanDepot's previous position that contact and other customer information is *not* confidential and/or a trade secret, and loanDepot should be equitably estopped from pursuing any claims against Hossain related to his purported use of any contact and other customer information.

## SECOND AFFIRMATIVE DEFENSE

### Unclean Hands

12.     Hossain reasserts and re-alleges Paragraphs 1 through 11 of his Affirmative Defenses as though set forth fully herein.

13.     If Hossain is found liable for his purported use of contact and other customer information following his departure from loanDepot, loanDepot must be held to the same standard.

14.     loanDepot actively instructed new employees, including Hossain, to upload preexisting contact and other information, stemming from new employees' previous employers, to loanDepot systems.

15.     According to the logic of loanDepot's Amended Complaint, loanDepot also misappropriated and induced Hossain to misappropriate trade secrets, and tortiously interfered with the prospective economic advantage of protectable business relationships, thereby violating, at least, the Federal Defend Trade Secrets Act ("DTSA").

16.     To the extent that loanDepot seeks equitable relief, its unclean hands bar it from doing so.

## THIRD AFFIRMATIVE DEFENSE

### *In Pari Delicto*

17.     Hossain reasserts and re-alleges Paragraphs 1 through 16 of his Affirmative Defenses as though set forth fully herein.

18.     To the extent that loanDepot seeks equitable relief, the doctrine of *in pari delicto* bars it from doing so.

## FOURTH AFFIRMATIVE DEFENSE

### Overbreadth of the Non-Solicit

19.     Hossain reasserts and re-alleges Paragraphs 1 through 18 of his Affirmative Defenses.

139734134.1

20.     The Non-Solicitation provision ("Non-solicit") contained in Hossain's agreement, attached as Exhibit E-2 to the Amended Complaint, is overly broad and therefore unenforceable.

21.     The Non-Solicit contains no geographical limitation; it applies to any business venture, including those that do not compete with loanDepot and those that exist in areas where loanDepot does not do business; and it includes all employees, regardless of what role they occupied at loanDepot or what role they were hired to perform.

22.     The Non-Solicit includes employees with whom Hossain had no contact with while at loanDepot; employees hired even years after Hossain resigned; employees who left loanDepot at any time in the history of the company; and employees with whom Hossain had no contact with until after they resigned or were fired from loanDepot.

23.     The Non-Solicit is not justified by any protectable interest in maintaining a stable work force.

24.     loanDepot's work force is not stable. To the contrary, there is high turnover, and the departure of individual employees, teams, and loan officer / assistant pairs is common within loanDepot.

25.     The Non-Solicit is also unenforceable because the one-year restriction contained therein is overly broad in duration.

26.     As the Non-Solicit is patently overbroad in geographic scope, applicability, and duration, it is unenforceable.

### FIFTH AFFIRMATIVE DEFENSE

#### *Prior Material Breach*

27.     Hossain reasserts and re-alleges Paragraphs 1 through 26 of his Affirmative Defenses.

139734134.1

28.     To the extent loanDepot's claims against the Individual Defendants are based on their agreements attached to the Amended Complaint, loanDepot's claims are barred, in whole or in part, because loanDepot first breached the agreements.

29.     Prior to any alleged misconduct by the Individual Defendants, loanDepot materially breached the agreements by depriving the Individual Defendants of substantial compensation they had been owed.

30.     Among other things, loanDepot routinely – and falsely – designated bona fide self-generated loans as company-generated loans resulting in paying a lower commission to the Individual Defendants.

31.     Due to this false designation by loanDepot, the Individual Defendants routinely received commissions lower than what they were entitled to.

32.     In addition to reducing the Individual Defendants' commissions, loanDepot falsely designated self-generated loans as company-generated loans to increase its own profits.

33.     loanDepot's conduct constituted a prior material contract breach.

34.     Due to loanDepot's first material breach of contract, loanDepot's claims against the Individual Defendants based on any alleged breach of their agreements are barred.

<u>**SIXTH AFFIRMATIVE DEFENSE**</u>

**Lack of Consideration**

35.     Hossain reasserts and re-alleges Paragraphs 1 through 34 of his Affirmative Defenses as though set forth fully herein.

36.     loanDepot's claims against Hossain related to his restrictive employment covenants are barred, in whole or in part, due to a lack of consideration.

## <u>FAHEEM HOSSAIN'S COUNTERCLAIM</u>

Faheem Hossain ("Hossain" or "Counter-plaintiff"), by his attorneys, states the following as his Counterclaims against Counter-defendant loanDepot.com, LLC ("loanDepot" or "Counter-defendant"):

### <u>INTRODUCTION</u>

1.      This is an action for violations of the Lanham Act and the New York Consumer Protection Act.

2.      Hossain worked at loanDepot as a Loan Consultant until May 3, 2022, when he resigned from his position. Hossain subsequently took up employment at another mortgage lender, CrossCountry Mortgage, LLC ("CrossCountry").

3.      After Hossain resigned, loanDepot intentionally used Hossain's name, likeness, and contact information to create confusion and mislead customers into believing Hossain remained employed at loanDepot.

4.      This activity included, at least, sending out an advertisement from Hossain's former loanDepot email address, directly to consumers on June 27, 2022, after Hossain's resignation from loanDepot, thereby creating the false impression that Hossain was still employed at loanDepot.

5.      As a direct result of loanDepot's campaign, consumers were tricked into believing Bonora remained associated with and/or employed by loanDepot.

6.      This was not an isolated incident or innocent mistake, but a systematic campaign to mislead consumers regarding the status of former loanDepot employees.

7.      Indeed, loanDepot did a similar thing, to the same effect, with respect to at least two other former employees based in New York: Ilya Vaysberg and Scott Bonora.

### <u>PARTIES</u>

8.      Hossain resides in New Hyde Park, New York and is a citizen of that state.

139734134.1

9.      loanDepot is a Delaware limited liability company with its principal place of business in Orange County, California.

## JURISDICTION AND VENUE

10.     Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 because this action arises in part under the Lanham Act, 15 U.S.C. 1051 § *et seq*., and as provided for in 28 U.S.C. § 1367, this Court shall exercise supplemental jurisdiction over the state law claims asserted herein.

11.     Pursuant to 28 U.S.C. § 1391(b)(2), venue in this Court is proper because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this judicial district.

## BACKGROUND FACTS

12.     Hossain resigned from loanDepot on May 3, 2022.

13.     At the time of his resignation from loanDepot, Hossain was a Loan Consultant affiliated with loanDepot's New York branches.

14.     Following his resignation, Hossain began employment with another mortgage lender, CrossCountry.

15.     However, on June 27, 2022, several months after Hossain's departure, loanDepot sent a marketing email to customers, from Hossain's former loanDepot email address, with the subject line "Weekly Marketing Update" (the  June 2022 email").

16.     The June 2022 email advertised loanDepot's selection of home loan products. Moreover, it falsely gave the impression that Hossain remained employed at loanDepot and solicited business from consumers on that basis.

17.     The June 2022 email was part of a larger campaign to intentionally confuse consumers regarding the status of former loanDepot employees.  As mentioned above, loanDepot sent consumers similarly deceptive emails from Faheem Scott Bonora's ("Bonora") and Ilya

Vaysberg's ("Vaysberg") loanDepot email addresses in May 2022 falsely giving the impression that Bonora and Vaysberg remained employed at loanDepot and solicited business from consumers on that basis. In reality, Bonora and Vaysberg were not employed by loanDepot when these deceptive marketing emails were sent to consumers.

18.     loanDepot has also sent marketing emails to consumers from the loanDepot email addresses of other former employees, thereby misleading consumers. *See* Exhibit A (Facebook post of former loanDepot employee, Kevin Luchko, stating "[d]espite the fact that I've not been with loanDepot since January 7, 2022, I believe emails have continued to be generated and sent from my former loan email address at loanDepot (using my name, image and likeness)").

## COUNT I- FALSE ENDORSEMENT – LANHAM ACT, 15 U.S.C. §1125 (A)(1)(A)

19.     Hossain restates and realleges the allegations set forth in Paragraphs 1 through 18 as though set forth fully herein.

20.     Hossain is well known in the New York real estate market and recognized as a superior mortgage broker. There is clear commercial value in his identity and reputation, as reflected by his loyal customer base.

21.     By sending the June 2022 Email, loanDepot willfully, knowingly, and wrongfully used Bonora's name, likeness, and contact information to intentionally confuse consumers into believing he endorsed loanDepot and remained employed there, several months after his departure.

22.     loanDepot's conduct has created a likelihood of confusion with consumers who are looking to obtain mortgages.

23.     As a result of loanDepot's conduct, Hossain has been damaged by actual consumer reliance on the misleading statements, and has suffered actual injury in the form of lost revenue and profits from consumers who obtained mortgages through loanDepot, thinking that Hossain remained employed there and/or endorsed loanDepot.

139734134.1

24.    As a result of loanDepot's conduct, loanDepot has unjustly enriched itself by closing on – and earning commissions from - mortgage loans while consumers mistakenly thought that Hossain was still employed at loanDepot, and thereby benefiting from the goodwill associated with Bonora's name.

**WHEREFORE**, Counter-plaintiff respectfully requests that this Court enter an Order (a) awarding Bonora treble the amount of his damages, as determined at trial; (b) ordering loanDepot to disgorge any funds obtained through its use of Hossain's name, likeness, voice recording, or image; (c) ordering loanDepot to perform corrective advertising; and (d) awarding Hossain the costs of this action, including but not limited to attorney fees.

## COUNT II: FALSE ADVERTISEMENT – LANHAM ACT, 15 U.S.C. §1125(A)(1)(B)

25.    Hossain restates and realleges the allegations set forth in Paragraphs 1 through 24 as though set forth fully herein.

26.    Hossain is well known in the New York real estate market and recognized as a superior mortgage broker. There is clear commercial value in his identity and reputation as reflected by his loyal customer base.

27.    By sending the June 2022 email, loanDepot willfully, knowingly, and wrongfully used Hossain's name, likeness, and contact information to intentionally confuse consumers into believing he endorsed loanDepot and remained employed there, several months after his departure.

28.    loanDepot's June 2022 email was a commercial advertisement for its products and services and contained Hossain's likeness, name, and contact information in an effort to create a likelihood of confusion with consumers looking to purchase mortgages.

29.    loanDepot's June 2022 email deceived or had the tendency to deceive each consumer of mortgages that received the email, by suggesting that Hossain remained employed with loanDepot.

30.     As a result of loanDepot's conduct, Hossain has been damaged by actual consumer reliance on the misleading statements, and has suffered actual injury in the form of lost revenue and profits from consumers who purchased mortgages through loanDepot, thinking that Hossain remained employed there.

31.     As a result of loanDepot's conduct, loanDepot has unjustly enriched itself by closing on – and earning commissions from - mortgage loans while consumers mistakenly thought that Hossain was still employed at loanDepot.

**WHEREFORE**, Hossain respectfully requests that this Court enter an Order (a) awarding Bonora treble the amount of his damages, as determined at trial; (b) ordering loanDepot to disgorge any funds obtained through its use of Hossain's name, likeness, voice recording, or image; (c) ordering loanDepot to perform corrective advertising; and (d) awarding Hossain the costs of this action, including but not limited to attorney fees.

## COUNT III: VIOLATION OF NEW YORK CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES LAW, DECEPTIVE TRADE PRACTICES UNDER N.Y. GEN. BUS. LAW § 349

32.     Hossain restates and realleges the allegations set forth in Paragraphs 1 through 31 as though set forth fully herein.

33.     loanDepot's June 2022 email was sent from Hossain's former loanDepot email address, thereby identifying him by name and providing his contact information as at loanDepot.

34.     Hossain's email was sent without Hossain's consent.

35.     At the time loanDepot sent the email, Hossain was no longer working at loanDepot. Despite that, loanDepot tried to capitalize on Hossain's excellent reputation and goodwill with consumers and sent the mass email out, with the hope that consumers would purchase a mortgage through loanDepot, due to its supposed affiliation with Hossain.

139734134.1

36.     loanDepot directed the email to customers with the intent to deceive consumers into believing that Hossain remained affiliated with loanDepot, knowing full well that he had resigned prior to the mass email being sent.

37.     As a result of loanDepot's fraud on consumers, Hossain lost commissions on mortgages that loanDepot closed as a result of the confusion loanDepot intentionally caused in the mortgage marketplace.

## COUNT IV: VIOLATION OF NEW YORK CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES LAW, FALSE ADVERTISING UNDER N.Y. GEN. BUS. LAW § 350

38.     Hossain restates and realleges the allegations set forth in Paragraphs 1 through 37 as though set forth fully herein.

39.     Hossain is well known in the New York real estate market and recognized as a superior mortgage broker. There is clear commercial value in his identity and reputation as reflected by his loyal customer base.

40.     By sending the June 2022 email, loanDepot willfully, knowingly, and wrongfully used Hossain's name, likeness, and contact information to intentionally confuse consumers into believing he endorsed loanDepot and remained employed there, several months after his departure.

41.     loanDepot's June 2022 email was a commercial advertisement for its products and services and contained Hossain's likeness, name, and contact information in an effort to create a likelihood of confusion with consumers looking to purchase mortgages.

42.     loanDepot's June 2022 email deceived or had the tendency to deceive each consumer of mortgages that received the email, by suggesting that Hossain remained employed with loanDepot.

43.     As a result of loanDepot's conduct, Hossain has been damaged by actual consumer reliance on the misleading statements, and has suffered actual injury in the form of lost revenue

113

and profits from consumers who purchased mortgages through loanDepot, thinking that Hossain remained employed there.

44.      As a result of loanDepot's conduct, loanDepot has unjustly enriched itself by closing on – and earning commissions from - mortgage loans while consumers mistakenly thought that Hossain was still employed at loanDepot.

**WHEREFORE**, Counter-plaintiff respectfully requests that this Court enter an Order awarding Counter-plaintiff the following relief:

a.      Counter-plaintiff's actual damages in an amount to be determined at trial;

b.      Punitive damages;

c.      Attorneys' fees and costs;

d.      Any other relief deemed appropriate pursuant to N.Y. Gen. Bus. Law § 349; and

e.      Any other relief deemed appropriate pursuant to N.Y. Gen. Bus. Law § 350.

**COUNTER-PLAINTIFF DEMANDS TRIAL BY JURY.**

Dated:  December 27, 2022                    **FOX ROTHSCHILD LLP**

By:      */s/ Jeffrey L. Widman*
            Jeffrey Widman
            321 N. Clark Street, Suite 1600
            Chicago, IL 60654
            (312) 980-3807
            jwidman@foxrothschild.com

            Mitchell Berns
            101 Park Avenue
            New York, NY 10178
            (212) 878-7900
            mberns@foxrothschild.com


            *Attorneys for the Individual Defendants*

114

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, states that on December 27, 2022, he caused a copy of the foregoing to be served on all counsel of record via the Court's ECF system.

*/s/ Jeffrey L. Widman*

139734134.1