UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOANDEPOT.COM, LLC, | Case No. 1:22-cv-05971-LGS |
| Plaintiff, | **ECF CASE** |
| -against- | |
| CROSSCOUNTRY MORTGAGE, LLC, STANISLAV ALESHIN, KEISHA ANTOINE, ANTHONY AYALA, SCOTT BONORA, FAHEEM HOSSAIN, STUART KOLINSKY, BARRY KOVEN, DANIEL KWIATKOWSKI, JAROSLAW KWIATKOWSKI, YUSHENG LIU, ROBERT LONDON, ENRICO MARTINO, DANIEL MEIDAN, SCOTT NADLER, GIOVANNI NARVAEZ, DAVID OSTROWSKY, EMELINE RAMOS, ROBERT RAUSH, RAFAEL REYES, MICHAEL SECOR, LLEWELLYN TEJADA, ILYA VAYSBERG, ERIKA VIGNOLA, and YAN ZHENG, | |
| Defendants. | |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT.................................................................................................1

ARGUMENT........................................................................................................................2

    I.      LOANDEPOT IS LIKELY TO SUCCEED ON ITS TRADE SECRET
          CLAIMS.........................................................................................................2

          A.     The "Key Employee Agreements" ("Key Agreements") Are Not
                Relevant............................................................................................2

          B.     Compilations of "basic customer contact information" are trade
                secrets here........................................................................................4

          C.     CrossCountry's "Instructions" Do Not Rebut Wrongful Acquisition ...........5

          D.     Defendants Have Not Made a Showing of Unclean Hands ...........................6

    II.     LOANDEPOT IS LIKELY TO SUCCEED ON CONTRACT AND
          TORT CLAIMS................................................................................................8

          A.     Confidentiality and Return Provisions.....................................................8

          B.     Employee Solicitation............................................................................8

    III.    LOANDEPOT SUBSTANTIATED ITS IRREPARABLE HARM.......................10

    IV.   LOANDEPOT IS ENTITLED TO FORENSIC REMEDIATION.....................13

CONCLUSION...................................................................................................................15

# TABLE OF CONTENTS

**PAGE(S)**

## Cases

*Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.,*
578 F. Supp. 3d 467 (S.D.N.Y. 2022)...................................................................................2

*Computer Assocs. Int'l, Inc. v. Bryan,*
784 F. Supp. 982 (E.D.N.Y. 1992) ......................................................................................6

*Convergent Nonprofit Sols., LLC v. Wick,*
2019 WL 7423549 (M.D. Fla. Sept. 5, 2019).....................................................................15

*Directors Fin. Grp. v. Savino,*
2017 WL 5634601 (C.D. Cal. Feb. 7, 2017) ...................................................................4, 15

*Est. of Lennon by Lennon v. Screen Creations, Ltd.,*
939 F. Supp. 287 (S.D.N.Y. 1996) ....................................................................................7, 8

*Gen. Mills, Inc. v. Champion Petfoods USA, Inc.,*
2020 WL 915824 (S.D.N.Y. Feb. 26, 2020) .......................................................................13

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.,*
82 F. Supp. 2d 126 (S.D.N.Y. 1999)....................................................................................7

*Hund v. Cuomo,*
501 F. Supp. 3d 185 (W.D.N.Y. 2020)................................................................................14

*IME Watchdog, Inc. v. Gelardi,*
2022 WL 1525486 (E.D.N.Y. May 13, 2022).................................................................13, 14

*Intertek Testing Servs., N.A., Inc. v. Pennisi,*
444 F. Supp. 3d 303 (E.D.N.Y. Mar. 9, 2020) ..............................................................11, 12

*LaRouche v. Kezer,*
20 F.3d 68 (2d Cir.1994) ...................................................................................................13

*loanDepot.com, LLC v. Schneider,*
2022 WL 17818550 (N.D. Ill. Dec. 20, 2022)...........................................................4, 7, 13, 15

*Marsh USA Inc. v. Karasaki,*
2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008) ......................................................................13

*Medtech Prod. Inc. v. Ranir, LLC,*
596 F. Supp. 2d 778 (S.D.N.Y. 2008)...................................................................................2

*Mehlman v. Avrech,*
146 A.D.2d 753 (2d Dep't 1989) ..........................................................................................6

## TABLE OF AUTHORITIES

(CONTINUED)

**PAGE(S)**

*Mt. West Series of Lockton Cos., LLC v. Alliant Ins. Servs.*,
  2019 WL 2536104 (Del. Ch. Ct. June 20, 2019) ................................................................. 7

*N. Atl. Instruments, Inc. v. Haber*,
  188 F.3d 38 (2d Cir. 1999) ...................................................................................................... 4

*Natsource LLC v. Paribello*,
  151 F. Supp. 2d 465 (S.D.N.Y. 2001) .................................................................................. 12

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
  60 F.3d 27 (2d Cir. 1995) ...................................................................................................... 14

*Tradescape.com v. Shivaram*,
  77 F. Supp. 2d 408 (S.D.N.Y. 1999) .................................................................................... 12

*Union Home Mort. Corp. v. Payne*,
  2020 WL 4282309 (N.D. Ohio March 9, 2020) ............................................................. 5, 7

*Universal Reinsurance Co. v. St. Paul Fire & Marine Ins. Co.*,
  1999 WL 771357 (S.D.N.Y. Sept. 29, 1999) ....................................................................... 3

*Unknown Parties v. Johnson*,
  2016 WL 8188563 (D. Ariz. Nov. 18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d
  710 (9th Cir. 2017) ................................................................................................................ 13

## PRELIMINARY STATEMENT

loanDepot's opening brief (Dkt. 242, "Opening Br.") made an overwhelming evidentiary showing as to why it is entitled to a PI here. Defendants do not rebut that showing. In fact, since loanDepot filed its Opening Brief, the evidence has become worse for Defendants. A small sampling of these documents are attached as exhibits to the Decl. of Miguel A. Lopez ("Lopez Decl.").

Defendants' omissions and admissions in their "opposition" papers further support entry of a PI. Only four of the 24 Individual Defendants even bothered to submit declarations. What's more, these *Individual Defendants do not dispute that*[1]: they (and other Individual Defendants) took volumes of documents from loanDepot, the vast majority of that information constitutes loanDepot trade secrets; they are contractually required to return this information to loanDepot; they continue to possess, and have not returned, this information; and they are using this information on behalf of CrossCountry. Bonora does not deny that he solicited the Individual Defendants to leave loanDepot for CrossCountry, and Secor does not deny that he solicited Ramos (*see* Dkt. 272, 275).

Similarly, *CrossCountry admits that it*: asked Individual Defendants to transfer databases to CrossCountry (Dkt. 284, ¶ 10; Dkt. 285, ¶ 7; Dkt. 286, ¶ 5); has onboarding instructions that asked Individual Defendants to transfer prospective customer information, as well as certain loan information (Dkt. 281-1); accepted this database information knowing it came from loanDepot; and was aware of loanDepot's agreements which require (among other things) the return of loanDepot information and property (Dkt. 284, ¶ 17; Dkt. 285-2 (April 2022 email from CrossCountry's Tim

---

[1] *Compare* Dkt. 242, p. 10 (Bonora transferring loanDepot documents to USB and suspicious time in loanDepot office), *with* Dkt. 272, Bonora Decl. (not addressing same); Dkt. 242, p. 11 (Kolinsky copying and taking of loanDepot documents), *with* Dkt. 273, Kolinsky Decl. (not addressing same); Dkt. 242, pp. 6-7 (summarizing loanDepot documents taken by Secor), *with* Dkt. 275, Secor Decl. (not addressing same). *See also* Dkt. 242, pp. 7-12 (detailing numerous documents, files, and folders taken by Raush, Martino, Zheng, Kwiatowski, London, Meidan, Narvaez, Vaysberg, Antoine, Ayala, Nadler, Vignola), *with* Defendants' Opposition papers (failing to address same).

Roach noting that he has ███████████████████████████████████████); Ex. 15 (CrossCountry on notice of return provision in agreements in March 2022)).

*CrossCountry also does not dispute that*: Individual Defendants are contractually prohibited from transferring this information to CrossCountry and are contractually required to return it to loanDepot (*see* Dkt. 283, 284, 285, 286, *generally*); customer information taken from loanDepot was transferred to CrossCountry's systems and utilized to solicit business (*Id.*); and CrossCountry is aware that its employees continue to possess volumes of loanDepot information, including documents for customers that they are converting to CrossCountry. (*Id.*) loanDepot respectfully requests that the Court enter its proposed PI order (Dkt. 247).

## ARGUMENT

## I.   LOANDEPOT IS LIKELY TO SUCCEED ON ITS TRADE SECRET CLAIMS

### A.   The "Key Employee Agreements" ("Key Agreements") Are Not Relevant

The inoperative Key Agreements do not undermine the trade secret status of loanDepot's customer contact information for (at least) five reasons. *First*, all but one of the 10 Individual Defendants (Nadler) who entered into the Key Agreements also entered into the 2019 Retail Master Incentive Plan agreements ("RMIP"), which contain strict confidentiality and return provisions substantially similar to those in the 2022 Confidentiality Agreements. *See* Lopez Decl., Exs. 1-4. The RMIP's confidentiality provision supersedes "those terms of the earlier contract that are of the same subject matter" – here, the confidentiality provisions of the Key Agreements. *See Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 504 (S.D.N.Y. 2022); *Medtech Prod. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 793 (S.D.N.Y. 2008) ("the confidentiality provisions of the PIIAs are superseded by the confidentiality provisions of the General Releases").[2] "Even in the absence of an integration

---

[2] Defendants argue that the 2022 Confidentiality Agreements did not make "the treatment of basic customer contact information *retroactive*," citing *Colello v. Colello*. *See* ID Opp. at 9 (emphasis added). But that case concerns the retroactivity of an agreement's effective date, which is not the issue here.

and merger clause, a subsequent contract regarding the same subject matter supersedes the prior agreement." *Universal Reinsurance Co. v. St. Paul Fire & Marine Ins. Co.*, 1999 WL 771357, at *7 (S.D.N.Y. Sept. 29, 1999). The return provision in the RMIP also contradicts and supersedes the Key Agreements' outdated language that allowed signatories to "retain contact information"[3]:

> Upon termination of Participant's employment for any reason... Participant shall immediately deliver to Company all tangible and intangible property (including . . . **memory devices, files, data downloads and any other tangible item**)... **and documents** . . . together with all copies of any of the foregoing, and **any other material containing, summarizing, referencing, or incorporating... or otherwise disclosing any work product or Company materials**.

Lopez Decl., Exs. 1at 2-3. (emphasis added).

Second, the Key Agreements (many of which were not even with loanDepot, but with Mortgage Master) do not negate the measures **loanDepot** subsequently took to protect the confidentiality of customer contact information. Dkt. 246 ¶¶ 5-15. Third, Individual Defendants' claim that their behavior should be excused because "they were not advised of any change in the treatment of their customer lists or basic customer contact information," ID Opp. at 8, is meritless. They were advised of this change **by the express terms of the superseding written agreements they signed**, and in the final paragraph of both the RMIPs and 2022 Confidentiality Agreements, acknowledged that they read and understood the document, had an opportunity to consult counsel, and entered into the agreement of his/her own "free choice." *See* Dkt. 117-9, at 7. What's more, their reliance on the Key Agreements is belied by their own behavior: they surreptitiously worked to abscond with the customer information from loanDepot undetected, and did not openly take it with them (as they claim they believe the Key Agreements allowed them to do).

---

[3] Although Individual Defendants try to group Bonora's Branch Operator Agreement together with the Key Agreements, it has no such carve-out in its confidentiality provision.

_Fourth_, certain Defendants claim they should be excused from the 2022 Confidentiality Agreement because they signed "mere weeks before leaving loanDepot." ID Opp. at 8. They cite no legal support for this argument and it is baseless given they were party to the RMIPs for years prior. Moreover, as Judge Chang recently held in rejecting CrossCountry's Key Agreement arguments: "those prior agreements were replaced by new agreements, between 2018 to 2022, that prohibited disclosure of basic customer-contact information," and "loanDepot did take reasonable measures in the timeframe relevant to this dispute to keep basic customer-contact information secret." _loanDepot.com, LLC v. Schneider_, 2022 WL 17818550, at *6 (N.D. Ill. Dec. 20, 2022). _Finally_, Defendants' argument relies on a misreading of the Key Agreements. Those (superseded) agreements provide only that "contact information" could be "retain[ed]." But, Individual Defendants did not "retain contact information." Instead, they took detailed compilations of customer information from loanDepot's databases, along with numerous files and folders containing customer information. Defendants **_never_** had the right to **_steal_** this information from loanDepot's systems, and surreptitiously abscond with it, even under the Key Agreements. Accordingly, the Key Agreements are a non-starter.

## B.   Compilations of "basic customer contact information" are trade secrets here.

Defendants likewise fail to rebut what Judge Chang already held in the Chicago Action: that "_compilation[s]_ of ["basic customer contact"] information specific to loan customers" have "economic value" and "likely… constitutes loanDepot confidential information protectable as a trade secret." _Id._ at *4. The same is true under New York law: "A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." _N. Atl. Instruments, Inc. v. Haber_, 188 F.3d 38, 44 (2d Cir. 1999). Mortgage industry cases also recognize this: _Directors Fin. Grp. v. Savino_, 2017 WL 5634601, at *2, 4 (C.D. Cal. Feb. 7, 2017) (mortgage clients "expect [plaintiff] to protect [their information] and [plaintiff] must

keep this information private under strict federal laws."); *Union Home Mort. Corp. v. Payne,* 2020 WL 4282309, at *7 (N.D. Ohio March 9, 2020) ("strong likelihood of success" where employee forwarded "pipeline and pre-approval lists" to competitor). As already explained, *see* Opening Br. at 19, and as set forth below, loanDepot makes a substantial effort to generate its customer compilations, and keep this information in confidence.[4] And if the information was so readily accessible, Defendants would not be fighting to have this Court to bless their use of the information that they took.[5]

### C.    CrossCountry's "Instructions" Do Not Rebut Wrongful Acquisition

CrossCountry's claim that it instructed Individual Defendants not to transmit loan information does not rebut the evidence that Defendants took valuable customer data compilations from loanDepot, along with thousands of files and folders containing loanDepot information. Whether CrossCountry took possession of *all* or just *some* of the trade secrets misappropriated by Individual Defendants does not limit loanDepot's entitlement to a PI against Defendants. Individual Defendants are CrossCountry Senior VPs (Dkt. 272, ¶ 1), Branch Managers (Dkt. 274, ¶ 1), and loan officers, and continue to possess the exfiltrated data. Moreover, CrossCountry's *actions* are totally inconsistent with the "Employee Agreements" and "Confidential Information Acknowledgments" upon which it relies. CrossCountry was well aware that the "files" and "information" that it openly accepted from Individual Defendants came from loanDepot. *See, e.g.,* Ex. 6 (█████████████████████████████████ █████████████████████████████); Dkt. 243-7, at 3-4 (███████████████████████ ████████████████████████████████████████████████████████████████

---

[4] Individual Defendants claim they brought contact information with them to loanDepot.  Of the 24 Individual Defendants, the only evidence they cite is a Meidan email from 2017, a London email from 2014 to Mortgage Master, and an undated email from Kolinsky at Mortgage Master. That's it.
[5] CrossCountry's attempt to reconstruct databases of loanDepot borrower contacts proves that this information is *not* readily ascertainable. On its best day, it was estimated the undertaking might replicate ~70% of Individual Defendant's loanDepot customer database "*if it actually works*." *See* Ex. 5. Evidently it did not work, because Defendants do not submit any "reconstructed" database, and instead argue that they should be permitted to use the information that they stole from loanDepot.

██████████████ ); Dkt. 243-7, at 14 (███████████████████████

████████████████████████ ); Dkt. 243-8, at 1 (████████████████████

█████████████████████████████████ ). CrossCountry was well aware that

Individual Defendants' possession of this data was prohibited by their loanDepot agreements. For

example, ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████ Ex. 7.[6] What's more, CrossCountry's Salesforce database ingests far more

than what it conveniently self-describes as "basic customer contact information." ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ See Dkt. 286-1, at 2. This information is

valuable in generating future business. See McGowen Reply Decl. ¶ 8. In sum, CrossCountry's

"instructions" aren't worth the paper they are written on and are no shield to an PI here.

### D.   Defendants Have Not Made a Showing of Unclean Hands

loanDepot's request for injunctive relief is not barred by the unclean hands doctrine, either.

"The doctrine of unclean hands is only applicable when the conduct relied on is directly related to the

subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct."

*Mehlman v. Avrech*, 146 A.D.2d 753, 754 (2d Dep't 1989). In a case involving trade secret

misappropriation, that "mean[s] that it would have to be related to the creation or acquisition of

***the trade secrets themselves***." *Computer Assocs. Int'l, Inc. v. Bryan*, 784 F. Supp. 982, 998 (E.D.N.Y.

1992) (rejecting unclean-hands defense) (emphasis added). "The defendant who invokes the doctrine

---

[6] ████████████████████████████████████████████████ . *See* Ex. 8.

of unclean hands has the burden of proof." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 126, 130 (S.D.N.Y. 1999). CrossCountry cannot meet its burden of proving unclean hands. CrossCountry's arguments do not go to the trade secrets at issue in ***this case***, and should thus be rejected outright.[7] CrossCountry does not (and cannot) claim that any of the trade secrets at issue were taken from CrossCountry, since no Individual Defendant previously worked there. Nor can CrossCountry claim that any contact information allegedly transferred by a CrossCountry employee to loanDepot are trade secrets, given that CrossCountry has very publicly taken the shifting position that ***it now does not view its customer contact information to be confidential at all***.

CrossCountry's arguments were also already considered, and rejected, by Judge Chang, including CrossCountry's misplaced reliance on the "Marketing Checklist." *See Schneider,* 2022 WL 17818550, at *4-5 (noting that even if certain companies in the loan industry do not treat customer contact complications as trade secrets "that does not mean that loanDepot was frozen from taking steps to protect the information as a trade secret"; and "whether a list of contacts constitutes a trade secret ***is fact and context dependent*** and does not clash with the company's contention here that the contact information ***that the Individual Defendants took*** along with sensitive personal data and loan details are… a trade secret") (emphasis added).[8]

CrossCountry's legal authority cited in support of its "unclean hands" argument is inapposite. In *Est. of Lennon by Lennon v. Screen Creations, Ltd.*, 939 F. Supp. 287 (S.D.N.Y. 1996), the court declined to enjoin the termination of an agreement because the party seeking an injunction hid a conflict of

---

[7] *Accord Mt. West Series of Lockton Cos., LLC v. Alliant Ins. Servs.,* 2019 WL 2536104 (Del. Ch. Ct. June 20, 2019) (rejecting "tit-for-tat" argument in analogous context: "This court's task is not to judge the conduct of the… brokerage industry… My task is more narrow: to evaluate [plaintiff's] claims against [competitor] based on [competitor's] conduct in engineering a mass resignation from the Denver office. What may have happened in other cases does not undermine the case for an injunction.").
[8] *Payne,* 2020 WL 4282309, *7 (customer list was trade secret: "although defendant may have started the lead sheets before beginning her employment with plaintiff, she added to them during her employment").

interest in the negotiation *of that same agreement*, and misrepresented the exclusivity *of that agreement*. *Id.* at 293–94. Unlike CrossCountry's tit-for-tat argument, the conduct at issue in *Estate of Lennon* directly involved the thing in dispute (a licensing agreement).[9] In short, CrossCountry makes no unclean hands defense at all, it only attempts to create a trial-within-a-trial on unrelated sideshows.

## II.   LOANDEPOT IS LIKELY TO SUCCEED ON CONTRACT AND TORT CLAIMS

### A.   Confidentiality and Return Provisions

Defendants do not, because they cannot, dispute that Individual Defendants had loanDepot agreements that prohibited the disclosure and use of loanDepot's information regarding prospects, databases, and customers; that Individual Defendants were required to return all loanDepot property to loanDepot upon the termination of their employment; and that CrossCountry was aware of these provisions. *See* Section I(A), *supra.* As set forth above, it is also undisputed that Defendants continue to retain, and have not returned, the loanDepot property and information they took. *Id.* Defendants do not dispute that the Individual Defendants transferred information covered by their agreements to CrossCountry, and have used information covered by their agreements at CrossCountry. *Id.* Accordingly, Defendants do not rebut that loanDepot is likely to succeed on its breach of confidentiality and return provision claims, and tortious interference claims relating to same.

### B.   Employee Solicitation

CrossCountry's bald assertion that it did not induce any Individual Defendants to recruit each other is an exercise in sophistry, as is the suggestion that Individual Defendants did not recruit each other. In fact, it is borderline perjurious and belied by the written record. CrossCountry implies that

---

[9] The other two cases – *Stokely-Van Camp, Inc. v. Coca-Cola Co.* and *Nikkal Indus., Ltd. v. Salton, Inc.* – each concerned one competitor's request to enjoin the other's marketing practices as violative of the Lanham Act, when the competitor requesting an injunction engaged in the same sort of practice for the same sort of product. The present litigation is not about misrepresentations CrossCountry or loanDepot made about its similar services or products. The only similarity between the cases is that they are between competitors, which is not even an element of the unclean hands doctrine.

it solicited the Individual Defendants directly because it – and not Individual Defendants – made the employment offers. CCM Opp. at 21-22. But the non-solicitation clause prohibits soliciting or inducing, both directly and "indirectly," loanDepot employees to terminate their employment with loanDepot or *apply* for employment with another business or entity. loanDepot marshalled sufficient evidence to prove that, at least Bonora, Secor, Kwiatkowski, Reyes, Vaysberg, and Vignola each actively solicited and induced their colleagues to join them at CrossCountry. *See* Opening Br. at 5-9; Ex. 9 (Reyes discussing solicitation of Ayala).

CrossCountry's factual assertions are also false. Lieberman claims to have directly contacted the Bonora Group based on his own knowledge and search of publicly available information. Dkt. 284 ¶ 8. But this sworn assertion is rebutted by CrossCountry's own employment applications which identify Individual Defendants (and not Lieberman) as the person from whom they learned about the job opportunity: Median (" "); Raush (" "); Aleshin (" "); and Nadler (" "). *See* Opening Br. at 9. Defendants lack credibility.

CrossCountry's internal emails also show—contrary to what it claims it "ensured" against (Dkt. 282 at p. 1)—that using loanDepot employees to solicit each other was its modus operandi. For example,



Ex. 10, at 4 (emphasis added). Later,

*Id.* at 1 (emphasis added).

Finally, Individual Defendants' statements regarding their purported reasons for leaving loanDepot are (even if not fabricated for the purposes of this lawsuit) not relevant. Their complaints do not give them license to misappropriate trade secrets, or to breach their contracts and fiduciary duties. Moreover, the record undermines even these legally irrelevant factual assertions. Numerous documents reveal Individual Defendants' serious complaints **about CrossCountry**. *See, e.g.*, Ex. 11, at 2 (

); *id.* (

).[10] Simply put, the evidence supports that the Individual Defendants were solicited and induced to breach their obligations and duties to loanDepot—nothing more.[11]

## III.   LOANDEPOT SUBSTANTIATED ITS IRREPARABLE HARM

Defendants do not rebut loanDepot's showing of irreparable harm. In their oppositions, Defendants generally argue that loanDepot's allegations of irreparable harm are speculative and that mortgage lenders cannot suffer irreparable harm anyway, because the lenders have no expectation of repeat business. These arguments fail and, in making them, Defendants did not even attempt to address the evidence that loanDepot has already marshalled in support of its irreparable harm showing.

---

[10] Individual Defendants' complaints with CrossCountry also touch on issues such as loan pricing and commission calculations. *See* Ex. 12                  .
[11] Defendants also do not rebut loanDepot's showing that Individual Defendants solicited loanDepot customers for CrossCountry, both while still at loanDepot, *see* Opening Br. at 6 & 9, or after joining CrossCountry, *see* Dkt. 245, ¶ 24, or after having misappropriated confidential customer documents regarding these same customers from loanDepot, *see* Opening Br. at 7 & 11. Documents produced since loanDepot's Motion add to the evidence of CrossCountry's tortious interference, and attempts to conceal same. *See* Ex. 13                              ). For these reasons, the Court should find that loanDepot is likely to succeed on its breach of the confidentiality and customer non-solicitation provisions of their agreements (and tortious interference claims) as well.

Regarding Defendants' first argument, loanDepot's allegations of irreparable harm are not speculative—they are concrete and ongoing. A showing that "defendants were disseminating [plaintiff's] trade secrets to one of its competitors . . . is sufficient to show a likelihood of irreparable harm absent a permanent injunction." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 444 F. Supp. 3d 303, 331 (E.D.N.Y. Mar. 9, 2020). In *Intertek*, the Court found "the record is sufficient to support a finding in plaintiff's favor" because "defendants had meaningful access to important customer information and client contacts." *Id.* at 332. The same is true here. *See* Dkt. 245 ¶ 14. As in *Intertek*, loanDepot's unrebutted forensic evidence shows that "information on [Antoine's, Hossian's, Martino's, Narvaez's, Ramos's, and Raush's] laptops was erased prior to being returned to plaintiff; and . . . that [Meidan, Secor, Ramos, Raush, and Zheng] sent plaintiff's confidential information from his [plaintiff] email address to [their] personal email account[s]." 444 F. Supp. 3d at 333. Here, Individual Defendants also exfiltrated data from their loanDepot laptops by USB (Antoine, Hossian, Kolinsky, London, Martino, Meidan, Secor, and Vaysberg). *See* Opening Br. at 6-12; Declaration of Jim Vaughn (Dkt. 5), *passim*; Supplemental Declaration of Jim Vaughn (Dkt. 244), *passim*. The Individual Defendants are now **CrossCountry** executives, managers, and employees in possession of loanDepot's confidential and trade secret information; loanDepot documents remain on CrossCountry's email systems (*see* Dkt. 243-2, at 4-15, Dkt. 243-7, at 10-14); and CrossCountry uploaded loanDepot contact information for marketing and business generation and, if not enjoined, will continue to enjoy the benefits of same causing irreparable harm to loanDepot. As in *Intertek*, this is quintessential irreparable harm.

Regarding Defendants' second argument, CrossCountry argues that mortgage lenders have "little expectation of long-term customer relationships." CCM Opp. at 10, 14. This is belied by their insistence on acquiring customer databases to further these long-term customer relationships; indeed, customers often look to refinance after closing loans. Bonora, Kolinsky, Koven, and Secor also claim that their customer leads at loanDepot were "self-generated" and that "new and old customers" reach

out to them directly for mortgage assistance. (Dkt. 272 ¶¶ 9, 17; Dkt. 273 ¶¶ 9, 14; Dkt. 274 ¶¶ 11, 19; Dkt. 275 ¶¶ 3, 8). These allegations, if true, support loanDepot's position. As in *Intertek*, loanDepot is irreparably harmed because Individual Defendants "performed an integral aspect of [the] company's business development strategy, including . . . handling clients and soliciting business from existing and prospective clients . . . Indeed, the active cultivation of client relationships was the entire premise of the commission-based compensation system under which [Individual Defendants] worked." 444 F. Supp. 3d at 332. In any event, these allegations are untrue. loanDepot assigned leads to all of the Individual Defendants, including Bonora, Kolinsky, Koven, and Secor. *See* McGovern Reply Decl. ¶¶ 3-5. loanDepot also invests in an entire marketing infrastructure to support the Individual Defendants' business generation, including a business development budget for each loan officer, and special access to referral sources. *See id.* ¶ 6. There are also seven to eleven discrete roles or *entire departments* that contribute to any given mortgage closing. *Id.* ¶ 7. If it were not for this effort, loan officers would not have any business.

loanDepot also faces a continuing threat from Defendants' tortious interference with loanDepot's employee non-solicitation covenants. "The loss of training and interference with already established relationships that would occur should [Defendant] recruit other employees within the year are unquantifiable assets." *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001). As Bonora explained to Antoine when he recruited her to join loanDepot: ███████████████████ ██████████████████████████████████████████████████████████ Ex. 14. Even worse, CrossCountry's raid led to the closure of three branches. Dkt. 245 ¶ 16. The closure of the branches poses continuing "long-term damage to plaintiff's market share and reputation," which is unquantifiable and therefore constitutes irreparable harm. *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411–12 (S.D.N.Y. 1999). Having a physical location in a community is critical to generating goodwill for loanDepot, and developing relationships with referral partners. Dkt. 245 ¶ 17-19.

Finally, Defendants do not address loanDepot's sound equitable argument for extending the non-solicitation periods by the time it has taken to enforce them. *See* Opening Br. at 17 & n.5 (citing *N.Y. Real Est. Inst., Inc. v. Edelman*, 839 N.Y.S.2d 488, 489-90 (1st Dep't 2007) and *Marsh USA Inc. v. Karasaki*, 2008 WL 4778239, at *14 (S.D.N.Y. Oct. 31, 2008). CrossCountry cynically argues that "loanDepot has received the benefit of its bargain." CCM Opp. at 13. What benefit? Defendants breached (or interfered with) the non-solicitation provisions *before and after* leaving loanDepot. Not extending the restrictive periods is an injustice on loanDepot, to Defendants' benefit.

## IV.    LOANDEPOT IS ENTITLED TO FORENSIC REMEDIATION

The forensic remediation requested by loanDepot is *prohibitory*, not mandatory, and therefore the normal PI standard applies. The "'[s]tatus quo' to be preserved by a [PI] is the last actual, peaceable uncontested status which preceded the pending controversy." *LaRouche v. Kezer,* 20 F.3d 68, 74 n.7 (2d Cir.1994). The status quo was the date on which each Individual Defendant left loanDepot when they indisputably were contractually obligated to return loanDepot documents. Defendants' continued possession of these documents is not the "status quo" by virtue of their decision to keep what they stole and failed to return. *See Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, 2020 WL 915824, at *8 (S.D.N.Y. Feb. 26, 2020) (period when defendant was in breach of non-compete was *not* status quo).

Judge Chang viewed forensic remediation as preservation of the status quo under the normal PI standard. *See Schneider*, 2022 WL 17818550, at *7. The fact that Defendants will have to make their devices, accounts, or networks available to an independent forensic analyst does not make this relief mandatory. *See Unknown Parties v. Johnson*, 2016 WL 8188563, at *3 (D. Ariz. Nov. 18, 2016) ("It is not enough that the result of an injunction may be an action taken in response to it; as long as the injunction does not mandate a change in the status quo it is prohibitory."), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017). In *IME Watchdog, Inc. v. Gelardi*, 2022 WL 1525486 (E.D.N.Y. May 13, 2022), the court found that the relief sought by the plaintiff – return and destruction of all electronic

information belonging to Plaintiff that was in their possession – was a "status quo injunction . . . and applies the general standard for [PI], as opposed to the heightened legal standard." *Id.* at *5-6.

Individual Defendants do not make any arguments in opposition to loanDepot's specific request for a forensic examination of their devices and accounts. *See* Dkt. 269, generally. CrossCountry concedes that forensic inspection is justified when there is evidence an adversary has "tampered" with evidence. Dkt. 277 at p. 23. This is precisely what happened here. Individual Defendants deleted documents. And CrossCountry claims (for the first time in its opposition) that it took it upon itself to "delete[] contacts in its marketing platform for the Individual Defendants created prior to December 26, 2022" (after having it for months, and while ignoring that other loanDepot documents remain on CrossCountry's systems). *Id.* at p. 5. Aside from the fact that CrossCountry is not credible (and neither loanDepot or this Court should accept its word), this is a direct admission of evidence tampering. A forensic inspection and remediation is ***critical*** to evaluate, remediate, and preserve evidence.[12]

CrossCountry also incorrectly argues that a stricter standard is required for forensic remediation because it would give loanDepot all the relief it requests. But in the Second Circuit, "the heightened standard does not apply to 'any [request for an] injunction where the final relief for the plaintiff would simply be a continuation of the preliminary relief.'" *Hund v. Cuomo*, 501 F. Supp. 3d 185, 207 (W.D.N.Y. 2020) (quoting *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)). Instead, the heightened standard applies only if preliminary relief cannot be undone. *See Tom Doherty Assocs.*, 60 F.3d at 35. Here, the deletion of loanDepot documents from Defendants' devices, accounts, or networks can be easily undone by the forensic firm. Reply Decl. of Jim Vaughn ¶ 6. As for the return of the loanDepot documents themselves – CrossCountry cannot argue against this, since it is loanDepot's property to begin with. *See* Opening Br. at 22.  Moreover, even if the Court

---

[12] loanDepot also served on CrossCountry requests for forensic images of devices provided to the Individual Defendants. Dkt. 283-3. CrossCountry has refused to conduct a forensic investigation. Lopez Decl. ¶ 17.

finds that the forensic remediation constitutes mandatory injunctive relief, loanDepot has met that heightened standard because Individual Defendants have "a contractual obligation to return or destroy such information upon Plaintiff's request." *See Convergent Nonprofit Sols., LLC v. Wick*, 2019 WL 7423549, at *8 n.11 (M.D. Fla. Sept. 5, 2019); *see also* Opening Br. at 22.

CrossCountry's suggestion that loanDepot did not make its request for forensic remediation until seven months after filing suit is equally baseless. *See* CCM Opp. at 24. loanDepot requested forensic remediation in its Complaint on July 13, 2022. *See* Dkt. 1 at 49-50 ¶ 2. On August 23, 2022, loanDepot proposed an injunction including forensic remediation. *See* Dkt. 69-1 ¶¶ 4-6. Defendants refused. Three days later, loanDepot wrote to the Court:

> Given Defendants'… blatant and ongoing use of misappropriated loanDepot customer information to close loans, loanDepot has no choice but to seek a preliminary injunction… in an effort to minimize burden on the Court . . . loanDepot respectfully requests that the Court enter a preliminary injunction reflecting the agreed upon terms and then set a limited discovery schedule ***concerning the remaining contested scope….*** Dkt. 73 at 2 (emphasis added).

Finally, given that Individual Defendants have not returned (or even produced) to loanDepot all of the devices, files, and folders identified in the Vaughn Declarations, *see* Lopez Decl. ¶ 17, and the fact that Defendants continue to possess loanDepot documents and information, the Court should order an independent forensic analysis.[13]

## **CONCLUSION**

loanDepot requests that the Court enter the proposed order at Dkt. 247, which is materially similar to the PI order recently entered in the Chicago Action by Judge Chang and other PI orders in similar cases. *See, e.g., Directors Fin. Grp.,* 2017 WL 5634601, at *5-6.

---

[13] CrossCountry argues that loanDepot should bear the cost of the forensic vendor. It is ludicrous for Defendants to misappropriate documents from loanDepot, refuse to return them despite clear contractual obligations, and then insist that loanDepot pay to secure the return of its information. Defendants should pay for the remediation. *See Schneider,* 2022 WL 17818550 (ordering CrossCountry to pay for remediation).

Dated:  March 21, 2023                         LITTLER MENDELSON, P.C.

By: */s/ Jessica Pizzutelli*

Jessica Pizzutelli, Esq.
375 Woodcliff Drive, Suite 2D
Fairport, NY 14450
(585) 203-3414
Pizzutelli@littler.com

Miguel A. Lopez, Esq.
900 Third Avenue, 8th Floor
New York, NY 10022
(212) 583-2595
MALopez@littler.com

*Attorneys for Plaintiff loanDepot.com, LLC*