UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
LOANDEPOT.COM, LLC,
                              Plaintiff,

                -against-

CROSSCOUNTRY MORTGAGE, LLC, et al.,
                              Defendants.
-------------------------------------------------------------X

22 Civ. 5971 (LGS)

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

      Plaintiff loanDepot.com, LLC ("loanDepot") brings this action against Defendant CrossCountry Mortgage, LLC ("CrossCountry") and several former loanDepot employees who now work for CrossCountry (the "Individual Defendants"). The Complaint alleges misappropriation of trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA") and related state law claims. The gravamen of the Complaint is that Individual Defendants (1) wrongfully retained loanDepot's confidential information when they left loanDepot with the aim of diverting loanDepot's customers and business and (2) solicited their loanDepot colleagues to leave for CrossCountry as well.

      On September 15, 2022, a temporary restraining order (the "TRO") was entered against Defendants. The TRO bars Defendants from using or disclosing loanDepot documents and information retained by Individual Defendants after they left loanDepot, but does not preclude them from using or disclosing basic customer contact information that they possess independent of any loanDepot documents. The TRO does not enjoin the solicitation of loanDepot employees, because Plaintiff did not show a likelihood of irreparable harm on that issue. On September 30, 2022, with Defendants' consent, the TRO was extended until the resolution of Plaintiff's motion for preliminary injunction.

Following a period of expedited discovery, Plaintiff moves for a preliminary injunction to extend the requirements of the TRO and (1) enjoin the solicitation of loanDepot employees, (2) enjoin the use or disclosure of basic customer contact information and (3) require a forensic examination of certain devices for such information and require the return of that information at Defendants' expense. For the following reasons, Plaintiff's motion is GRANTED in part and DENIED in part.

I. BACKGROUND

The following facts are taken from the parties' submissions on this motion. The facts are undisputed unless otherwise noted. *See Mullins v. City of New York*, 626 F.3d 47, 51-52 (2d Cir. 2010) ("[T]he decision of whether to award preliminary injunctive relief is often based on . . . evidence that is less complete than in a trial on the merits."); *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 276 n.3 (2d Cir. 2021) ("[C]ourts may consider hearsay evidence such as affidavits when determining whether to grant a preliminary injunction."); *see also 725 Eatery Corp. v. City of New York*, 408 F.Supp.3d 424, 455 (S.D.N.Y. 2019) (noting that, for purposes of a preliminary injunction, a party "is not entitled to have the court accept its untested representations as true if they are disputed").[1]

Between February and May 2022, Individual Defendants left their employment at loanDepot branches in New York to join competitor CrossCountry. When they left, they accessed, downloaded and took client data, including compilations of customer contact information -- addresses, phone numbers and emails. loanDepot alleges that this customer contact information is a proprietary trade secret, and that Individual Defendants, in concert with

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes and citations are omitted.

CrossCountry, violated federal trade secret law and breached contractual and fiduciary obligations.  loanDepot also alleges that some of the Individual Defendants conspired with CrossCountry to poach other loanDepot employees away from loanDepot, in contravention of their non-solicitation agreements.

When Individual Defendants were first hired at loanDepot, many of them signed employment contracts -- or "Key Employee Agreements" -- that permitted them to retain and use contact information for loan customers and prospects developed by Individual Defendants while working at loanDepot.  Several of the Individual Defendants, who joined loanDepot through its acquisition of another lender, had similar agreements that carried over from their prior employer. However, Individual Defendants entered into later agreements (the "Subsequent Agreements")[2] with loanDepot, that loanDepot contends retracted the exemption allowing employees to retain customer contact information.  Each Individual Defendant also agreed to return to loanDepot all confidential information upon the termination of employment, and not to "share, copy, transmit, or use such Confidential Information or property."  The Subsequent Agreements also contain employee non-solicitation clauses, preventing them, for various timeframes, from soliciting or inducing any other loanDepot employee to terminate employment with loanDepot or apply for employment elsewhere.

---

[2] Each of the Individual Defendants entered into one of the following: the Retail Master Incentive Plan ("RMIP"); the 2020 Employee Confidentiality, Work Product, Intellectual Property, and Non-Solicitation Agreement ("2020 Confidentiality Agreement"); or the 2022 Employee Confidentiality, Work Product, Intellectual Property, and Non-Solicitation Agreement ("2022 Confidentiality Agreement").  Collectively, they are referred to below as "the Subsequent Agreements."

## II. STANDARD

To prevail on a motion for a preliminary injunction, the movant must "show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). That is the applicable standard here.

The higher standard for so-called mandatory injunctions is inapplicable. When a plaintiff seeks a preliminary injunction that will "alter the status quo," it "must demonstrate a *substantial* likelihood of success on the merits." *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 223 (2d Cir. 2021). But "[t]he 'status quo' in preliminary-injunction parlance is really a 'status quo ante'" -- "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League*, 883 F. 3d at 37 & n.5. Here, Plaintiff's proposal to enjoin Defendants from breaching their employee non-solicitation agreements and using basic customer contact information taken from loanDepot does not "alter the status quo." *Hartford Courant*, 986 F.3d at 223. Instead, it seeks to revert to the "last actual, peaceable uncontested status" prior to when Individual Defendants allegedly took confidential information from loanDepot and poached loanDepot employees. *N. Am. Soccer League*, 883 F. 3d at 37.

## III. DISCUSSION

As a preliminary note, a nearly identical case, *loanDepot.com, LLC v. Schneider*, 22 Civ. 6105, is pending before the United States District Court for the Northern District of Illinois (in text below, the "Chicago Action"). There, loanDepot is suing CrossCountry and a handful of former employees from its Chicago-area offices who allegedly took confidential client information with them when they left for jobs at CrossCountry, and who allegedly breached their

4

non-solicitation agreements with loanDepot by recruiting other loanDepot employees to CrossCountry. There, as here, loanDepot brings claims under the DTSA and applicable state law. On December 20, 2022, Judge Edmond Chang granted loanDepot's motion for a preliminary injunction in the Chicago Action, enjoining the defendants from using the basic customer contact information they took with them to contact or solicit prospective customers. *See loanDepot.com, LLC v. Schneider*, 22 Civ. 6105, 2022 WL 17818550 (N.D. Ill. Dec. 20, 2022). The injunction also bars the individual defendants from soliciting loanDepot employees. *Id.* at *9. The defendants were also ordered to return documents to loanDepot containing customer information, and were warned of the importance of preserving all relevant evidence for the pendency of the litigation. *Id.*

Although the preliminary injunction order in the Chicago Action is not binding here, and in some respects may be factually different, it is a useful reference and is discussed below.

### A. Solicitation of loanDepot Employees

Individual Defendants each signed non-solicitation agreements with loanDepot. Those who signed the RMIP and 2020 Confidentiality Agreements agreed that "while in the employment of [loanDepot] and for a period of one (1) year after the termination of that employment regardless of reason," they would not "solicit or induce, directly or indirectly . . . an employee . . . of [loanDepot] to terminate or breach his or her employment . . . with [loanDepot] or apply for employment or a contractor relationship with any person, business or entity." Individual Defendants who signed the 2022 Confidentiality Agreement agreed "while in the employment of loanDepot" not to "solicit or induce, directly or indirectly . . . an employee . . . of loanDepot to terminate that individual's employment . . . with loanDepot or apply for employment or a contractor relationship with any person, business or entity." They also agreed

5

"for a period of one (1) year" after the end of employment not to "use any unlawful or improper means" to solicit or induce loanDepot employees to terminate their employment or apply for employment elsewhere.

### 1. Irreparable Harm

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023). To succeed, Plaintiff "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.*

Plaintiff has not shown a threat of irreparable harm sufficient to support a preliminary injunction against solicitation of its employees because Plaintiff has not offered any evidence that solicitation of its employees is actual and imminent. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) ("[I]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). While Plaintiff argues that its current employees are "potential targets for solicitation," the harm it posits is conjectural. Plaintiff effectively concedes this point when it states "even if Defendants have not solicited other loanDepot employees does not mean that they will not do so."

In their employment contracts with loanDepot, Individual Defendants "acknowledge[d] that monetary damages alone will not be a sufficient remedy for . . . breach of any provision" of loanDepot's confidentiality or non-solicitation agreements, and that loanDepot "shall be entitled to specific performance, injunctive relief, or . . . other equitable relief . . . ." Such clauses in employment contracts "do[] not control the question whether preliminary injunctive relief is

6

appropriate." *JTH Tax, LLC*, 62 F. 4th at 674.  While ex-ante acknowledgements that a party may obtain injunctive relief "may be entitled to weight," magic words in a contract do not alone turn what might otherwise be a "remote" or "speculative" injury into one that is "actual and imminent."  *Id.* at 672-74.  A plaintiff "must present the district court with *actual evidence* . . . that the plaintiff 'will suffer an injury that is neither remote nor speculative, but actual and imminent.'"  *Id*. at 673 (emphasis added).

Plaintiff's argument regarding "yet another raid by CrossCountry" after the issuance of the TRO also fails.  Plaintiff offers the declaration of Mark McGowen, a loanDepot officer who states that, "since the filing of this lawsuit, CrossCountry has raided another loanDepot branch (causing its shuttering) in Georgia."  The declaration provides no further details of the alleged raid, nor does it explain how a raid on a loanDepot branch in Georgia is relevant to "the viability of loanDepot's Manhattan, Astoria, and Brooklyn locations."  The exhibit attached to Mr. McGowen's declaration shows that the last New York-area employee to leave loanDepot for CrossCountry did so in May 2022, four months before the TRO issued.[3]

As loanDepot has not shown an "actual and imminent" risk of irreparable harm, Plaintiff's request for a preliminary injunction against the solicitation of loanDepot's employees is denied.

B. Basic Customer Contact Information

As in the Chicago Action, loanDepot has made a sufficient showing to enjoin CrossCountry from using basic customer contact information that loanDepot former employees brought with them from loanDepot when they went to work for CrossCountry, as set forth in the

---

[3] In contrast, the preliminary injunction in the Chicago Action included a bar on the individual defendants' solicitation of loanDepot employees.  *See Schneider*, 2022 WL 17818550, at *7.  loanDepot may have made a stronger evidentiary showing of imminent harm in that case, or Seventh Circuit law may be less demanding than the Second Circuit's requirement of an evidentiary showing that the harm be "actual and imminent."

7

separate Preliminary Injunction Order. For the same reasons, Defendants shall return all copies of documents containing such information.

### 1. Irreparable Harm

loanDepot has established that irreparable harm would result if Defendants are not enjoined from using basic customer contact information. "A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will . . . irreparably impair the value of those secrets." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009); *accord KCG Holdings, Inc. v. Khandekar*, No. 17 Civ. 3533, 2020 WL 1189302, at *16 (S.D.N.Y. Mar. 12, 2020). If Defendants misappropriated customer contact information, there is danger both that Individual Defendants will impair the information's value by sharing it with their new employer and colleagues, and that CrossCountry will impair its value by using it to interfere in loanDepot's customer relationships. *See Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 15 Civ. 211, 2021 WL 1553926, at *13 (S.D.N.Y. Apr. 20, 2021). For example, Mr. McGowen's declaration states that Individual Defendants have closed loans at CrossCountry with several dozen loanDepot customers whose contact information they took when they left loanDepot.

"It is well established in this Circuit that the loss of client relationships and customer goodwill . . . generally constitutes irreparable harm." *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 105 (S.D.N.Y. 2021). "That is because 'it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.'" *Id.* As the court in the Chicago Action observed, "[d]amages [to loanDepot] would have to be calculated customer-by-customer, likely devolving into dozens of mini-trials to determine if a customer left or did not borrow

through loanDepot because of the Defendants' allegedly illegal conduct or, instead, for other, permissible reasons." *Schneider*, 2022 WL 17818550, at *6.

Individual Defendants do not contest that loanDepot might suffer irreparable harm without an injunction against their use of customer contact information. Instead, they argue that "the basic customer and other contact information are not trade secrets under New York law," precluding any claim to harm by Plaintiff flowing from Defendants' misappropriation of that information. As discussed below, however, loanDepot has shown that the customer contact information is a trade secret under the DTSA.

### 2. Serious Questions on the Merits -- Defend Trade Secrets Act Claim

Once a party seeking a preliminary injunction has established irreparable harm, it must show "either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party." *N. Am. Soccer League*, 883 F.3d at 37. loanDepot has demonstrated serious questions on the merits of its DTSA claim.

To prevail on a DTSA claim, the plaintiff must establish that (1) it possessed a trade secret and (2) the defendant misappropriated the trade secret. 18 U.S.C. § 1836(b)(1). Because the requirements for a trade secret misappropriation claim are similar under both federal and New York state law, "[d]istrict courts [in New York] often rely on cases discussing misappropriation under New York law to analyze DTSA claims." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020).

The parties dispute whether the basic customer contact information that Individual Defendants took with them when they left loanDepot is a trade secret. Under the DTSA, the term "trade secret" includes "all forms and types of financial, business, scientific, technical, economic, or engineering information" if (1) "the owner thereof has taken reasonable measures to keep such

9

information secret" and (2) "the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). "The question of whether or not a customer list is a trade secret is generally a question of fact." *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir. 1991); *accord NES Baseball & Softball Facility, Inc. v. Ne. Angels Softball, LLC*, No. 22 Civ. 9158, 2022 WL 17370117, at *12 (S.D.N.Y. Dec. 2, 2022).

      a. <u>Reasonable Measures to Keep the Information Secret</u>

Plaintiff is likely to be able to prove the first requirement for a trade secret, that Plaintiff employed reasonable secrecy measures. Such measures may include "the use of confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential in an employee handbook, and frequently reminding employees of the need to maintain confidentiality." *Ad Lightning Inc. v. Clean.io, Inc.*, No. 19 Civ. 7367, 2020 WL 4570047, at *3 (S.D.N.Y. Aug. 7, 2020); *see also Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 21-952, 2022 WL 701161, at *2 (2d Cir. Mar. 9, 2022) (summary order) (stating that whether a measure is reasonable "depend[s] in significant part on the nature of the trade secret at issue," and that a court assessing reasonableness "will often focus on who is given access, and on the importance of confidentiality and nondisclosure agreements to maintaining secrecy"). loanDepot has submitted the declaration of Mike Brown, its Senior Vice President of IT Infrastructure and Operations, attesting that loanDepot has taken several of these measures to protect its trade secrets. Plaintiff requires all of its employees to enter into confidentiality agreements. Plaintiff also has each employee review and electronically acknowledge its Employee Handbook and the company's Information Security Policy. The

company uses password-protection and restrictive-access and encryption protocols to prevent access to customer contact information by those without a business need.

Defendants contest the sufficiency of these secrecy measures. They argue that loanDepot's Key Employee Agreement allowed employees "to retain and use customer contact information in future employment," therefore defeating any claim that loanDepot shielded this information from disclosure. But the terms of the Key Employee Agreements were superseded by the Subsequent Agreements, at least one of which each Individual Defendant signed at various points from 2019 to 2022. The Subsequent Agreements, Individual Defendants admit, do not permit Individual Defendants to retain their customer contact information.

Individual Defendants argue instead that, because most of them entered into the Subsequent Agreements "mere weeks before leaving loanDepot," those agreements cannot bind Defendants. But no case law supports the proposition that the terms of an employment contract are void because an employee departs the job shortly after signing the contract. Likewise unsupported is Defendants' contention that "the lack of retroactive language in the newer employment agreements" somehow renders them inapplicable to previously obtained customer contact information. New York's common-law doctrine of contract merger dictates that "[w]hen parties who have entered first into one agreement subsequently enter into a second regarding the same subject matter, the first agreement 'merges' with the second, and the terms of the second agreement control." *Nat'l Lab. Rels. Bd. v. Newark Elec. Corp.*, 14 F.4th 152, 166 (2d Cir. 2021) (New York law); *see also id.* ("Under New York law . . . a subsequent contract regarding the same matter will supersede the prior contract."). While the Key Employee Agreements may have permitted employees to retain and use customer contact information, the superseding Subsequent Agreements imposed stricter confidentiality constraints.

11

Nor have Defendants convincingly argued that loanDepot employees were not, upon signing the Subsequent Agreements, "advised of any change in the treatment of their customer lists or basic customer contact information." This argument fails because the terms of the Subsequent Agreements themselves provided sufficient notice of the change in the treatment of customer contact information. *See Level Exp. Corp. v. Wolz, Aiken & Co.*, 305 N.Y. 82, 87 (1953) ("He who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them."); *accord ABR Wholesalers, Inc. v. King*, 172 A.D.3d 1929, 1931 (4th Dept. 2019). The upshot of those Subsequent Agreements -- that customer contact information was to be treated as confidential and proprietary information -- was reinforced by other secrecy measures adopted by loanDepot, including password-protection and the confidentiality provisions in its employee handbook, none of which Defendants dispute. These multiple secrecy measures by loanDepot suffice to meet the first prong of the DTSA's "trade secret" definition.

    b. Independent Economic Value

To qualify as a trade secret, the DTSA next requires that "the information derive[] independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). Plaintiff carries its burden of showing sufficiently serious questions on the merits of its claim. The declaration of Mark McGowen states that the holder of the customer contact information has "invaluable insight into how to strategically market to [loanDepot] customers in the future." As the decision granting the preliminary injunction in the Chicago Action stated, the "extensive downloading and spiriting

12

away of the information . . . circumstantially show that basic customer-contact information indeed does have economic value." *Schneider*, 2022 WL 17818550, at *4.

Defendants' argument that the basic customer contact information cannot qualify as a trade secret because that information is readily ascertainable is unconvincing. While that information *may* be recreated through public databases, such as CoreLogic and NeighborWho, the possibility of ex-post recreation of the information does not alter the reality that assembling the list from scratch would require a substantial investment of time and resources. Even if Individual Defendants have been able to recreate lists of customers and their contact information since the commencement of this litigation, this is not the course by which Defendants initially opted to acquire that information. *See N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 46 (2d Cir. 1999) ("[R]egardless of whether [Defendants] could generate the list on its own, [they] did not."); *see also Schneider*, 22 WL 17818550 at *4 ("[D]espite CrossCountry's contention . . . that this kind of information is available at the push of the button, no record evidence supports the notion that the compilation is readily replicable from public sources."). Individual Defendants instead took the information with them when they left loanDepot -- even though that information purportedly could be replicated through independent means -- which strongly suggests a desire to avoid the potentially painstaking effort to research, compile and collate client contact information.

Plaintiff has shown serious questions on the merits of proving that the basic customer contact information is a trade secret under the DTSA.

    c. Misappropriation

Once a plaintiff has demonstrated its possession of a trade secret, to prevail on its DTSA claim it must show that the defendants misappropriated the trade secret. 18 U.S.C. § 1836(b)(1).

The DTSA defines "misappropriation" to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret" or "knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who had used improper means to acquire the trade secret." 18 U.S.C. § 1839(5). Improper means include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1839(6).

Individual Defendants do not dispute that they took client information from loanDepot's servers when they left, but instead rest their argument on the contention that the basic customer contact information is not a trade secret. As discussed above, this argument fails.

CrossCountry contends that loanDepot cannot establish that CrossCountry misappropriated any trade secrets because "CrossCountry had no basis to know, and loanDepot has no evidentiary support to establish it knew, that Individual Defendants retained or used any of loanDepot's confidential information." CrossCountry points to the Employee Agreement and Confidentiality Information Acknowledgement that all of the Individual Defendants signed when they began work at CrossCountry. These agreements "contained acknowledgements that [Individual Plaintiffs] did not retain, and would not use, confidential information from loanDepot."

But in light of evidence adduced in discovery so far, these agreements do not absolve CrossCountry of liability for misappropriating loanDepot's trade secrets. For example, loanDepot submitted a chat between Individual Defendant Scott Nadler and a CrossCountry executive, dated March 15, 2022, in which Nadler expressed his concern that "language in [his]

14

current agreement with [loanDepot] about solicitation and confidential information" could cause loanDepot to "[go] after [him] for breach of the agreement," and accordingly requests an indemnification provision from CrossCountry.  Nadler's annotations to his later Employment Agreement suggest that CrossCountry did provide him with indemnification against future litigation by loanDepot.  A chat with another Individual Defendant Rafael Reyes shows that Reyes also received an indemnification agreement from CrossCountry.  These arrangements belie CrossCountry's contention that it "had no basis to know . . . that the Individual Defendants retained or used any of loanDepot's confidential information."

Plaintiff has presented sufficient evidence that it possesses a trade secret in its customer contact information, and that Defendants misappropriated that trade secret, to show serious questions going to the merits of the DTSA claim.

### 3. Balance of Harms and Public Interest

To obtain a preliminary injunction, a movant who makes a showing of irreparable harm and raises "serious questions on the merits" must also show that "a balance of hardships decidedly favor[s] the moving party; and . . . that a preliminary injunction is in the public interest." *N. Am. Soccer League*, 883 F.3d at 37.  Plaintiff has made an adequate showing here.

A preliminary injunction enjoining the use of customer contact information taken by Individual Defendants neither prevents those Individual Defendants from working for CrossCountry, nor deprives CrossCountry of the opportunity to compete for business with loanDepot.  Contrary to Individual Defendants' suggestion that loanDepot seeks to interfere with their relationships, a preliminary injunction would not preclude consumers from "reach[ing] out directly to loan officers, through text, email, phone and otherwise."  Nothing in the preliminary injunction prevents a would-be customer from affirmatively contacting one of the Individual

15

Defendants.  Nor are borrowers inhibited from using the loan provider of their choice or, as CrossCountry alleges, forced to seek their loans from loanDepot.  Because the preliminary injunction binds only Defendants, and not consumers, the public interest is not adversely affected.

CrossCountry argues, as it did in the Chicago Action, that the preliminary injunction would gin up "endless litigation," as "loanDepot will claim CrossCountry has violated the preliminary injunction order every time a customer who happens to be listed on a loanDepot document initiates a loan with CrossCountry."  *See Schneider*, 2022 WL 17818550, at *7.  There is no evidence that the Chicago injunction, entered in December 2022, has given rise to "endless litigation" -- nor is there reason to think that would happen here.

CrossCountry also raises the affirmative defense of unclean hands, alleging that loanDepot engaged in substantially the same misconduct by hiring employees from CrossCountry, and requesting them to bring client contact information with them.  This argument fails.  "Under New York law, the doctrine of unclean hands is never used unless the plaintiff is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is *directly related* to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct.'"  *Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 122 (S.D.N.Y. 2020) (New York law) (emphasis added).  "If the alleged misconduct is unrelated to the claim to which it is asserted as a defense, it does not constitute unclean hands."  *Nostrum Pharms., LLC v. Dixit*, No. 13 Civ. 8718, 2016 WL 5806781, at *20 (S.D.N.Y. Sept. 23, 2016).  The defendant bears the burden of proving an affirmative defense.  *See Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*, 54 F.4th 115, 122 (2d Cir. 2022).  Whether or not loanDepot encourages its new hires to bring along client information is irrelevant to the subject of this litigation: whether Individual Defendants, in breach of their agreements with loanDepot, took confidential and

proprietary information with them when they left and poached other loanDepot employees. *See, e.g.*, *Jackpocket, Inc. v. Lottomatrix NY LLC*, No. 22 Civ. 5772, 2022 WL 17733156, at *55 (S.D.N.Y. Dec. 7, 2022) (finding in a trademark infringement action that the "alleged unclean hands must relate to plaintiff's acquisition or use of the . . . trademark, and does not apply to issues which are collateral to the infringement litigation."); *Am. Home Energy Inc. v. AEC Yield Cap. LLC*, No. 21 Civ. 1337, 2022 WL 595186, at *17 (E.D.N.Y. Feb. 28, 2022) (finding defendant asserted a viable unclean hands defense because "the allegedly fraudulent conduct [was] directly related to the subject matter of the litigation . . . as that case concerns the *same* agreements and business relationships.") (emphasis added).

    **4. Other Requested Relief**

Plaintiff requests an order for a forensic inspection of Defendants' devices and accounts, and a forensic protocol to accomplish the return and remediation of loanDepot documents, at Defendants' expense. This application is denied. As stated above, loanDepot is entitled to an order requiring Defendants to return customer contact information to loanDepot. This relief is consistent with the return provisions of the Subsequent Agreements, which require Individual Defendants to return promptly any loanDepot documents taken upon the termination of their employment at loanDepot, including information contained on USB devices. However, the further relief of forensic intervention is not warranted. "Forensic examinations of computers and cell phones are generally considered a drastic discovery measure because of their intrusive nature." *Aminov v. Berkshire Hathaway Guard Ins. Companies*, No. 21 Civ. 479, 2022 WL 818944, at *1 (E.D.N.Y. Mar. 3, 2022).

Finally, Defendant CrossCountry requests in a footnote that loanDepot be required to post a bond pursuant to Federal Rule 65(c), because "CrossCountry will be substantially harmed from

17

the issuance of . . . an injunction when it ultimately prevails on the merits of its defenses." Rule 65(c) "indicates that the District Court is vested with wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm." *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996); *accord Chanel, Inc. v. Lin*, No. 23 Civ. 2004, 2023 WL 2574946, at *4 (S.D.N.Y. Mar. 20, 2023). Because CrossCountry has not convincingly established a likelihood of harm flowing from the issuance of a preliminary injunction, loanDepot is not required to post a bond.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion is GRANTED in part and DENIED in part. A preliminary injunction order will be entered separately.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 241.

Dated: June 8, 2023
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE